**No. 26-2696 (consolidated with Nos. 26-2636 & 26-2675)**

# In the United States Court of Appeals for the Seventh Circuit

UNITED STATES OF AMERICA AND
COMMODITY FUTURES TRADING COMMISSION,
*Plaintiffs-Appellees*,

*v.*

STATE OF WISCONSIN AND JOSHUA L. KAUL,
IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF WISCONSIN,

*Defendants.*

*v.*

AMERICAN GAMING ASSOCIATION,

*Proposed Intervenor-Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN, NO. 2:26-CV-749-WCG

## OPENING BRIEF AND SHORT APPENDIX OF APPELLANT AMERICAN GAMING ASSOCIATION

Kevin F. King
*Counsel of Record*
Matthew J. Glover
Sameer Aggarwal
Hassan Ahmad
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for American Gaming Association*

September 21, 2026

Save As Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2696

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

American Gaming Association

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Covington & Burling LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Kevin F. King Date: 09/21/2026

Attorney's Printed Name: Kevin F. King

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 850 Tenth Street NW

Washington, DC 20001

Phone Number: (202) 662-5488 Fax Number: (202) 788-5488

E-Mail Address: kking@cov.com

Save As　　Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2696

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Gaming Association

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Covington & Burling LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Matthew J. Glover　Date: 09/21/2026

Attorney's Printed Name: Matthew J. Glover

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 850 10th Street NW

Washington, DC 20001

Phone Number: (202) 662-5430　Fax Number:

E-Mail Address: MGlover@cov.com

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2696

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Gaming Association

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Covington & Burling LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Sameer Aggarwal Date: 09/21/2026

Attorney's Printed Name: Sameer Aggarwal

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 850 10th Street NW

Washington, DC 20001

Phone Number: (202) 662-5434 Fax Number:

E-Mail Address: SAggarwal@cov.com

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2696

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
American Gaming Association

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Covington & Burling LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Hassan Ahmad    Date: 09/21/2026

Attorney's Printed Name: Hassan Ahmad

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 850 10th Street NW
Washington, DC 20001

Phone Number: (202) 662-5514    Fax Number:

E-Mail Address: HAhmad@cov.com

rev. 12/19 AK

**TABLE OF CONTENTS**

**Page**


TABLE OF AUTHORITIES .......... iv

GLOSSARY .......... xii

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 4

STATEMENT OF THE ISSUES .......... 5

STATEMENT OF THE CASE .......... 6

A. AGA Members Offer Legal, Regulated Gaming in Wisconsin and Nationwide. .......... 6

B. Prediction Markets Offer Sports Betting in Violation of Wisconsin Law. .......... 7

C. Procedural History .......... 12

SUMMARY OF ARGUMENT .......... 15

STANDARD OF REVIEW .......... 19

ARGUMENT .......... 20

I. AGA Satisfies Rule 24's Requirements for Intervention .......... 20

A. AGA Is Entitled to Intervene as of Right Under Rule 24(a). .......... 20

1. AGA's Motion Was Timely. .......... 21

2. AGA Has a Direct, Significant, and Legally Protectable Interest in this Litigation .......... 23

3. The Disposition of This Action Could Impair AGA's Interests. .......... 28

4. The Existing Parties Do Not Adequately Represent AGA's Interests....30

B. Alternatively, AGA Should Have Been Permitted to Intervene Under Rule 24(b). ....36

II. The District Court Did Not Abuse Its Discretion in Denying the CFTC's Preliminary-Injunction Motion. ....39

A. The CFTC Is Unlikely to Succeed on the Merits. ....40

1. Prediction Markets Offer Sports Bets. ....40

2. Prediction Markets' Sports Bets Are Not "Swaps." ....47

3. The CEA Does Not Preempt State Gaming Laws. ....59

B. The CFTC Has Not Established Irreparable Harm. ....68

C. The Equities Favor Wisconsin and AGA. ....70

CONCLUSION ....74

CERTIFICATE OF COMPLIANCE....75

CERTIFICATE OF SERVICE....76

CIRCUIT RULE 30(d) STATEMENT ....77

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) ........ 1

*Atlantic Mutual Ins. Co. v. Nw. Airlines, Inc.*,
24 F.3d 958 (7th Cir. 1994) ........ 22

*Berger v. North Carolina State Conference of the NAACP*,
597 U.S. 179 (2022) ........ 30

*Blue Lake Rancheria v. Kalshi, Inc.*,
2026 WL 2728466 (9th Cir. Sep. 16, 2026) ........ 2, 10, 24, 40, 43, 61

*Bost v. Ill. State Bd. of Elections*,
75 F.4th 682 (7th Cir. 2023) ........ 19, 23, 27, 30, 31, 32, 34, 35, 36

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021) ........ 39

*City of Chicago v. Fulton*,
592 U.S. 154 (2021) ........ 53

*Clorox Co. v. S.C. Johnson & Son, Inc.*,
627 F. Supp. 2d 954 (E.D. Wis. 2009) ........ 22

*Connecticut v. U.S. Dep't of the Interior*,
344 F. Supp. 3d 279 (D.D.C. 2018) ........ 26, 29, 34

*Crossroads Grassroots Pol'y Strategies v. FEC*,
788 F.3d 312 (D.C. Cir. 2015) ........ 34

*Driftless Area Land Conservancy v. Huebsch*,
969 F.3d 742 (7th Cir. 2020) ........ 4, 21, 29, 30, 31, 32, 33, 34, 35

*Dubin v. United States*,
599 U.S. 110 (2023) ........ 51

*Faulman Inv., Ltd. v. Engineered Prods. & Servs., Inc.*,
2026 WL 962840 (E.D. Wis. Apr. 9, 2026) .......... 37

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 51

*Flying J, Inc. v. Van Hollen*,
578 F.3d 569 (7th Cir. 2009) .......... 5, 27, 29, 38

*Forest County Potawatomi Cmty. v. United States*,
317 F.R.D. 6 (D.D.C. 2016) .......... 26, 27, 28, 34

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003) .......... 34

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 60

*Griffith v. Univ. Hosp., LLC*,
249 F.3d 658 (7th Cir. 2001) .......... 19

*Illinois v. City of Chicago*,
912 F.3d 979 (7th Cir. 2019) .......... 4

*KalshiEX, LLC v. Assad*,
2026 WL 2543846 (9th Cir. Aug. 28, 2026) .......... 2, 25, 40-45, 47, 48
.......... 50-51, 55-59, 63-67, 69-71, 73

*KalshiEX LLC v. Bird*,
2026 WL 2691009 (S.D. Iowa Sep. 8, 2026) .......... 53, 54, 55

*KalshiEX LLC v. Cafferelli*,
2026 WL 2294589 (D. Conn. Aug. 10, 2026) .......... 47, 48, 50, 67, 69

*KalshiEX LLC v. Cox*,
2026 WL 2241564 (D. Utah Aug. 4, 2026) .......... 61, 63, 67

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 42, 63, 66

*KalshiEX LLC v. Hendrick*,
2025 WL 1901399 (D. Nev. June 2, 2025) .......... 16, 17, 26, 28, 36, 37

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) .......................................... 25, 53

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ............................................. 66, 69

*KalshiEX, LLC v. Schuler*,
2026 WL 657004 (S.D. Ohio Mar. 9, 2026) .................................. 14, 25

*KalshiEX LLC v. Schuler*,
2026 WL 1295806 (6th Cir. Apr. 24, 2026) ...................... 14, 61, 66, 70

*Kansas v. Garcia*,
589 U.S. 191 (2020) .................................................................. 62

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*,
422 F.3d 490 (7th Cir. 2005) .................................................... 27

*Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*,
924 F.3d 375 (7th Cir. 2019) .................................... 21, 22, 23, 28, 29

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) .................................................................. 60

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .................................................................. 61

*Minocqua Brewing Co. v. Hess*,
160 F.4th 849 (7th Cir. 2025) ..................................................... 20

*Mova Pharm. Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998) ............................................. 22, 28

*Murphy v. NCAA*,
584 U.S. 453 (2018) ................................................ 1, 57, 58, 59, 64

*N. Am. Derivatives Exch., Inc. v. Nevada*,
2025 WL 4670470 (D. Nev. Sep. 9, 2025) ............................. 22, 25, 37

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
928 F.3d 639 (7th Cir. 2019) ..................................................... 64

*NFIB v. OSHA*,
595 U.S. 109 (2022) .......... 58

*Nissei Sangyo Am., Ltd. v. United States*,
31 F.3d 435 (7th Cir. 1994) .......... 21

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) .......... 63

*Patriotic Veterans, Inc. v. Indiana*,
736 F.3d 1041 (7th Cir. 2013) .......... 59

*Planned Parenthood of Wis., Inc. v. Kaul*,
942 F.3d 793 (7th Cir. 2019) .......... 30

*Pulsifer v. United States*,
601 U.S. 124 (2024) .......... 51

*QCX LLC v. Nessel*,
2026 WL 1895958 (W.D. Mich. June 17, 2026) .......... 14, 24, 53, 54, 55

*Quarles v. United States*,
587 U.S. 645 (2019) .......... 51

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) .......... 68

*Ross v. Marshall*,
426 F.3d 745 (5th Cir. 2005) .......... 5

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*,
331 F.R.D. 5 (D.D.C. 2019) .......... 26

*Scherr v. Marriott Int'l, Inc.*,
703 F.3d 1069 (7th Cir. 2013) .......... 52

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
101 F.3d 503 (7th Cir. 1996) .......... 38

*Trbovich v. United Mine Workers of Am.*,
404 U.S. 528 (1972) .......... 30, 35

*United States v. City of Chicago*,
870 F.2d 1256 (7th Cir. 1989) ........ 22

*Util. Air Regul. Group v. EPA*,
573 U.S. 302 (2014) ........ 56

*Vill. of Rosemont v. Jaffe*,
482 F.3d 926 (7th Cir. 2007) ........ 59

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........ 20

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........ 3

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 20

*Wisconsin v. Ho-Chunk Nation*,
784 F.3d 1076 (7th Cir. 2015) ........ 8

*Yates v. United States*,
574 U.S. 528 (2015) ........ 52

**Statutes**

7 U.S.C.
§ 1a ........ 13, 17, 48, 49, 52, 53
§ 2 ........ 14, 55, 56, 60, 62
§ 7a-2 ........ 54, 62, 65, 68
§ 13a-2 ........ 62
§ 16 ........ 61, 62

15 U.S.C. § 3001 ........ 60

18 U.S.C.
§ 1084 ........ 64
§ 1955 ........ 64

25 U.S.C.
§ 2701 .......... 8
§ 2710 .......... 10
§ 2711 .......... 10, 25

31 U.S.C.
§ 5362 .......... 64
§ 5363 .......... 64

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......... 52

Wis. Stat. § 14.035 .......... 8, 9, 24

Wis. Stat. § 945.01 .......... 9, 25

Wis. Stat. § 945.03 .......... 7

Act 601, 2025 Wis. Assemb. Bill 601 (Apr. 9, 2026) .......... 9

**Rules & Regulatory Materials**

17 C.F.R. § 38.151 .......... 67

17 C.F.R. § 40.11 .......... 54

25 C.F.R. § 502.4 .......... 8

Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80,572 (Dec. 22, 2010) .......... 67

Event Contracts, 89 Fed. Reg. 48,968 (June 10, 2024) .......... 73

Fed. R. Civ. P. 24 .......... 16, 17, 20, 21, 26, 28, 30, 32, 36, 37, 39

**Other Authorities**

AGA, *Gaming Regulations and Statutory Requirements - Wisconsin* (2025) .......... 9, 72

AGA, *Our Impact* .......... 23

AGA, *Our Membership* .......... 6

AGA, *State of the States - 2026: The AGA Analysis of the Commercial Casino Industry* (May 2026) ............................... 8, 29, 57

Amendments to the Forest County Potawatomi Community of Wisconsin and the State of Wisconsin Gaming Compact of 1992 (Dec. 3, 1998)........................................................................ 28

Amendments to the Forest County Potawatomi Community of Wisconsin and the State of Wisconsin Gaming Compact of 1992 (Jan. 22, 1999)........................................................................ 9

Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025)........................................................................ 42

Br. of Appellee, *KalshiEX LLC v. CFTC*, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) ...................................... 11

David Propper, *NYC Bar Will Give Fans $100 Off Tabs if Knicks Win Game 1 of NBA Finals Thanks to Owner's Clever Bet*, N.Y. Post (June 2, 2026)................................................. 49

David Purdum, *Notable Bets: Mattress Mack and the Wildest Wagers and Betting Tales of 2022*, ESPN (Jan. 2, 2023)................... 49

Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sep. 17, 2025)................. 41

Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026) ............................... 45

Dustin Gouker, *Robinhood Cometh?*, Event Horizon (Sep. 2, 2026)........................................................................ 42

Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025) .............................. 41

Environmental Assessment: Menominee Indian Tribe of Wisconsin Kenosha Casino Project, U.S. Dep't of the Interior (Mar. 2026) ........................................................................ 6

Eric Ramsey & Dustin Gouker, *Parlays Propel Kalshi to Back-to-Back Volume Records to Open Football Season*, Event Horizon (Sep. 15, 2026) .......... 10, 46

Hard Rock Hotel & Casino Kenosha, *Casino*, .......... 7

Hard Rock Hotel & Casino Kenosha, *Project Information & Updates* .......... 6, 7

Kalshi, *Combos* (Mar. 25, 2026) .......... 10

Kalshi, *Signing Up as an Individual* (Mar. 10, 2026) .......... 72

KlasRobinson Q.E.D., *Proposed Kenosha Casino and Destination Entertainment Center Packs Major Economic Boost* .......... 7

Lake of the Torches Resort Casino, *Sports Betting* .......... 8

Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC, *Notification Regarding the Initial Listing of the "Will the fastest serve in <tennis match> be <above/below/exactly/at least/between><count><speed>?" Contract* (Jan. 16, 2026) .......... 44

Notice of Gaming Land Acquisition Application, U.S. Dep't of the Interior (Mar. 24, 2026) .......... 6

Sam McQuillan, *Kalshi Parlay Volume Surges, But Sports Prediction Economics Still Lag Sportsbooks*, Legal Sports Report (Mar. 24, 2026) .......... 46

Wisconsin Dep't of Admin., *Tribal Compacts and Amendments* .......... 8

## GLOSSARY

| | |
|---|---|
| AGA | American Gaming Association |
| App. | Short Appendix |
| CEA | Commodity Exchange Act |
| CFTC or Commission | Commodity Futures Trading Commission |
| DCM | Designated Contract Market |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| IGRA | Indian Gaming Regulatory Act |

## INTRODUCTION

This appeal concerns the motion for leave to intervene filed by the American Gaming Association (AGA), a trade association whose members include a broad range of commercial and Native American casino gaming operators. AGA moved to intervene as a defendant because the preemption claim asserted by the United States and the Commodity Futures Trading Commission (CFTC or Commission) would upend the longstanding framework for regulating gaming in the United States.

For more than a century, courts have held that oversight of "gambling is … within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905). Some states have exercised that authority by prohibiting gaming altogether. Others have permitted gaming and enacted licensing standards, tax laws, and consumer-protection requirements designed to ensure that it serves the public interest. Congress has consistently "respect[ed] the policy choices of the people of each State on the controversial issue of gambling" by incorporating state-law rules in federal statutes. *Murphy v. NCAA*, 584 U.S. 453, 484 (2018).

AGA's members have invested billions of dollars within that settled framework. They participate in state-regulated sports-betting markets—

including in Wisconsin—and bear the licensing, compliance, and tax obligations those markets require. In return, the state-based regime has provided a level playing field in which all parties compete under the same set of rules.

The theory advanced by the United States and the Commission would throw that system into chaos. They contend that the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 authorized prediction markets to offer "sports-event contracts" nationwide, and that these contracts are derivatives governed exclusively by the Commission. But that rationale has a "gambling problem": sports-event contracts are sports bets in every meaningful sense. *KalshiEX, LLC v. Assad*, __ F.4th __, 2026 WL 2543846, at *10 (9th Cir. Aug. 28, 2026). When a customer places a sports bet on a prediction market, "[t]he only thing that changes is [the] vocabulary." *Blue Lake Rancheria v. Kalshi, Inc.*, __ F.4th __, 2026 WL 2728466, at *9 (9th Cir. Sep. 16, 2026). Prediction markets offer traditional sports wagers, such as bets on point spreads and parlays, and they advertise those transactions as "legal sports betting." If the Commission is correct, prediction markets may offer the same wagers as

AGA's members while avoiding the taxes, regulations, and licensing requirements that apply to all other sportsbooks. That result would directly injure AGA's members and undermine the competitive balance that federal and state gaming laws have long preserved.

There is no credible evidence that Congress designed the Dodd-Frank Act to have that destabilizing effect. Dodd-Frank was enacted as a response to the 2008 financial crisis, not as a nationwide gambling code. Yet the federal government asks this Court to conclude that Dodd-Frank preempted a broad swath of state gaming laws and granted the Commission sweeping new authority to serve as a sports-betting regulator. Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and a transfer of authority over one of the States' core police-power functions would be a very large elephant indeed. The provisions cited by the federal government do not come close to the clear statement necessary to preempt state laws on such a major question.

Although the District Court correctly declined to grant a preliminary injunction, it nevertheless erred in denying AGA's motion for leave to intervene. AGA meets the requirements to intervene under Federal Rule of

Civil Procedure 24 for two main reasons. *First*, the claim asserted in this suit directly affects the interests of AGA's members, given the competitive and economic harms they would suffer if prediction market sports betting were exempt from state gaming laws. *Second*, Wisconsin cannot adequately represent AGA because the State's sovereign, public interests diverge from the private, commercial interests of AGA's members. Wisconsin *regulates* the gaming industry rather than serving as its advocate—a key distinction this Court recognized in *Driftless Area Land Conservancy v. Huebsch*, 969 F.3d 742, 744 (7th Cir. 2020).

This Court should reverse the denial of AGA's intervention motion and affirm the denial of the federal government's preliminary-injunction motion.

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction over the Plaintiffs' claim under 28 U.S.C. §§ 1331 and 1345.

This Court has appellate jurisdiction to review the District Court's July 29, 2026 Order under 28 U.S.C. §§ 1291 and 1292(a)(1). *See Illinois v. City of Chicago*, 912 F.3d 979, 984 (7th Cir. 2019) ("Because denial of a motion to intervene essentially ends the litigation for the movant, such

orders are final and appealable." (citation omitted)). On August 14, 2026, AGA timely filed a notice of appeal regarding the District Court's denial of AGA's motion for leave to intervene.

## STATEMENT OF THE ISSUES

1. Whether AGA meets Rule 24's requirements to intervene as a defendant, given the competitive and economic effects unlicensed prediction market sports betting would have on AGA's members.

2. Whether the District Court correctly denied the Commission's preliminary-injunction motion after determining that the Commission is not likely to succeed on the merits and that the other factors disfavor enjoining enforcement of Wisconsin's gaming laws.[1]

---

[1] AGA's appeal is from the District Court's denial of its intervention motion. Because the merits of the Commission's preliminary-injunction appeal are before this Court in the lead consolidated case, and because the Court may decide intervention and the merits together, AGA has conditionally briefed the merits in the event the Court concludes that intervention was incorrectly denied. *See Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 574 (7th Cir. 2009) (reversing denial of intervention, explaining that the panel could not "understand why the parties did not brief the merits," and directing merits briefing by intervenor); *Ross v. Marshall*, 426 F.3d 745, 761 n.68 (5th Cir. 2005) (reversing denial of intervention and "proceed[ing] to the merits" since "issues have been fully briefed and argued" and "remand to the district court would be futile").

Should the Court affirm the denial of intervention, AGA respectfully requests that the Court consider Part II of this brief as an amicus submission. For that purpose, pursuant to Federal Rule of Appellate Procedure

## STATEMENT OF THE CASE

### A. AGA Members Offer Legal, Regulated Gaming in Wisconsin and Nationwide.

AGA is a non-profit trade association whose members represent the full spectrum of the legal, regulated gaming industry—including commercial and tribal casino operators, suppliers, and online sportsbooks.[2] AGA members participate in legal gaming markets throughout the United States, including in Wisconsin. For instance, the Menominee Indian Tribe of Wisconsin has partnered with Hard Rock International, an AGA member,[3] to develop the Hard Rock Hotel & Casino in Kenosha, Wisconsin.[4] Since the project was announced in 2022, the Menominee Tribe and Hard Rock International have incurred significant costs to secure approvals from both the federal government and the State.[5] Once all

29(a)(4)(E), AGA affirms that no party or party's counsel authored this brief in whole or in part, and that no person other than AGA or its counsel made any monetary contributions intended to fund the preparation or submission of this brief.

[2] *See* AGA, *Our Membership*, https://perma.cc/Y6KR-6S8S.

[3] Hard Rock International is a wholly owned subsidiary of the Seminole Tribe of Florida and thus is an AGA member under AGA's bylaws.

[4] *See* Hard Rock Hotel & Casino Kenosha, *Project Information & Updates*, https://perma.cc/96ME-73KF (accessed Sep. 21, 2026).

[5] *See, e.g.*, Notice of Gaming Land Acquisition Application, U.S. Dep't of

approvals are finalized, Hard Rock intends to invest $360 million into the Kenosha casino project, including $104 million in construction payroll alone.[6] The casino is expected to employ more than 1,000 people, generate 1.6 million annual visits from out-of-state visitors, and have an annual economic impact of $492 million in Wisconsin.[7] It will offer a broad range of casino games, including sports betting.[8]

### B. Prediction Markets Offer Sports Betting in Violation of Wisconsin Law.

Wisconsin generally prohibits commercial gambling. *See* Wis. Stat. § 945.03. State law defines a "bet" as a "bargain in which the parties agree that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value specified in the agreement." *Id.* § 945.01(1). And state law generally does not permit anyone

---

the Interior (Mar. 24, 2026), https://perma.cc/4XKA-HQEM; Environmental Assessment: Menominee Indian Tribe of Wisconsin Kenosha Casino Project, U.S. Dep't of the Interior (Mar. 2026), https://perma.cc/RL3X-SR4U.

[6] Hard Rock, *Project Information & Updates*, *supra* note 4.

[7] KlasRobinson Q.E.D., *Proposed Kenosha Casino and Destination Entertainment Center Packs Major Economic Boost*, https://perma.cc/H57H-JTHY.

[8] *See* Hard Rock Hotel & Casino Kenosha, *Casino*, https://perma.cc/B3RC-QK82 (accessed Sep. 21, 2026).

to, for gain, "receiv[e], recor[d] or forwar[d] a bet," become "custodian of anything of value bet," or use a "wire communication facility for the transmission or receipt of information assisting in the placing of a bet." *Id.* § 945.03(1m)(b), (c), (g).

That said, Wisconsin has entered into eleven tribal-state compacts that authorize casino gaming under state law and the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq*. *See* Wis. Stat. § 14.035.[9] There are currently 27 tribal casinos in Wisconsin that offer Class II or Class III gaming pursuant to these compacts.[10] Several of these casinos offer sports betting—in some cases through a partnership between the tribe and a commercial gaming operator.[11]

---

[9] *See also* Wisconsin Dep't of Admin., *Tribal Compacts and Amendments*, https://perma.cc/MV5S-CUUL (accessed Sep. 21, 2026).

[10] *See* AGA, *State of the States – 2026: The AGA Analysis of the Commercial Casino Industry*, at 17 (May 2026), https://perma.cc/7APF-Y88F. Class II gaming "includes bingo and certain nonbanked card games that are 'explicitly authorized by the laws of the State.'" *Wisconsin v. Ho-Chunk Nation*, 784 F.3d 1076, 1077-78 (7th Cir. 2015) (quoting 25 U.S.C. § 2703(7)(A)(ii)). Class III gaming includes "sports betting," games such as "roulette," "slot machines," and "wagering on horse racing." 25 C.F.R. § 502.4.

[11] *See, e.g.*, Lake of the Torches Resort Casino, *Sports Betting*, https://perma.cc/2L95-KA6Z (accessed Sep. 21, 2026) (tribe "has partnered with DraftKings to provide retail sportsbook operations").

Earlier this year, Wisconsin enacted a law that, for the first time, authorizes sports wagers from mobile and electronic devices. *See* Act 601, 2025 Wis. Assemb. Bill 601 (Apr. 9, 2026). Assembly Bill 601 excludes "event or sports wager[s]" from the definition of "bet" so long as the server used to conduct the wager "is physically located on a federally recognized American Indian tribe's Indian lands located in [the] state" and is "conducted pursuant to an Indian gaming compact." Wis. Stat. § 945.01(1)(h). These compacts, which are negotiated between the State and the tribes pursuant to state law, *see id.* § 14.035, set the rules governing sports betting in Wisconsin, including that individuals "must be at least 21 years of age to participate in sports betting" and that bets are not allowed "on Wisconsin college sports teams nor on the outcomes of sporting events with participants aged under 19."[12] As with the brick-and-mortar sportsbooks already in operation, state law, IGRA, and the compacts permit the tribes to partner with commercial gaming operators to manage the online

[12] AGA, *Gaming Regulations and Statutory Requirements – Wisconsin*, at 4 (2025) (AGA Wisconsin Overview), https://perma.cc/295E-UUGM; *see also, e.g.*, Amendments to the Forest County Potawatomi Community of Wisconsin and the State of Wisconsin Gaming Compact of 1992, at 2 (Jan. 22, 1999) (restricting gaming access for persons under 21), https://perma.cc/Q3WJ-8A2L.

sportsbooks authorized by this new state legislation. *See, e.g.*, 25 U.S.C. §§ 2710(d)(9), 2711.[13]

Beginning in January 2025, several companies registered with the CFTC as Designated Contract Market (DCM) operators, including proposed-intervenor KalshiEX, LLC (Kalshi), began offering sports bets nationwide, including in Wisconsin. *See* Dkt. 1, ¶ 63 (Compl.).[14] Referring to themselves as "prediction markets," these companies permit users to wager money on whether a particular team will win or lose a sporting event, as well as outcomes within games, such as point spreads and totals. *Blue Lake Rancheria*, 2026 WL 2728466, at *6-9. They also offer proposition bets on individual player performances within a single game and parlays that combine bets on multiple sporting event outcomes into a single wager that pays only if *all* the component bets are correct.[15] Although prediction markets previously argued that "Congress did not want

[13] *See also* AGA Wisconsin Overview, *supra* note 12, at 1 (Wisconsin compacts allow "the tribes" to "enter into management contracts for the operation and management of the tribal casinos").

[14] Unless otherwise noted, all "Dkt." references are to the district-court docket, *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis.).

[15] *See* Kalshi, *Combos* (Mar. 25, 2026), https://perma.cc/WH6Z-G73N; Eric Ramsey & Dustin Gouker, *Parlays Propel Kalshi to Back-to-Back*

sports betting to be conducted on derivatives markets," Br. of Appellee at 41, *KalshiEX LLC v. CFTC*, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024), they now contend that their sports bets are subject to the Commission's exclusive jurisdiction and a federal regime that preempts state gaming laws. *See, e.g.*, Dkt. 24 at 4-5.

On April 23, 2026, Wisconsin filed civil enforcement actions against prediction-market platforms (including Kalshi), alleging that they are "engaged in illegal gambling in violation of Wis. Stat. § 945.03(1m)(b), (c), and (g), thereby causing a public nuisance." Compl. ¶ 63. The enforcement action explains that prediction markets are "facilitating illegal sports betting" by permitting Wisconsinites to "plac[e] bets on the outcome of sporting events." Dkt. 13-1, ¶¶ 2-3. The prediction markets "us[e] a fig leaf to disguise the casino-style sports betting" they facilitate, as their "event contracts" are "indistinguishable from an ordinary sports bet." *Id.* ¶¶ 4-5.

---

*Volume Records to Open Football Season*, Event Horizon (Sep. 15, 2026), https://perma.cc/V4CC-X3DZ.

### C. Procedural History

On April 28, 2026, the Commission sued "to halt [Wisconsin's] efforts" to enforce state gaming laws against prediction markets "that are governed by federal law." Compl. ¶ 1. The Commission asserts that Wisconsin's efforts to restrict unauthorized sports betting "intrud[e]" on federal authority to "oversee national swaps markets." *Id.* ¶ 5. The Complaint raises a single claim under the Supremacy Clause, alleging that Wisconsin law is preempted as applied to transactions on DCMs. *Id.* ¶¶ 84-93.

On May 1, the Commission moved for a preliminary injunction to block Wisconsin from enforcing its gaming laws against prediction markets. Dkt. 6. On May 28, Kalshi moved for leave to intervene and to join the Commission's preliminary-injunction motion. Dkts. 23, 24, 26. Wisconsin then moved to dismiss for lack of subject matter jurisdiction, asserting that the Commission lacks standing to pursue its claim, and to transfer the case to the Western District of Wisconsin. Dkts. 9, 27. On July 14, AGA moved for leave to intervene. Dkts. 46, 47.

On July 29, the District Court issued an Order denying the Commission's preliminary-injunction motion, the State's motions to dismiss and transfer, and the motions for leave to intervene.

The District Court addressed AGA's motion for leave to intervene as of right in a single paragraph. Appendix (App.) 15. The court held that AGA's members "have no interest" in this litigation "that is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." *Id.* It also concluded that the State "is adequately representing the interests of" AGA's members. *Id.*

The District Court dedicated one additional paragraph to AGA's request for permissive intervention. The court held that it was "only fair" to deny AGA's motion, since it had also denied Kalshi's motion. Because "the legal issue[s]" do not turn "upon the amount of money either side stands to lose," the court denied intervention. *Id.*

The District Court then analyzed and denied the Commission's preliminary-injunction motion. App.15-17.

The court first held that the Commission is unlikely to succeed on the merits. App.18-25. Regarding the threshold question whether prediction markets' "sports event contracts" constitute "swaps" under 7 U.S.C. § 1a(47)(A)(ii), the court explained that "it is difficult to imagine any agreement, contract, or transaction" that would not fit under the Commission's proposed definition. App.19. The court found persuasive the

analysis of several other courts that have addressed this issue and rejected the Commission's interpretation given the "importance of context in discerning [the] meaning" of statutory language and the focus of the Commodity Exchange Act (CEA) on financial markets. App.19-20 (citing *QCX LLC v. Nessel*, 2026 WL 1895958, at *6 (W.D. Mich. June 17, 2026), and *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *4 (S.D. Ohio Mar. 9, 2026) (*Schuler I*)).

Alternatively, the District Court also rejected the Commission's preemption arguments. The court "agree[d]" with the Sixth Circuit's conclusion that "the CEA's grant of 'exclusive jurisdiction'" in 7 U.S.C. § 2(a)(1)(A) "applies to the CFTC in contrast to other agencies, not in contrast to other laws." App.22 (citing *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026) (*Schuler II*)). Field preemption does not apply, the court reasoned, because "[s]ports gambling is an area traditionally regulated by the states," and "[c]ompliance with Wisconsin law only requires that [prediction markets] abstain from certain activities that the CFTC claims are *permitted*, not *required*, under the CEA." App.23-24. Finally, the court rejected the Commission's conflict preemption arguments based on the absence of "any authority" establishing that

prediction markets must "offer all the same products to every customer in every location." App.25.

The District Court then turned to irreparable harm and held that the threat of enforcement actions by the State against prediction markets does not inflict irreparable harm on the Commission. App.26-27. And given the failure to show irreparable harm, the Commission could not show that the balance of equities supports an injunction. App.27-28.

The Commission timely appealed the denial of its preliminary-injunction motion. Dkt. 56. Thereafter, Kalshi and AGA timely appealed the denials of their intervention motions. Dkts. 63, 68.

This Court consolidated all three appeals for purposes of briefing and disposition. *See United States v. Wisconsin*, No. 26-2636, Dkt. 11 (7th Cir. Aug. 24, 2026).

## SUMMARY OF ARGUMENT

The Commission contends that prediction markets may offer sports bets nationwide free from state gaming laws. AGA's members, which operate under state gaming regimes, face substantial competitive harm if that theory prevails. AGA therefore should have been permitted to intervene. Regarding the merits, the District Court correctly declined to grant

a preliminary injunction because the products at issue are sports bets, not swaps; the CEA does not preempt state gaming laws; the Commission has not shown irreparable harm; and the equities favor States, consumers, and regulated operators.

**I.** The denial of intervention should be reversed.

**A.** AGA satisfies Rule 24(a)'s requirements for intervention as of right. Its motion was timely, filed less than three months after the complaint and before any substantive rulings. AGA has a legally protectable interest in this suit because its members have made substantial investments in state-regulated gaming markets, including in Wisconsin, and face competitive harm if prediction markets may offer sports betting without complying with the regulations that govern all other operators. A ruling for the Commission would impair AGA's ability to protect those interests, and Circuit precedent recognizes that a decision's stare decisis effect supports intervention. Finally, the existing parties do not adequately represent AGA's interests. While the State has sovereign authority and a duty to pursue the public interest, AGA's focus is on the private, commercial interests of its members. *See KalshiEX LLC v. Hendrick*, 2025 WL

1901399, at *1 (D. Nev. June 2, 2025) (*Hendrick I*) (granting industry association intervention under Rule 24(a), given the "divergent interests" of Nevada and the association's members).

**B.** Alternatively, AGA qualifies for permissive intervention under Rule 24(b). It argues the same core question presented by the parties' dispute—whether federal law preempts state gaming regulations—and its participation would neither delay the proceedings nor prejudice any party. *See id.* at *2 (industry association met criteria for permissive intervention for similar reasons). Unlike Kalshi, AGA faces no abstention-related concerns. The District Court therefore abused its discretion in denying permissive intervention.

**II.** The District Court's preliminary-injunction ruling should be affirmed.

**A.** The District Court correctly rejected the Commission's preemption claim. The contracts at issue are sports bets, not financial instruments, and prediction markets advertise them as sports wagering. They are not "swaps" under the CEA because bets on 30-leg parlays and whether the Bears will beat the spread against the Packers are not "associated with potential financial, economic, or commercial consequences." 7 U.S.C.

§ 1a(47)(A)(ii). The broader statutory context and the major questions doctrine confirm that Dodd-Frank's "swap" provisions did not authorize nationwide sports betting.

Moreover, the Commission's preemption theories fail. The CEA's grant of "exclusive jurisdiction" allocates authority among federal regulators rather than displacing state gaming laws, and Congress left substantial room for supplementary state regulation and repeatedly preserved state authority over gambling. Wisconsin's gaming laws neither frustrate any federal objective nor make compliance with federal law impossible, particularly because Congress authorized the Commission to prohibit gaming-related contracts and contracts that violate state law. Because the products are sports bets, Wisconsin remains free to regulate them.

**B.** The Commission has not established irreparable harm. It relies principally on alleged injuries to third-party prediction-market platforms, including lost business and compliance costs, which are monetary, speculative, and self-inflicted. Platforms such as Kalshi operated for years without offering sports betting and knowingly entered a legally disputed market.

**C.** The balance of equities and public interest favor Wisconsin. States have built comprehensive sports-betting regimes that incorporate licensing, consumer protection, and taxation requirements. AGA's members have invested substantial resources in reliance on those regimes and structured their businesses around them. The Commission's theory would allow prediction markets to offer the same wagers while avoiding those obligations, distorting competition, undermining reliance interests, and weakening consumer protections. The resulting harm would fall not only on States, but also on consumers and regulated gaming operators that have complied with state law and invested accordingly.

## STANDARD OF REVIEW

When assessing whether a proposed intervenor satisfies the requirements for intervention as of right, this Court "review[s] th[e Rule 24(a)] factors de novo, except for the timeliness factor, which [it] review[s] for abuse of discretion." *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 686 (7th Cir. 2023) (citations omitted). A district court's denial of permissive intervention under Rule 24(b) is reviewed for abuse of discretion. *Griffith v. Univ. Hosp., LLC*, 249 F.3d 658, 661 (7th Cir. 2001).

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court reviews the denial of a preliminary injunction for abuse of discretion and the underlying issues of law de novo. *See Minocqua Brewing Co. v. Hess*, 160 F.4th 849, 851 (7th Cir. 2025). In applying these standards, the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982), "balance the competing claims of injury," and "consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24.

## ARGUMENT

### I. AGA Satisfies Rule 24's Requirements for Intervention.

AGA meets the requirements for intervention as of right under Rule 24(a) and should have been permitted to intervene. Alternatively, the District Court erred in denying AGA permissive intervention under Rule 24(b).

#### A. AGA Is Entitled to Intervene as of Right Under Rule 24(a).

Under Rule 24(a), a court "*must* permit intervention if (1) the motion is timely; (2) the moving party has an interest relating to the property or

transaction at issue in the litigation"; (3) "that interest may, as a practical matter, be impaired or impeded by disposition of the case"; and (4) the "existing parties" do not "adequately represent [the movant's] interests." *Driftless*, 969 F.3d at 746. AGA satisfies all four requirements.

### 1. AGA's Motion Was Timely.

Courts consider four factors in determining timeliness: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; and (4) any other unusual circumstances." *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 388 (7th Cir. 2019) (cleaned up). Although the District Court did not address the issue, all four timeliness factors favor AGA's intervention.

*First*, AGA acted promptly, moving to intervene less than three months after the complaint was filed. *See Nissei Sangyo Am., Ltd. v. United States*, 31 F.3d 435, 439 (7th Cir. 1994) (intervention timely when sought "three months" after movant "learned of this matter"). Timeliness turns on "a reasonableness standard: potential intervenors [must] act

reasonably promptly." *Id.* at 438. Here, AGA "act[ed] with dispatch," *Atlantic Mutual Ins. Co. v. Nw. Airlines, Inc.*, 24 F.3d 958, 961 (7th Cir. 1994), and cannot be said to have "dragged [its] heels," *United States v. City of Chicago*, 870 F.2d 1256, 1263 (7th Cir. 1989).

*Second*, there was no prejudice to the original parties, "the most important consideration." *Lopez-Aguilar*, 924 F.3d at 389 (cleaned up). When AGA moved to intervene, the case remained in its early stages: the District Court had not issued any substantive rulings. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (motion filed "before the district court ruled on the preliminary injunction … cannot be regarded as untimely").[16] Further, the State did not oppose AGA's motion, and though the Commission opposed AGA's motion, it took no position on similar motions by Kalshi and another prediction-market platform.

---

[16] *See also Clorox Co. v. S.C. Johnson & Son, Inc.*, 627 F. Supp. 2d 954, 961 (E.D. Wis. 2009) (timeliness requirement satisfied after parties had fully briefed and held hearing on preliminary-injunction motion); *N. Am. Derivatives Exch., Inc. v. Nevada*, 2025 WL 4670470, at *1 (D. Nev. Sep. 9, 2025) (*Crypto.com*) (granting intervention to gaming trade association where motion "was timely filed less than three months" after case began, "[n]o discovery ha[d] occurred, and no substantive rulings ha[d] yet been made").

*Third*, AGA would suffer prejudice if denied intervention. *See* pp.28-29, *infra*. Courts are "reluctant" to find untimeliness where the "would-be intervenor may be seriously harmed if intervention is denied." *Lopez-Aguilar*, 924 F.3d at 388 (citation omitted).

*Fourth*, no unusual circumstances weigh against intervention. To the contrary, when AGA moved to intervene, two other intervention motions were pending, and the District Court decided all three together. App.11-15.

AGA's motion was therefore timely.

#### 2. AGA Has a Direct, Significant, and Legally Protectable Interest in this Litigation.

AGA also has a "direct, significant and legally protectable interest in the subject at issue in the lawsuit." *Bost*, 75 F.4th at 686 (brackets removed). This interest must "belong to the would-be intervenor in its own right, rather than derived from the rights of an existing party." *Id.* at 687. Because the inquiry is "highly fact-specific," courts apply a "libera[l]" definition of a sufficient interest. *Lopez-Aguilar*, 924 F.3d at 392 (cleaned up).

AGA's members participate in legal gaming markets that generate $53 billion in annual tax revenue and support 1.8 million jobs nationwide.[17] They have made substantial investments in Wisconsin pursuant to state gaming approvals. For example, Hard Rock is developing the Hard Rock Hotel & Casino in Kenosha, which involves a capital investment of $360 million, including $104 million in construction payroll alone. Hard Rock has invested in that project under the regulatory regime established pursuant to state law, *see, e.g.*, Wis. Stat. § 14.035, and has done so with the reasonable expectation that all competitors will operate under the same rules. AGA's members are also involved in other aspects of Wisconsin's casino gaming market as equipment and technology providers, which too are harmed by prediction markets. For example, the State recently enacted an online sports betting law that expands the opportunities for AGA's members to operate in the state-regulated market for sports betting. *See* pp.9-10, *supra.*

The Commission's claim threatens those interests. It seeks to permit prediction markets to offer sports betting in Wisconsin without regard for state laws and regulations that govern all other competitors. Although

---

[17] AGA, *Our Impact*, https://perma.cc/6N6M-FRCX.

the Commission characterizes prediction markets' "sports event contracts" as derivatives, they are indistinguishable from sports wagers. *See, e.g.*, *Blue Lake Rancheria*, 2026 WL 2728466, at *8; *QCX*, 2026 WL 1895958, at *8-9; *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1029-39 (D. Nev. 2025) (*Hendrick II*), *aff'd sub nom. Assad*, 2026 WL 2543846.

If prediction-market platforms can offer sports betting free from Wisconsin's gaming laws, AGA's members will face significant competitive disadvantages. Among other things, prediction markets could offer sports betting statewide without participating in tribal partnerships, known as "management contracts," that Wisconsin law requires and that substantially limit the revenue share for commercial operators. *See* 25 U.S.C. § 2711(c) (limiting management contractors to no more than 40 percent of a gaming operation's net revenues); Wis. Stat. § 945.01(1)(h) (extending these rules statewide as a matter of state law). Prediction markets could also offer sports bets to persons under age 21 and on games involving Wisconsin college sports teams, in violation of state law. *See* pp.7-10, *supra* (describing Wisconsin gambling regulations); *Schuler I*, 2026 WL

657004, at *10 n.9. This result would upset AGA members' settled expectations and disadvantage operators that have invested significant resources to comply with state law.

Courts have repeatedly held that such competitive harms satisfy Rule 24(a)'s requirements. *See, e.g.*, *Crypto.com*, 2025 WL 4670470, at *1-2 (granting industry trade association intervention based on competitive interest); *Hendrick I*, 2025 WL 1901399, at *1 (gaming industry association members had "significantly protectable interests in their Nevada gaming licenses that they have spent substantial sums to obtain, maintain, and protect," and faced "a considerable competitive disadvantage" from prediction markets); *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 10 (D.D.C. 2019) (intervenor tribes had interest in potential "loss of gaming dollars" and "consequent reduction in funding for governmental services the tribes provide to their members"); *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 304 (D.D.C. 2018) (holding that threat of "imminent competition" enabled casino operator to intervene).

*Forest County Potawatomi Community v. United States*, 317 F.R.D. 6 (D.D.C. 2016), illustrates the point. There, the court granted the Menominee Tribe's motion to intervene to defend the Interior Department's disapproval of another Wisconsin tribe's gaming compact. *Id.* at 8. The court held that the Menominee Tribe had an interest in the litigation because a decision in the plaintiff's favor "would put the Menominee at a 'competitive disadvantage when seeking state approval for off-reservation gaming.'" *Id.* at 12 (quoting *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497 (7th Cir. 2005)). That "alteration in competitive conditions 'clearly amount[ed] to a concrete injury,'" providing a sufficient "interest" to intervene. *Id.* at 12-13; *cf. Flying J*, 578 F.3d at 572 (intervenors had sufficient interest because, under unfavorable decision, "they would lose much or even all of their business" to competitors).

The District Court did not address any of these factors or cases, instead erroneously characterizing AGA members' interests as "remote." App.15. AGA's members offer the same product—sports betting—as the prediction markets and will be *directly* harmed if prediction markets may

avoid the significant costs, restrictions, and compliance obligations Wisconsin law imposes on licensed sportsbooks. *See Flying J*, 578 F.3d at 572. And that interest belongs to AGA independent of the State's sovereign interests, as this Court's precedent requires. *Bost*, 75 F.4th at 687.

### 3. The Disposition of This Action Could Impair AGA's Interests.

The disposition of this action could "as a practical matter impair or impede" AGA's "ability to protect its interest[s]." *Lopez-Aguilar*, 924 F.3d at 392 (quoting Rule 24(a)(2)).

AGA and its members would suffer concrete harm from a ruling for the Commission. Prediction markets could offer sports betting in Wisconsin under the Commission's asserted authority without needing to enter into partnerships with Indian tribes, comply with the State's gaming rules, or share any percentage of their winnings with the State.[18] AGA members, like Hard Rock, that have invested in lawful gaming would face competitive injuries and reduced returns on those investments. *See Mova Pharm.*, 140 F.3d at 1076 (intervenor's "interests were … at risk" where

[18] Amendments to the Forest County Potawatomi Community of Wisconsin and the State of Wisconsin Gaming Compact of 1992, at 12-13 (Dec. 3, 1998) (Potawatomi Tribe pays 6.5% of its net winnings to the State), https://perma.cc/YQL8-ACVL.

it "was in danger of losing market share"); *see also Hendrick I*, 2025 WL 1901399, at *1 (litigation could "impair [gaming industry association's] members' ability to protect their interests" because "Kalshi's efforts in this case could erode [Nevada's well-regulated] market"); *Forest Cnty.*, 317 F.R.D. at 14 ("requested relief, if granted, would, as a practical matter, impede the Menominee's efforts … to develop a gaming facility in Kenosha"); *Connecticut*, 344 F. Supp. 3d at 304 (intervenor's interest "may be impaired" because litigation could "create imminent competition for [intervenor's] casino").

This case also has broader implications for AGA members throughout this Circuit. Illinois has 17 commercial casinos and generated $1.48 billion of sports betting revenue in 2025, and Indiana has 13 commercial casinos and generated $570.5 million of sports betting revenue in 2025.[19] Many of those casinos and sportsbooks are operated by AGA members. A decision here will thus affect substantial gaming markets beyond Wisconsin, and this Court has recognized that "concern with the stare decisis effect of a decision can be a ground for intervention." *Lopez-Aguilar*, 924 F.3d at 392 (quoting *Flying J*, 578 F.3d at 573).

[19] AGA, *State of the States – 2026*, *supra* note 10, at 47-48, 51-52.

### 4. The Existing Parties Do Not Adequately Represent AGA's Interests.

The existing parties—in particular, the State—do not adequately represent AGA's interests. This Circuit applies a three-tiered framework for adequacy of representation under Rule 24(a)(2), *see Driftless*, 969 F.3d at 747 (citing *Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 799 (7th Cir. 2019)), depending on the relationship between the existing party and the intervenor, *see Bost*, 75 F.4th at 688. Under the default, "liberal" rule, the burden is "minimal": an intervenor need only show that representation of its interests "may be" inadequate. *Driftless*, 969 F.3d at 747 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). A rebuttable presumption of adequacy applies only when the intervenor's interests are "identical" to an existing party's, and a stronger presumption applies when a governmental entity is "charged by law with protecting the interests of the proposed intervenors." *Id.* (cleaned up).

Neither heightened standard applies here. As this Court recently observed, "the Supreme Court in *Berger v. North Carolina State Conference of the NAACP* [597 U.S. 179 (2022)] called into question whether *any* presumption of adequate representation is appropriate." *Bost*, 75 F.4th at 688 n.3 (emphasis added). *Bost* saved that "issue for another day" since

the default standard was appropriate and "appl[ied] no presumption of adequacy at all." *Id.* The Court need not resolve the issue here either, as the same "lenient default standard" applies. *Driftless*, 969 F.3d at 747.

The intermediate standard is inapplicable because Wisconsin and AGA do not have "genuinely identical" interests. *Bost*, 75 F.4th at 688 (quotation marks omitted); *see also Driftless*, 969 F.3d at 747 (applying intermediate standard where interests are "identical"). Precedent rejects the view that AGA and the State have identical interests simply because they both support enforcement of Wisconsin's gaming laws. Because "a prospective intervenor must intervene on one side of the 'v.' or the other and will have the same general goal as the party on that side," it is insufficient to examine whether the intervenor and the existing party have a common "general goal," such as "want[ing] the case dismissed." *Driftless*, 969 F.3d at 748; *see Bost*, 75 F.4th at 688 ("For the potential intervenor and the named party to have 'the same goal,' it is not enough that they seek the same outcome."); *id.* at 689 n.4 ("simply saying that they each want the law upheld … is insufficient to warrant application of the intermediate rule"). "[T]hat mode of analysis operates at too high a level of

generality." *Driftless*, 969 F.3d at 748. Rule 24(a)(2) "calls for a contextual, case-specific analysis, and resolving questions about the adequacy of existing representation requires a discerning comparison of interests." *Id.* That analysis shows that, while AGA and the State want Wisconsin's gaming laws to be enforced, "the stakes for each of them are different." *Bost*, 75 F.4th at 689.

*Driftless* is instructive. There, two environmental groups sued the Wisconsin Public Service Commission, seeking to invalidate the permits granted to three companies to build a transmission line. 969 F.3d at 744. The three companies moved to intervene as defendants, seeking to protect their financial interests in the validity of the permits. *Id.* The Court held that the companies' interests were "independent of and different from the Commission's in several important respects." *Id.* at 748. The companies, for example, "own[ed], finance[d], and w[ould] operate the transmission line in question," "ha[d] obligations to their investors," "ha[d] substantial sunk and anticipated future investments in the power line," and had "a valid expectation of a return on their investment." *Id.*

Although the Commission's "interests and objectives overlap[ped] in certain respects," they were nevertheless "importantly different." *Id.* The

Commission's "obligations [were] to the general public, not to the transmission companies or their investors." *Id.* Further, "the Commission *regulate[d]* the transmission companies" and did "not *advocate for* them or represent their interests." *Id.* The Court observed that "[t]he transmission companies cannot be forced to rely entirely on *their regulators* to protect their investment in this enormous project, which they st[ood] to lose if the plaintiffs [were] successful." *Id.* The Court thus held that, "[b]ecause the transmission companies' interests and objectives [were] materially different than the Commission's," the intermediate standard did not apply. *Id.* at 749.

The same reasoning applies here. The State is likely to focus on its sovereign authority, the Commission's standing to sue, and the effect of prediction markets' sports betting on the public at large. *See* Dkt. 27. AGA, by contrast, seeks to protect its members from the competitive and economic harms that would result if prediction markets could offer sports betting without complying with the rules governing licensed operators. AGA members partner with tribes to operate gaming in Wisconsin (and throughout this Circuit), have obligations to their investors, and have

made significant investments in state-regulated gaming with additional investments planned.

These commercial interests are distinct from the State's interests. AGA members are regulated by the State, and they "cannot be forced to rely entirely on *their regulators* to protect their investment[s]." *Driftless*, 969 F.3d at 748; *Bost*, 75 F.4th at 688 ("These responsibilities mean [the state agency] has a certain amount of authority over [the regulated entity]—*not* that it represents [the regulated entity's] interests."). Indeed, because the State's "overarching 'obligation is to represent the interests of the [Wisconsin] people,'" whereas AGA's "obligation is to represent its own interests," courts "often [have] concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Connecticut*, 344 F. Supp. 3d at 305 (quoting *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003)); *see also Forest Cnty.*, 317 F.R.D. at 15 (similar); *cf. Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015) (reversing denial of intervention in part because of doubt that government entities can serve as adequate advocates for private parties' interests). Under these circumstances, the intermediate standard does not apply.

Nor does the highest standard apply. Wisconsin is not "charged by law with protecting" AGA's interests. *Driftless*, 969 F.3d at 747. There is no law requiring that the State protect or represent the gaming industry's interests or investments. Indeed, the relationship between the State and AGA is *regulatory*, not representative. *See id.* at 748 (government defendant "*regulates* the … companies, it does not *advocate for* them or represent their interests"). The State's interests lie in its sovereign authority, not in protecting the competitive landscape for gaming or the gaming industry's investments. *See id.*

Under the default rule, AGA satisfies its "minimal" burden to "sho[w] that representation of [its] interest[s] 'may be' inadequate," *Id.* at 747 (quoting *Trbovich*, 404 U.S. at 538 n.10). The State will focus its arguments on its enforcement prerogatives and the public interest, whereas AGA will focus on the competitive, economic, and industry-wide consequences of the Commission's claim. *See Bost*, 75 F.4th at 690 ("The lenient default standard is satisfied when the named party fails to make an argument before the trial court that would further the intervenor's interests."). Further, while the State "may be content to move slowly in this litigation," AGA "want[s] to move quickly" given the massive investments

of its members at stake and the costs arising from uncertainty regarding the legal framework governing sports betting. *Driftless*, 969 F.3d at 749. These "[d]ifferent defenses" and approaches to the litigation "reflect very real differences in the interests at stake." *Id.*

The District Court thus erred in concluding that the State adequately represents AGA's interests. App.15. Indeed, the District Court's cursory assessment conflicts with the reasoned analysis in *Hendrick I*, where the court concluded that Nevada and the Nevada Resort Association had "divergent interests" given "the competitive disadvantages [the Association's members would] face if Kalshi is unregulated by states." 2025 WL 1901399, at *1. This case involves the same issues; the only difference is that AGA is a national rather than state-specific trade association.

### B. Alternatively, AGA Should Have Been Permitted to Intervene Under Rule 24(b).

Rule 24(b) permits intervention where the intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). In making this determination, the court must consider whether intervention "will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see*

*Bost*, 75 F.4th at 691 ("the only *required* considerations … are undue delay and prejudice to the rights of the original parties").

These considerations weigh in favor of permitting AGA to intervene. For the reasons explained above, AGA raises the same core legal question as the parties. And AGA's proposed intervention would neither delay proceedings, as this case is in its early stages, *see* pp.21-23, *supra*, nor prejudice the State (which did not oppose AGA's motion) or the Commission (which took no position on similar motions filed by Kalshi and another prediction-market platform).

Courts routinely permit intervention in similar circumstances. *See, e.g.*, *Hendrick I*, 2025 WL 1901399, at *2 (granting intervention because association "clearly share[d] common questions of law and fact"); *Crypto.com*, 2025 WL 4670470, at *2 (same); *see also Faulman Inv., Ltd. v. Engineered Prods. & Servs., Inc.*, 2026 WL 962840, at *5 (E.D. Wis. Apr. 9, 2026) (granting permissive intervention where intervenor "nearly" met requirements for intervention as of right).

The District Court abused its discretion in denying AGA's request for permissive intervention for two reasons.

*First*, the court denied AGA's motion because it "seems only fair" to deny AGA intervention after denying intervention to Kalshi. App.15. But AGA is differently situated. The court denied Kalshi's motion because intervention would have caused delay and triggered *Younger* abstention based on pending state court civil enforcement proceedings. App.13-14. AGA faces no such enforcement proceedings, and its intervention would not cause any delay—a mandatory factor the court failed to consider.

*Second*, the District Court based the denial of permissive intervention on the notion that "the legal issue presented in this case is not dependent upon the amount of money either side stands to lose." App.15. Put another way, the court denied intervention because of AGA's "lack (as the judge thought) of an 'interest' sufficient to justify intervention." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 509 (7th Cir. 1996). "But 'interest' does not appear in Rule 24(b). All that is required for permissive intervention … is that the applicant have a claim or defense in common with a claim or defense in the suit." *Id.*; *see also Flying J*, 578 F.3d at 573 ("Neither the 'impair or impeded' requirement nor the 'interest' requirement is repeated in the subpart of Rule 24 that governs permissive intervention."). And there was no dispute that

AGA satisfied that requirement because it raised the same preemption question as the parties. App.15. The District Court abused its discretion by relying on a purported lack of an "interest" to deny intervention when AGA satisfied the conditions for permissive intervention. Particularly given the rulings allowing a similar trade association to intervene in *Crypto.com* and *Hendrick I*—cases that are nearly identical to this one, but that the District Court did not address—there is no valid reason for denying AGA permissive intervention here.

## II. The District Court Did Not Abuse Its Discretion in Denying the Commission's Preliminary-Injunction Motion.

The District Court correctly denied the Commission's motion for a preliminary injunction, and the Commission cannot demonstrate that the court abused its discretion. A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021). The Commission's position fails at every step. *First*, sports-based event contracts are sports bets, not swaps. *Second*, even assuming they are swaps, the CEA does not preempt Wisconsin's gambling laws under any theory of preemption. *Third*, the Commission faces no irreparable harm, and the equities favor Wisconsin, AGA, and the public.

This Court should join the vast majority of courts having considered this question and affirm the denial of a preliminary injunction.

### A. The Commission Is Unlikely to Succeed on the Merits.

The Commission's preliminary-injunction motion rests on a category error. A product does not become a "swap" because a DCM lists it, a platform calls it an "event contract," or the Commission advances a new litigation position. As the Ninth Circuit's recent decisions in *Assad*, 2026 WL 2543846, at *6-15, and *Blue Lake Rancheria*, 2026 WL 2728466, at *13-14, confirm, courts must interpret the CEA by considering ordinary meaning, statutory context, and common sense, not an agency's label or a private party's bald assertion. The District Court applied that method soundly, and its conclusion that the Commission is unlikely to prevail—both because sports-event contracts are not "swaps" and because the CEA does not preempt Wisconsin's gaming laws—was well founded.

#### 1. Prediction Markets Offer Sports Bets.

The Commission's position attempts to obfuscate a simple truth: prediction markets offer sports betting. As courts across the country have observed, "[e]ach entry into a sports event contract materially resembles" a traditional sports bet—i.e., "an act of placing a bet or wager." *Blue Lake Rancheria*, 2026 WL 2728466, at *9 (cleaned up). These contracts are

sports gambling in "substance," and "everyone, including Kalshi, knows" it. *Assad*, 2026 WL 2543846, at *9-11.

Kalshi has "market[ed] its sports event contracts … as 'legal sports betting'" and "advertised itself as 'the first app for legal sports betting in all 50 states.'" *Id.* at *9-10. Although Kalshi employs sanitized terms like "trading" in its court papers, its advertisements have repeatedly described its offerings as "sports betting":[20]







[20] Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sep. 17, 2025), https://perma.cc/8NJ4-HFUR; Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025), https://perma.cc/QEH6-YA3L.

*See also KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 235 (3d Cir. 2026) (Roth, J., dissenting). The data confirm what the marketing makes clear. In 2025, sports betting accounted for "[o]ver 90% of Kalshi's trades" and "95% of its revenue." *Assad*, 2026 WL 2543846, at *4.

Prediction markets offer the same bets, on the same outcomes, as sportsbooks. A customer at a traditional sportsbook "can place a sports bet on the Las Vegas Raiders winning a game by over 7.5 points," while on a prediction market "that same customer can buy an event contract based on the Las Vegas Raiders winning a game by over 7.5 points," each with the same payout. *Id.* at *10. The graphic below, published in a *New York Times* article regarding prediction markets' expansion into sports betting, illustrates the point.[21] The top image shows betting options for an NFL game on a state-regulated sportsbook; the bottom shows betting options offered by Kalshi for the same game. Both use the same format,

[21] Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025), https://perma.cc/JZ9K-7HX8.

offer bets on the same point spread, and offer bets on the same over-under for the number of points scored:[22]




*See Blue Lake Rancheria*, 2026 WL 2728466, at *5.

Prediction markets also offer other bets that have long been standard sportsbook fare, including "prop[osition] bets," which are "bets based on outcomes within a game." *Assad*, 2026 WL 2543846, at *4. Kalshi, for

[22] Although Kalshi recently discontinued "American" pricing (e.g., "-106" in the Cowboys/Jets example), it explained that "[n]othing about the markets themselves has changed" and "[t]his change only affects how prices are shown on screen." Dustin Gouker, *Robinhood Cometh?*, Event Horizon (Sep. 2, 2026), https://perma.cc/6XHR-F432.

example, offers bets on the speed of the fastest serve in tennis matches[23] and the number of corner kicks in soccer matches: [24]




Prediction markets likewise allow users to place parlay bets, which combine several different wagers and pay off only if *all* listed outcomes occur, with the payout "depend[ing] on the performance of [multiple]

[23] Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC, *Notification Regarding the Initial Listing of the "Will the fastest serve in <tennis match> be <above/below/exactly/at least/between><count><speed>?" Contract* (Jan. 16, 2026), https://perma.cc/SGE5-NT5N.

[24] AGA's counsel took a screenshot of this page on the Kalshi mobile application on May 20, 2026.

sports team[s] or" "player[s]." *Id.* at *10. A parlay based on the NFL game depicted above, for example, could wager that Dallas will win by more than 2.5 points *and* that the teams will collectively score more than 47.5 points.

Prediction markets do not restrict these parlays to a single game or even to matchups within a single sport. Kalshi promotes parlays that depend on 30 different outcomes across multiple games in different cities.[25] Earlier this year, Crypto.com offered a bet that (1) the Dallas Mavericks would defeat the Brooklyn Nets by at least 6.5 points in an NBA game; (2) the University of Louisiana-Lafayette and Troy University would combine for no more than 134 points in a basketball game; (3) Brighton & Hove Albion F.C. and Nottingham Forest F.C. would tie in a soccer match; and (4) Curaçao would defeat Germany in the FIFA World Cup: [26]

[25] Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026), https://perma.cc/V34F-4WAU.

[26] AGA's counsel took a screenshot of this page on the Crypto.com mobile application on February 23, 2026.




The Commission has made no effort to show that these parlays, which are "surging"[27] on prediction markets and make up more than 60% of Kalshi's betting volume,[28] are anything other than sports bets. Nor could it. There is "no principled reason for why a combo on both the Giants and

[27] Sam McQuillan, *Kalshi Parlay Volume Surges, But Sports Prediction Economics Still Lag Sportsbooks*, Legal Sports Report (Mar. 24, 2026), https://perma.cc/XF4N-RGRZ.

[28] *Parlays Propel Kalshi*, *supra* note 15 (parlays "accounted for 61% of" Kalshi's volume).

Broncos winning" has any economic consequence "apart from its significance to participants … who have wagered on that particular combination of outcomes." *KalshiEX LLC v. Cafferelli*, 2026 WL 2294589, at *8 (D. Conn. Aug. 10, 2026).

The Commission nevertheless argues that sports-event contracts are fundamentally different from traditional sports bets. The Ninth Circuit rejected the same effort to elevate form over substance, explaining that the claimed "distinctions" are "without differences" and lack "any connection to the statutory definition[s]" at issue. *Assad*, 2026 WL 2543846, at *11. "[P]lacing sports bets, even when called by another name, is still gambling." *Id.* at *10.

**2. Prediction Markets' Sports Bets Are Not "Swaps."**

The Commission seeks a preliminary injunction that would enjoin state law governing *all* sports bets—past, present, and future—on *all* prediction markets. To obtain that extraordinary relief, it must show that *all* those products constitute "swaps" under the CEA. Because the Commission (whose theory would treat trivial propositions and complex parlays alike as swaps) comes nowhere close to carrying that heavy burden,

the District Court properly rejected an injunction barring enforcement of Wisconsin's gaming laws.

Starting with the text, the Commission's arguments falter because a "swap" must be based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The Commission reads that language as covering any sports outcome because someone, somewhere, might experience downstream economic effects. But "event" does not mean the outcome of an event, and "associated with" requires an inherent connection, not a consequence manufactured by the wager itself. *Assad*, 2026 WL 2543846, at *8-13; *Cafferelli*, 2026 WL 2294589, at *7-10.

Many of the sports bets offered by prediction markets plainly lack the required financial, economic, or commercial consequence. Like traditional sportsbooks, prediction markets offer contracts on trivial in-game outcomes, such as whether the first scoring play in a football game will be a touchdown, field goal, or safety, whether a final score will be odd or even, the fastest serve in a tennis match, and how many corner kicks will occur in a soccer match. And like sportsbooks, they often combine those

propositions into parlays, sometimes comprising 20 or 30 outcomes spanning point spreads, player performances, and games played in a hodgepodge of cities across the country or even the world.[29] None of those wagers is associated with independently existing economic consequences. They are sports-betting products masquerading as financial instruments.

The Commission cannot show otherwise merely because the outcomes may have downstream implications for a team, sponsor, or local business.[30] Prediction markets' "sports event contracts do not help insti-

[29] It is insufficient for the parlays themselves to involve potential economic consequences because the CEA requires the underlying events—not the swap—to be "associated with" such consequences. 7 U.S.C. § 1a(47)(A)(ii). The word "potential" does not modify this requirement; instead, the statute requires an *actual* association with one or more such potential consequences.

[30] Kalshi, for example, has touted a promotion in which a bar offered customers $100 credit if the Knicks won Game 1 of the NBA Finals. David Propper, *NYC Bar Will Give Fans $100 Off Tabs if Knicks Win Game 1 of NBA Finals Thanks to Owner's Clever Bet*, N.Y. Post (June 2, 2026), https://perma.cc/SRV4-UXT8. But that example defeats, rather than supports, the Commission's theory. The bar owner faced no preexisting economic exposure to the game's outcome; he manufactured risk by wagering with his customers. Unlike farmers or banks, which use swaps to manage risks inherent in their businesses, the owner *created* risk that otherwise would not have existed. The Knicks' performance therefore was not a financial or economic variable "associated with" any preexisting exposure under § 1a(47)(A)(ii). Nor is there any regulatory gap to fill: merchants have long used ordinary sports-betting markets to hedge similar

tutions or investors hedge against risk; they create risk, largely for ordinary consumers, where none previously existed." *Assad*, 2026 WL 2543846, at *10. There is no genuine commodity or financial risk that turns on whether two teams score a combined 134 or 135 points, for example. As the District of Connecticut recognized, sports wagers serve neither the CEA's risk-management function nor its price-discovery function in commodity markets. *Cafferelli*, 2026 WL 2294589, at *10.

The hedging argument is especially implausible regarding parlays. A wager that combines the outcome of an NBA game, the total score in a college basketball game, a tie in an English soccer match, and Curaçao defeating Germany in the World Cup does not hedge any independently existing economic exposure. Its only financial significance arises from the wager itself. *See Cafferelli*, 2026 WL 2294589, at *8.

The phrase "associated with" reinforces this limitation. The potential financial, economic, or commercial consequence must be embedded in, or flow from, the underlying event. It cannot arise solely because parties decide to wager on an otherwise ordinary occurrence. Reading the CEA

---

promotional liabilities. *See* David Purdum, *Notable Bets: Mattress Mack and the Wildest Wagers and Betting Tales of 2022*, ESPN (Jan. 2, 2023), https://perma.cc/9BNL-S5EF.

"so expansively as to include any conceivable downstream economic consequence" for anyone would "render the definition of swap so broad as to be meaningless." *Assad*, 2026 WL 2543846, at *12. Under that reading, every coin flip, corner kick, odd-or-even score, and player statistic would qualify whenever someone chose to wager on it. Congress did not impose a consequence requirement that wagering itself automatically satisfies. *See Quarles v. United States*, 587 U.S. 645, 654 (2019) (courts "should not lightly conclude that Congress enacted a self-defeating statute").

The statutory context supports the District Court's conclusion as well. The Commission urges the Court to read a handful of CEA provisions "in isolation" and to "adopt [the] broadest meaning" of those terms. *Assad*, 2026 WL 2543846, at *8. But that "cursory plain-language" approach is incorrect. *Id.* Courts do not interpret statutory phrases "in isolation" or according to "the broadest imaginable definitions of [their] component words." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (citation omitted). They interpret statutes "by reviewing text in context," *Pulsifer v. United States*, 601 U.S. 124, 133 (2024), and in a manner that "fit[s] … all parts" of the statute "into a harmonious whole," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted).

Every contextual indicator shows that Congress used "swap" to describe quintessential financial-market transactions. The statutory definition refers to "option[s] … for the purchase or sale" of "currencies, commodities, securities" and similar instruments, "interest rate swap[s]," instruments used to hedge "financial risk," and "foreign exchange swap[s]." 7 U.S.C. § 1a(47)(A); *see* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). Those traditional financial instruments bear no resemblance to a 30-leg sports parlay or a wager on the number of corner kicks in a soccer match.

Read in that context, an event contract has the requisite "financial, economic, or commercial consequence[s]" when the underlying event itself has effects akin to the financial transactions described elsewhere in § 1a(47)(A) and presents a bona fide need to hedge an independently existing risk. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) (courts must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (citation omitted)); *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1077 n.2 (7th Cir. 2013) (courts "view words not in isolation but in the context of the terms that surround them," construe

statutes in light of the "entire statutory scheme," and "favor the more reasonable result" (citation omitted)).

The Commission's contrary reading of § 1a(47)(A)(ii) would also swallow the separate, differently worded swap definitions in § 1a(47)(A)(i) and (iii). *KalshiEX LLC v. Bird*, 2026 WL 2691009, at *10 (S.D. Iowa Sep. 8, 2026) ("[U]nder Kalshi's approach, it appears that every word of subsections (i) and (iii) is subsumed within subsection (ii) and thus superfluous. This is not the right way to read the statute." (citation omitted)); *QCX*, 2026 WL 1895958, at *3 ("all-encompassing" reading of the "event" clause "risks rendering the statute's other definitions of 'swap' superfluous" (citation omitted)); *see City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

History and experience point in the same direction. When Congress enacted Dodd-Frank to "brin[g] risky financial products out of the shadows," *no one* had *ever* offered a sports bet on a CFTC-registered exchange.

*Hendrick II*, 817 F. Supp. 3d at 1031. Indeed, "[t]he primary issue [Congress] set out to solve" through Dodd-Frank "had nothing to do with sports-related contracts." *QCX*, 2026 WL 1895958, at *4.

To ensure that DCMs did not become gambling platforms, Dodd-Frank included a Special Rule authorizing the Commission to prohibit contracts involving "gaming," "terrorism," "assassination," and other "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i).[31] The authority to deem such contracts "contrary to the public interest," *id.*, provides a "failsafe against attempts to" offer sports wagers on regulated exchanges, *QCX*, 2026 WL 1895958, at *7. In other words, by granting the Commission only the negative power to prohibit (rather than the affirmative power to authorize) gaming contracts, and "by lumping 'gaming' together with 'terrorism,' 'assassination,' 'war,' and other 'unlawful' conduct, Congress clearly viewed gaming contracts as a bad thing" to be avoided. *Bird*, 2026 WL 2691009, at *8.

The Commission embraced that understanding one year after Dodd-Frank was enacted, adopting a categorical "prohibition" on contracts that

---

[31] Because the Special Rule encompasses "agreements, contracts, transactions, *or* swaps," 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added), the reference to "gaming" does not prove that Congress envisioned gaming swaps.

involve the enumerated subjects. 17 C.F.R. § 40.11(a). Under that rule, which remains in effect, DCMs "shall not list for trading" any contract "that involves, relates to, or references" "gaming." *Id.* § 40.11(a)(1). As multiple courts have observed, it is implausible to infer "that Congress intended to *allow* gambling free from state regulatory oversight" by "mentioning it in an unmistakably negative way." *Bird*, 2026 WL 2691009, at *8 (cleaned up); *see QCX*, 2026 WL 1895958, at *7 (Special Rule's "oblique evidence of Congressional intent" is "insufficient to transform the text of the swap definition into a clear statement that" Dodd-Frank "swe[pt] in activity that had long been a core state responsibility").

More broadly, the Commission's "swap" interpretation is untenable because it lacks any limiting principle. If a sports wager is a "swap" whenever any conceivable person might experience some downstream economic effect, then the Commission would have authority over every sportsbook, game, and retail bettor nationwide because the statute generally makes it unlawful to enter into swaps outside a federally regulated exchange. 7 U.S.C. § 2(e).[32] The District Court correctly declined to adopt

[32] The CEA provides exceptions for certain categories of sophisticated "eligible" market participants not relevant here.

that boundless approach. App.21. *Assad* rejected the same theory for precisely that reason. 2026 WL 2543846, at *9-10. Were the Commission's view correct, "every person placing a sports bet" with a traditional sportsbook—including on the Las Vegas Strip—"is violating the CEA." *Id.* at *11 (citing 7 U.S.C. § 2(e)).

The prediction markets have elsewhere insisted that preemption applies only to "on-DCM" trading and would leave the States with authority to regulate "off-DCM" sports betting. But there is no statutory basis for that gerrymandered approach: The CEA does not contain an exception for bets placed at retail sportsbooks; nor does its "swap" definition turn on whether a contract is listed on a DCM. Thus, if a point-spread wager placed through Kalshi is a swap, an identical wager placed in a casino must be as well. The unavoidable consequence of the Commission's position is that Congress made the Commission the Nation's sole sports-betting regulator when it enacted Dodd-Frank. That "overly broad reading" cannot be right. *Id.*

The major-questions doctrine confirms that the "swap" definition cannot bear the weight of the Commission's interpretation. Courts are "skeptic[al]" "[w]hen an agency claims to discover in a long-extant statute an

unheralded power" over a matter of vast economic and political significance. *Util. Air Regul. Group v. EPA*, 573 U.S. 302, 324 (2014). Yet the Commission now seeks to recast the CEA, which was enacted in 1936, as a source of federal authority over the multibillion-dollar sports-betting industry.[33] That argument makes no sense given the unbroken, half-century of precedent on this issue: Not a single sports wager was traded on a CFTC-regulated exchange between 1936 and January 2025. Nor can Dodd-Frank, enacted in 2010, "be read as a direct (or indirect) regulation of sports gambling," as "the CFTC is not a national gambling regulator. No one suggested it was until over a decade after the law was passed." *Assad*, 2026 WL 2543846, at *14.

The Supreme Court recognized less than a decade ago that the "legalization of sports gambling" is a "controversial subject" involving "important policy choice[s]." *Murphy*, 584 U.S. at 486. Congress, the Court explained, has adopted "a coherent federal policy" that "respect[s] the policy choices of the people of each State" on that issue. *Id.* at 484. Under the Commission's view, however, that congressional policy was meaningless because the CEA had already legalized sports betting nationwide

---

[33] AGA, *State of the States – 2026*, *supra* note 10, at 10.

and transferred authority over it to the Commission. That is not a credible reading of the statute. As the Ninth Circuit recently observed, Congress did not "take a wrecking ball to all sports gambling regulations built up over decades by federal, state, and tribal governments" through obscure clauses in Dodd-Frank's "swap" definition. *Assad*, 2026 WL 2543846, at *15. The "lack of historical precedent" for the Commission's claimed authority, "coupled with the breadth of authority that the [agency] now claims," strongly indicates that its position "extends beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119-20 (2022) (citation omitted).

Congress has instead designed federal gambling statutes to incorporate and reinforce state gaming laws. *See Assad*, 2026 WL 2543846, at *14; *Murphy*, 584 U.S. at 484. Because the Commission's interpretation would displace that longstanding framework and transform a financial-markets regulator into a national gambling regulator, it requires "clear congressional authorization." *Assad*, 2026 WL 2543846, at *14. The provisions cited by the Commission do not rise to that level.

In short, the Commission's interpretation "has a gambling problem." *Id.* at *10. Prediction markets offer sports bets that do not transfer or

hedge independently existing financial risk, and their underlying sports outcomes are not associated with the types of financial, economic, or commercial consequences that the CEA requires. "[P]lacing sports bets, even when called by another name, is still gambling." *Id.* The District Court therefore correctly held that the Commission is unlikely to establish that prediction markets' sports bets are "swaps."

### 3. The CEA Does Not Preempt State Gaming Laws.

Even if some sports-event contracts fit the CEA's "swap" definition, nothing in the statute precludes Wisconsin from regulating them. The District Court thus correctly concluded that the Commission failed to show that Wisconsin's gambling statutes are expressly or impliedly preempted. *See* App.21-25.

To begin, because the States are independent sovereigns in our federal system, this Court applies a "presumption of non-preemption" of state law. *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013). The presumption operates with special force when Congress has legislated in a field traditionally regulated by the States pursuant to their "historic police powers," such as gaming. *Id.* (citation omitted); *see Murphy*, 584 U.S. at 484; *Vill. of Rosemont v. Jaffe*, 482 F.3d 926, 937

(7th Cir. 2007) (recognizing "the police powers of the state to regulate the gambling industry"). Congress has separately declared that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). As a result, the Commission must show that it was Congress's "clear and manifest purpose" in Dodd-Frank to silently transfer that responsibility to the Commission. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted); *see Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" (citation omitted)).

The Commission's theory would require the Court to infer a nationwide gambling code from provisions designed to govern derivatives markets. That is precisely the kind of extraordinary result that requires clear congressional language, not inference from a general jurisdictional grant. Because the CEA says nothing about restricting states' authority to regulate sports wagering, the District Court correctly held that it does not authorize that extraordinary result.

***Express Preemption.*** Beyond the presumption, the Commission's position fails given the CEA's text, structure, and history. Starting with express preemption, the statutory language the Commission invokes—the CEA's conferral of "exclusive jurisdiction," 7 U.S.C. § 2(a)(1)(A)—"would represent an unusual express-preemption provision." *Schuler II*, 2026 WL 1295806, at *4. The Supreme Court has explained that this language was designed to consolidate federal regulation of commodity futures in the Commission and delineate its functions from those of the Securities and Exchange Commission and other federal agencies. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982). Thus, as the Sixth Circuit recognized, "exclusive jurisdiction" identifies the governing federal agency, not the governing law in every field touched by a DCM. *Schuler II*, 2026 WL 1295806, at *4; *see also Blue Lake Rancheria*, 2026 WL 2728466, at *13 (same).

The CEA's other provisions show that Congress knew how to speak precisely about state law when it wished to do so. Section 16(e)(2) provides that the CEA "shall supersede and preempt" state gaming laws, but only "in the case of" specifically identified transactions not at issue here. 7 U.S.C. § 16(e)(2). That targeted language confirms that Congress did

not silently preempt every state gaming law applicable to every product listed on a DCM. As the District of Utah recently observed, the statute's "in the case of" limitation preserves state authority outside the enumerated categories. *KalshiEX LLC v. Cox*, 2026 WL 2241564, at *8-9 (D. Utah Aug. 4, 2026). The same point is reinforced by § 16(h), which provides that certain swaps "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h)(2). As the District Court found, these targeted preemption provisions, which are inapplicable here, underscore that Congress did not expressly preempt state gaming law through § 2(a). App.22.

***Field Preemption.*** The Commission argues that the CEA's comprehensive regulation of DCMs preempts the field of all trading on those markets. That theory mistakes the field at which Wisconsin's law is aimed. Field preemption applies only in the "rare cases" where Congress has "legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (cleaned up). But the CEA leaves considerable room for supplemental state regulation. Congress expressly preserved the "regulatory authorities … of any State" with respect to swaps traded on DCMs,

7 U.S.C. § 2(a)(1)(A), and authorized state officials to enforce "any general civil or criminal antifraud statute of such State," *id.* § 13a-2(7). The Special Rule likewise applies additional restrictions to contracts involving "activity that is unlawful under any … State law." *Id.* § 7a-2(c)(5)(C)(i)(I). In other words, the "Swiss cheese-like field" that Congress created "cannot preempt state law because field preemption requires *complete* occupation on the part of the federal government." *Flaherty*, 172 F.4th at 238 (Roth, J., dissenting).

In any event, field preemption depends on the target of the state law, not the prediction-market platform's preferred description of its product. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). *Assad* accordingly rejected field preemption because Nevada regulates gaming and sports pools, while the CEA addresses swaps traded on DCMs. 2026 WL 2543846, at *17. Wisconsin's laws likewise regulate sports wagering, not commodities markets. And Congress's express preemption of state gaming laws in specific categories preserves state authority outside those categories. *Cox*, 2026 WL 2241564, at *8-9 (discussing 7 U.S.C. § 16(e)(2)).

Had Congress intended to preempt *all* state gaming laws affecting products listed on a DCM, it would have said so. Instead, it preserved state gaming regulation outside the specifically identified circumstances.

Congress's broader treatment of gambling confirms the point. It has consistently eschewed comprehensive federal gaming regulation in favor of targeted statutes that incorporate, rather than supersede, state law. *See Murphy*, 584 U.S. at 484. The Unlawful Internet Gambling Enforcement Act prohibits knowingly accepting payments for "unlawful internet gambling" but defines that term by reference to state law. 31 U.S.C. §§ 5362(10)(A), 5363. The Illegal Gambling Business Act likewise defines an "illegal gambling business" as one that "is a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1). And the Wire Act allows specified transmissions involving wagering if (but only if) they are lawful in the relevant States. *Id.* § 1084(b). That repeated reliance on state-law baselines is difficult to reconcile with the Commission's theory that Congress implicitly vested a federal agency with exclusive authority over gambling products whenever they are listed on a DCM. As the Ninth Circuit explained, Congress

has spoken on gambling "repeatedly, deliberately, and specifically," making it "difficult" to conclude that Congress intended to overturn that longstanding state-centered framework through broad language in "a Wall Street Reform Bill." *Assad*, 2026 WL 2543846, at *9-10.

***Conflict Preemption.*** Conflict preemption exists only when compliance with state and federal law is impossible or state law stands as an obstacle to Congress's objectives. *See Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 646-47 (7th Cir. 2019). Neither theory applies here. *Assad* rejected both as applied to state gaming laws, 2026 WL 2543846, at *14-15, and the District Court correctly reached the same conclusion.

*First*, Wisconsin's sports-wagering laws do not obstruct the CEA's objectives. The CEA regulates derivatives markets; it does not establish a federal policy favoring nationwide sports betting. Indeed, Congress has not regulated sports gambling "directly, or indirectly through the CFTC." *Id.* at *14. Wisconsin's law cannot frustrate a federal sports-betting policy that Congress never enacted.

Far from conflicting with federal policy, Wisconsin's law complements it. As noted, Dodd-Frank authorizes the Commission to prohibit contracts

involving "gaming" or activity unlawful under state law. 7 U.S.C. § 7a-2(c)(5)(C)(i). And the Commission exercised that authority in § 40.11(a). That language is mandatory: "the regulation's use of the phrase 'shall not' prohibits Kalshi from listing its sports event contracts on a DCM." *Assad*, 2026 WL 2543846, at *13. These provisions refute any suggestion that Congress intended the CEA to guarantee nationwide access to contracts that Congress singled out for disfavored treatment and that the Commission's own regulations prohibit.

The Commission's reliance on regulatory uniformity fails too. A divided Third Circuit panel reasoned that the CEA establishes an objective to "do away with [a] patchwork of state regulations." *Flaherty*, 172 F.4th at 229-30. But an abstract interest in uniform derivatives regulation cannot establish a congressional objective of nationwide sports betting, particularly in an area traditionally governed by state law. Nor does the CEA demand uniformity even within the markets it regulates. Its savings clauses "often permi[t] state regulation," *Schuler II*, 2026 WL 1295806, at *5, and the Special Rule expressly incorporates state law as well, "establish[ing] that state law and the CEA can coexist." *Assad*, 2026 WL

2543846, at *16 (quoting *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025)).

*Second*, compliance with Wisconsin and federal law is not impossible. DCMs can comply with Wisconsin law by obtaining the required gaming licenses, using geofencing to exclude Wisconsin customers, or refraining from offering sports bets altogether (like *every* DCM did before January 2025). *Assad* rejected Kalshi's contrary argument as a "false, all-or-nothing proposition," explaining that regulated entities frequently use geofencing and that Kalshi's refusal to do so does not establish impossibility. 2026 WL 2543846, at *16. A private party's preference not to comply with state law does not create a conflict with federal law.

The Commission's impartial-access theory does not alter that conclusion. *See* App.24-25. Section 38.151(b) requires access criteria to be impartial, transparent, and nondiscriminatory; it does not require a DCM to offer every product in every State. 17 C.F.R. § 38.151(b). CFTC commentary describes the rule as addressing discriminatory access criteria, including criteria based on financial resources and exclusive membership standards, not as mandating identical geographic availability. *See Core Principles and Other Requirements for Designated Contract Markets*, 75

Fed. Reg. 80,572, 80,579 & n.51 (Dec. 22, 2010). And *Assad* concluded that Kalshi had not explained "*why*" excluding Nevada residents from sports contracts would violate § 38.151(b). 2026 WL 2543846, at *14; *see also Cox*, 2026 WL 2241564, at *12-14; *Cafferelli*, 2026 WL 2294589, at *13-14.

The Special Rule contemplates that a contract may not be listed because it involves gaming or activity that violates state law. *See* 7 U.S.C. § 7a-2(c)(5)(C). Reading § 38.151(b) to require nationwide availability would render that prohibition unworkable. "Impartial access" governs evenhanded access to the markets and services a DCM lawfully offers; it does not create a federal entitlement to offer every product in every jurisdiction. Because Wisconsin law neither obstructs Congress's objectives nor makes compliance with federal law impossible, conflict preemption does not apply.

**B. The Commission Has Not Established Irreparable Harm.**

The Commission has not established irreparable harm. To obtain preliminary injunctive relief, a plaintiff must face an injury that cannot be prevented or fully remedied by a final judgment. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). The Commission's

asserted injury from Wisconsin's enforcement of its gaming laws is a generalized disagreement with state policy and the possibility that private entities may incur compliance costs. The District Court correctly concluded that such allegations do not involve irreparable harm to the Commission. App.25-27.

Unable to identify any injury to itself, the Commission relies on alleged harms to Kalshi and other prediction-market platforms. But those are not the Commission's injuries. The District Court correctly recognized that regulated entities, not the Commission, are the proper parties to complain about lost business, compliance expenses, or customer impacts. And even as to those entities, the asserted harms are monetary, speculative, and, most of all, "self-inflicted." *Assad*, 2026 WL 2543846, at *17-18; *see also Cafferelli*, 2026 WL 2294589, at *15-17 (same regarding lost business and compliance costs). None justifies an injunction compelling Wisconsin to tolerate unlicensed sports betting.

Nor can the prediction-market platforms rely on harms (reputational or otherwise) caused by their own conduct. State gaming laws and § 40.11(a) have long prohibited the conduct at issue, yet the prediction markets proceeded anyway, despite the substantial legal risk. As *Assad*

explained, proceeding in the face of § 40.11(a), state-law warnings, and known litigation risks substantially undermines any claim to equitable relief. 2026 WL 2543846, at *17-18; *see also Martin*, 793 F. Supp. 3d at 676-79.

Assertions of customer confusion, diminished goodwill, and reputational injury are also derivative of prediction markets' private-business interests, not injuries to the Commission. In any event, such concerns can be addressed through refunds, close-out procedures, and other ordinary business measures. Likewise, geofencing costs do not constitute irreparable harm. Geofencing is a standard feature of regulated gaming and is feasible for prediction-market platforms. *Assad* and its companion cases held that the cost of implementing geofencing systems is not sufficient to justify preliminary injunctive relief, 2026 WL 2543846, at *17-18, and the Sixth Circuit explained that geofencing may be "challenging, time-consuming, and expensive," but "expensive does not mean impossible." *Schuler II*, 2026 WL 1295806, at *6.

### C. The Equities Favor Wisconsin and AGA.

The District Court likewise correctly concluded that the balance of equities and public interest weigh against an injunction. App.26-28. The

Commission's alleged injury is speculative and largely derivative of private operators' commercial interests. Wisconsin, by contrast, has a sovereign interest in enforcing its gaming laws, and AGA's members have substantial interests in preserving a level playing field in which every sports-betting operator bears the same licensing, compliance, consumer-protection, and tax obligations. *See* pp.23-27, *supra*. These interests outweigh the asserted harms to the Commission, as many courts have concluded. *See, e.g.*, *Assad*, 2026 WL 2543846, at *17-18.

Wisconsin's interests are concrete and substantial. Since *Murphy*, States have made different choices about whether and how to offer sports betting. In states like Wisconsin that permit licensed sports wagering, gaming operators, including AGA's members, have invested accordingly, building state-specific systems for licensing, geolocation, account controls, vendor relationships, and permissible bet offerings.

There is a bargain at the heart of that framework. Operators are licensed and investigated by the States in which they operate; their systems are audited; and their platforms incorporate geolocation, identity-verification, and reporting requirements. They provide States with tax revenue, infrastructure investments, and compliance functions designed

to protect consumers. In return, States provide markets in which all competitors are subject to the same rules. That level playing field has created settled expectations for regulators and operators alike.

The Commission's theory would upend that framework. *See* pp.28-29, *supra*. Prediction markets seek to offer the same sports wagers as state-licensed sportsbooks while avoiding the licensing requirements, geofencing mandates, responsible-gaming safeguards, advertising restrictions, and gaming taxes imposed by state law. The resulting competitive distortion would inflict substantial harm on AGA's members and undermine States' carefully constructed regulatory systems.

The public interest likewise favors enforcement of Wisconsin's gaming laws because the Commission's theory would allow prediction markets to circumvent restrictions on a broad range of issues that States have determined are essential to safe and responsible sports wagering. Like many States, Wisconsin prohibits persons under age 21 from placing sports wagers. *See* p.9, *supra*. By contrast, prediction markets permit 18-year-olds to place bets.[34] Wisconsin also restricts the types of sporting

[34] *See, e.g.*, Kalshi, *Signing Up as an Individual* (Mar. 10, 2026), https://perma.cc/GA9G-8PRW.

events on which wagers may be placed, such as games involving "Wisconsin college sports teams" and participants under age 19.[35] Although state-licensed operators must abide by those restrictions, prediction markets offer such contracts notwithstanding Wisconsin's judgment that these wagering markets should not be available.

The Commission's approach would also force the agency to serve as the Nation's sports-betting regulator even though the Commission has acknowledged that it "is not a gaming regulator" and lacks both "the statutory mandate" and the "specialized experience appropriate to oversee" sports betting. *Event Contracts*, 89 Fed. Reg. 48,968, 48,982-83 (June 10, 2024). Such a dramatic shift would result in fewer protections for consumers, reduced revenues for States, and a significant competitive imbalance for licensed gaming operators. There is no indication, much less a clear statement, that Congress designed federal commodities law to produce such upheaval. *See Assad*, 2026 WL 2543846, at *15.

In short, the District Court correctly concluded that the balance of hardships and public interest favor Wisconsin. The State seeks to enforce

---

[35] *Gaming Regulations and Statutory Requirements – Wisconsin*, *supra* note 12, at 4.

longstanding gaming laws. AGA's members seek only equal treatment under those laws. The public has a strong interest in responsible, transparent, and properly regulated sports wagering. The Commission, by contrast, identifies only speculative institutional concerns and injuries to private entities.

## CONCLUSION

The Court should reverse the District Court's denial of AGA's intervention motion and affirm its denial of the Commission's preliminary-injunction motion.

Respectfully submitted,

*/s/ Kevin F. King*

Kevin F. King
*Counsel of Record*
Matthew J. Glover
Sameer Aggarwal
Hassan Ahmad
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for American Gaming Association*

September 21, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32(c) because this brief contains 13,798 words, excluding the parts of the brief exempted by Federal Rule 32(f). This brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type style requirements of Federal Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Century Schoolbook font.

*/s/ Kevin F. King*
Kevin F. King

September 21, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on September 21, 2026, I caused a true and correct copy of the foregoing brief to be filed with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Kevin F. King*
Kevin F. King

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I certify that all material required by Circuit Rule 30(a) is in the appendix bound with this brief. I further certify that there are no materials within the scope of Circuit Rule 30(b).

*/s/ Kevin F. King*
Kevin F. King

**No. 26-2696 (consolidated with Nos. 26-2636 & 26-2675)**

# In the United States Court of Appeals for the Seventh Circuit

UNITED STATES OF AMERICA AND
COMMODITY FUTURES TRADING COMMISSION,
*Plaintiffs-Appellees*,

*v.*

STATE OF WISCONSIN AND JOSHUA L. KAUL,
IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF WISCONSIN,

*Defendants.*

*v.*

AMERICAN GAMING ASSOCIATION,

*Proposed Intervenor-Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN, NO. 2:26-CV-749-WCG

## SHORT APPENDIX

**SHORT APPENDIX TABLE OF CONTENTS**

Decision & Order Den. Mot. to Dismiss, Mot. to Change Venue, Mots. to Intervene, & Mot. for Prelim. Inj. (ECF No. 54) ....... App.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA and**
**COMMODITY FUTURES TRADING COMMISSION,**

**Plaintiffs,**

**v.** **Case No. 26-C-749**

**STATE OF WISCONSIN, et al.,**

**Defendants.**

---

# DECISION AND ORDER DENYING MOTION TO DISMISS, MOTION TO CHANGE VENUE, MOTIONS TO INTERVENE, AND MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiffs the United States of America and the Commodity Futures Trading Commission (hereinafter referred to collectively as the CFTC) commenced this action to enjoin the State of Wisconsin from enforcing Wisconsin gambling statutes against five entities that offer "sports-related event contracts" for trading in Wisconsin. Wisconsin claims that the companies that are offering these "event contracts" are facilitating sports betting, a form of illegal gambling under Wisconsin law. The CFTC argues that the sports-related event contracts are swaps, a type of financial derivative regulated exclusively by federal commodities law, which preempts the Wisconsin gambling statutes as applied to such contracts.

Shortly after commencing the action, the CFTC filed its motion for a preliminary injunction. Dkt. No. 6. The State responded with a motion for a change of venue and, shortly thereafter, a motion to dismiss. Dkt. Nos. 9, 27. In the meantime, two of the companies that offer "sports-related event contracts," North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America (CDNA), and KalshiEX LLC (Kalshi), moved to intervene as plaintiffs

and join the CFTC's motion for a preliminary injunction. Dkt. Nos. 12, 14, 23, & 26. More recently, the American Gaming Association (the AGA) has filed a motion to intervene as a defendant opposing the CFTC's request for declaratory and injunctive relief. Dkt. No. 46. For the reasons set forth below, the State's motions to change venue and to dismiss for lack of standing will be denied. The motions to intervene will likewise be denied. Finally, because the CFTC has failed to show a likelihood of success on the merits, its motion for a preliminary injunction will also be denied.

**BACKGROUND**

Wisconsin initiated civil enforcement actions on April 23, 2026, against various Designated Contracts Markets (DCMs) and Futures Commission Merchants (FCMs), including Coinbase, Kalshi, Robinhood, Polymarket, and Crypto.com, that allow their customers to trade event contracts based on the outcomes in sporting events. Compl. ¶ 2, Dkt. No. 1. In fact, three such actions, originally filed in the Circuit Court for Dane County, were removed to the United States District Court for the Western District of Wisconsin, where motions to remand them to state court based on a lack of federal jurisdiction are pending. Each of these original state court actions seek declarations that the named defendants are violating Wis. Stat. § 945.03, which prohibits commercial gambling, and causing a public nuisance. The State also seeks preliminary and permanent injunctions prohibiting the defendants from offering sports-related event contracts for trading in Wisconsin. *Id.*

A week later, the CFTC commenced this action to enjoin the State of Wisconsin, Governor Tony Evers, Attorney General Josh Kaul, the Department of Administration Division of Gaming, and Division of Gaming Administrator John Dillett from enforcing the State's anti-gambling statutes against the same defendants, arguing that the federal Commodity Exchange Act (CEA),

7 U.S.C. § 1 *et seq.*, and CFTC regulations preempt state laws as applied to event contracts. *Id.* ¶ 5. The CFTC argues that the event contracts in question are not "bets" under Wis. Stat. § 945.01(1), but even if they are, Wisconsin gambling statutes are preempted by the CEA, which classifies such contracts as "swaps," a type of financial derivative. *Id.* ¶ 6. The CFTC contends that the State's enforcement of its gambling laws as applied to event contracts intrudes on the exclusive authority granted by the CEA to the CFTC to regulate such contracts. *Id.* ¶ 5. The parties stipulated to dismiss defendants Governor Evers, the Division of Gaming, and Administrator Dillett, leaving as the only defendants the State of Wisconsin and Attorney General Josh Kaul. Dkt. No. 33.

## ANALYSIS

### I. Preliminary Matters

#### A. Venue

The State initially filed a motion to transfer venue in the case to the Western District of Wisconsin on the ground that venue was improper in this district under 28 U.S.C. § 1391 and, alternatively, pursuant to 28 U.S.C. § 1404(a) "[f]or the convenience of the parties and witnesses" and "in the interest of justice." Dkt. No. 9. Neither ground has merit, and so, the motion to change venue is denied.

"A civil action may be brought in . . . a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). The remaining defendants are Attorney General Kaul and the State of Wisconsin. The State contends that because Attorney General Kaul resides in the Western District, venue is proper only in that district. But because all of the defendants are residents of the State of Wisconsin, the action is proper in any district in which any defendant resides.

"A state is ubiquitous throughout its sovereign borders. The text of the statute therefore dictates that a state with multiple judicial districts 'resides' in every district within its borders." *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018) (citing *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005) (holding that, for purposes of 28 U.S.C. § 1391(e), "common sense dictates that a state resides throughout its sovereign borders")). Because the State of Wisconsin resides in the Eastern District, as well as in the Western District, venue in this district is proper under § 1391(b)(1).

Venue in this district is also appropriate under § 1391(b)(2). That subsection provides that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." 28 U.S.C. § 1391(b)(2). The purchase of sports-related event contracts, which the State contends constitutes illegal gambling that it seeks to enjoin, is occurring throughout the State. There can be no doubt that a "substantial part" of that activity is occurring in the most populous district in the State, especially since the State's professional baseball, basketball, and football teams are all located in that same district. It thus follows that venue in this district is also appropriate under § 1391(b)(2).

Alternatively, the State argues that venue should be transferred to the Western District pursuant to 28 U.S.C. § 1404(a). That section provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." The State argues that the interest of justice warrants transferring the case to the United States District Court for the Western District of Wisconsin because its three enforcement actions raising the same issue are currently pending in that court. A fourth case against Kalshi that raises similar issues brought by the Ho-Chunk Nation, an Indian tribe, is also pending in that court.

Having multiple lawsuits moving forward in two different districts that challenge the same law on the same basis, the State contends, is not in the interest of the parties and does not promote judicial economy. Dkt. No. 9 at 12.

The difficulty with the State's argument is that neither the federal government nor the CFTC is a party to the actions currently pending in the Western District. The State's three enforcement actions were commenced in state court against private entities, and while they were removed to federal court, the State's motions to remand each to state court for lack of federal jurisdiction are pending. Given the jurisdictional question in those cases, transferring this case to the Western District may simply delay the CFTC's effort to obtain the federal relief to which it claims it is entitled. As for the fourth case involving the Ho-Chunk Nation, that case involves claims under the Indian Gaming Regulatory Act (25 U.S.C. § 2701 *et seq*.), the Lanham Act (15 U.S.C. § 1125), and the Racketeer Influenced and Corrupt Practices Act (18 U.S.C. § 1962(c)). None of these statutes are at issue here.

The convenience factors also fail to favor transfer. Both parties seem to agree that the issue raised is a legal one that will not require many witnesses, if any. Moreover, the heavy caseload of the two judges in the Western District militates against any finding that judicial economy would be better served by transferring this case to that District. The court therefore concludes that transfer of venue pursuant to § 1404(b) is not appropriate.

**B. Standing**

The State has also moved to dismiss for lack of standing. Article III of the United States Constitution limits the jurisdiction of federal courts to actual "cases" or "controversies" brought by litigants who demonstrate standing. U.S. Const. art. III, § 2, cl. 1. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S.

330, 338 (2016). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* "In this way, the law of Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches and confines the federal courts to a properly judicial role." *Id.* (citation modified). "This jurisdictional requirement ensures that the resources of the federal judiciary are not expended on advisory opinions and hypothetical disputes." *Home Care Providers, Inc. v. Hemmelgarn*, 861 F.3d 615, 620 (7th Cir. 2017) (citation omitted).

"The familiar 'triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement.'" *Gracia v. SigmaTron Int'l Inc.*, 986 F.3d 1058, 1064 (7th Cir. 2021) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998)). The injury-in-fact must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* at 561.

In this case, it is clear that the business entities that offer sports-related event contracts in Wisconsin, for example, Kalshi and CDNA, will suffer economic loss if the State is allowed to enforce its gambling laws so as to prohibit those activities, and thus those entities clearly have standing. It is not apparent, however, that the federal government would be similarly harmed or suffer an injury in fact if Wisconsin's anti-gambling law is enforced. CFTC argues that federal preemption by itself is sufficient to confer standing on the federal government. Dkt. No. 34 at 11 ("The federal government can vindicate injuries to its sovereignty, including by challenging enforcement of preempted state law."). But the Court has never explicitly so held.

The State argues that the federal government, acting through the CFTC, has no standing to bring this action because the CFTC lacks a concrete and particularized injury, and thus fails to satisfy the injury-in-fact requirement of Article III. Dkt. No. 27 at 5. It notes that the CFTC points to no economic or material loss or damage that it would suffer from Wisconsin's enforcement of its own anti-gambling laws against the five entities that offer sports-related event contracts on CFTC-regulated national markets. The closest the CFTC comes at identifying such an injury, the State contends, is the assertion of its Acting Director of the Division of Market Oversight that CFTC staff have diverted resources from core functions to answering questions from CFTC-registered entities about compliance in light of steps taken by State authorities to enforce State gambling laws. Dkt. No. 6-1, ¶ 7. Such a vague and unsupported assertion, the State argues, falls short of establishing the concrete and particularized injury required to support the federal government's standing to bring this action. Dkt. No. 27 at 10–11.

The defect in the State's argument, however, is that it assumes that standing for a private litigant suing to vindicate a private interest is the same as that of the federal government seeking to vindicate a public interest. It fails to distinguish between "private rights" and "public rights." But as Justice Thomas explained in his concurring opinion in *Spokeo*, "courts imposed different limitations on a plaintiff's right to bring suit depending on the type of right the plaintiff sought to vindicate." 578 U.S. at 344 (Thomas, J., concurring). The concern that the judiciary could exceed its proper role in resolving concrete disputes and become entangled in disputes that are "primarily political" is "generally absent when a private plaintiff seeks to enforce only his personal rights against another private party." *Id.* Private rights are traditionally understood as "rights of personal security (including security of reputation), property rights, and contract rights." *Id.* "In a suit for

the violation of a private right, courts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded." *Id.*

The same is not true, however, when a private plaintiff sued for a violation of public rights. This is because "[g]enerally, only the government had the authority to vindicate a harm borne by the public at large, such as the violation of the criminal laws." *Id.* at 345. In those cases where private plaintiffs have been permitted to bring a claim for the violation of public rights, "they had to allege that the violation caused them 'some extraordinary damage, beyond the rest of the [community].'" *Id.* (quoting 3 BLACKSTONE *220 (discussing nuisance)); *see also Lujan*, 504 U.S. at 562 ("Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.").

The same showing is not needed, however, when it is the government seeking to vindicate public rights. A federal crime, for example, does not inflict any concrete and particularized injury upon the United States. Yet, no one seriously contends that the federal government does not have standing to prosecute individuals for federal crimes. The crucial point is that the government occupies an entirely different position with respect to public interests than a private party, and thus the government's standing to vindicate those interests is not the same as a private litigant's.

This is not to say that the federal government does not need to allege standing in order to establish federal jurisdiction. The fundamental judicial rule that requires that a complainant establish standing before a suit can be properly heard applies to the federal government, just as it applies to a private individual. *United States v. Mattson*, 600 F.2d 1295, 1297, 1300 (9th Cir. 1979) (citing *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285–86 (1888)). But the federal government's obligation to show standing to assert a public interest is satisfied when it alleges

action by the defendant that harms or interferes with federal policy. Thus, in *United States v. Arizona*, the Court held that the foreign policy of the United States, as reflected in the Nation's immigration laws, preempts a series of statutory enactments by the State of Arizona that sought "to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." 567 U.S. 387, 393 (2012) (internal quotation omitted). Because several of the provisions of the Arizona law conflicted with federal law on the subject, those provisions were found preempted and thus unenforceable. That is what the CFTC has alleged here.

According to the complaint, the CEA "provides a comprehensive framework for the regulation of commodity derivatives transactions in the United States" and "designates the CFTC as the federal agency with 'exclusive jurisdiction' over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges." Compl. ¶ 1. In enacting the CEA, Congress found that commodity derivatives transactions "are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). The express purposes of the CEA are:

> to serve [these national] public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission. To foster these public interests, it is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants.

*Id.* § 5(b). The complaint alleges that "Wisconsin's attempt to criminalize and shut down federally regulated markets intrudes on the exclusive federal scheme Congress designed to oversee national swaps markets." Compl. ¶ 5. The State's ongoing efforts, according to the complaint, "undermine the uniform application of federal law" and "subvert federal law and the exclusive jurisdiction to regulate event contract swaps conferred on the CFTC by Congress." *Id.* ¶¶ 10–11. In short, the complaint alleges that Wisconsin's attempt to enforce its gambling laws to prohibit transactions Congress has found are a regular part of interstate and international commerce undermines the national public interest in providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair, and financially secure trading facilities. Assuming these allegations are true, which the court must at the pleading stage, *Lujan*, 504 U.S. at 561, this is enough to confer standing on the federal government and the CFTC.

The court reached the same conclusion in *KalshiEX LLC v. Johnson*, No. CV-26-01715-PHX-MTL, 2026 WL 1223373 (D. Ariz. May 5, 2026). There was no question in that case that Kalshi had standing. Kalshi had commenced an action to enjoin certain Arizona state officials from enforcing the state's gambling laws against it in response to the criminal charges they had filed against Kalshi in state court. The question that arose was whether the federal court was required to abstain from deciding whether Kalshi was entitled to such relief under *Younger v. Harris*, 401 U.S. 37 (1971), because Arizona, like Wisconsin, had previously filed an enforcement action against Kalshi in state court. While that case was pending, the CFTC filed its own action against the State, contending that the CEA preempts Arizona's enforcement of its gambling laws against event contracts traded on DCMs. The court consolidated the two actions, and after denying Kalshi's motion for a preliminary injunction, granted the CFTC's motion on substantially the same

grounds as Kalshi had asserted. *Johnson*, 2026 WL 1223373, at *1. Addressing the issue of the government's standing, the court stated:

> The federal government "may sue to protect its interests," *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967), and that authority extends to suits seeking to enjoin the enforcement of preempted state law. *See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016) (reading *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 325–27 (2015), to permit the United States to seek injunctive relief and invoke preemption to protect its interests); *see also Arizona v. United States*, 567 U.S. 387, 416 (2012) (affirming in part a preliminary injunction in favor of the United States against enforcement of preempted state law). The CFTC therefore has standing to seek to enjoin Arizona's enforcement of its gambling laws against event contracts traded on DCMs.

*Id.* at *3; *see also United States v. Minnesota*, No. 26-cv-2661, 26 WL 2150211, at *8 (D. Minn. July 27, 2026) (holding that "the CFTC has shown that it is sufficiently likely to establish the injury-in-fact element of standing").

The court reaches the same conclusion here. Even though the federal government has not suffered the kind of "particularized and concrete" injury or harm that a private party must allege in order to show standing to sue, the allegation that Wisconsin's attempt to enforce its anti-gambling laws to prohibit sports-related events contracts interferes with and undermines the national public interest in authorizing and regulating derivatives and similar financial instruments is sufficient to confer standing on the federal government. The State's motion to dismiss for lack of standing is therefore denied.

### C. Motions to Intervene

Kalshi and CDNA (collectively, Intervening Plaintiffs) have filed motions to intervene and join in the CFTC's motion for a preliminary injunction enjoining the State from enforcing its gambling statutes against them. The Intervening Plaintiffs argue that they are entitled to intervene as of right under Rule 24(a) of the Federal Rules of Civil Procedure. In the alternative, the Intervenor Plaintiffs argue that they should be allowed to permissively intervene under Rule 24(b).

As relevant here, Rule 24(a)(2) provides that "on timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The State does not dispute that the motions filed by the Intervening Plaintiffs are timely. Nor does the State dispute that the Intervenor Plaintiffs "likely have an interest in how this litigation is resolved," though it is unclear whether that is the same as an interest in "the property or transaction that is the subject of the action." Dkt. No. 28 at 5. Nevertheless, the State argues that the Intervening Plaintiffs are not entitled to intervention as of right both because the CFTC adequately represents their interests and because the outcome of this litigation will not impair their ability to protect those interests. The court agrees.

Although it is true that the Intervening Plaintiffs have substantial financial interests in the CFTC's effort to enjoin the State of Wisconsin from enforcing its anti-gambling laws against their sports-related event contracts, the issue presented is essentially one of law—whether the CEA preempts Wisconsin's gambling laws as applied to sports-related event contracts. The fact that the Intervening Plaintiffs have based a substantial portion of their businesses on the proposition that the CFTC insulates their sports-related event contracts from state gambling laws does not alter the answer to that question. And it is clear from the CFTC filings in this and other cases around the country that it is vigorously representing its interests on this issue which are aligned with the Intervening Plaintiffs. The CFTC's representation on the issue is adequate no matter what standard is used. *See Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 799 (7th Cir. 2019).

The court is also satisfied that the Intervening Plaintiffs are not "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest."

The Intervening Plaintiffs are already protecting their interests in the state court actions that were removed to federal court in the Western District. If the State's motions to remand are granted, the Intervening Plaintiffs will have a full and fair opportunity to press their argument that Wisconsin's attempt to enforce its gambling laws against them are preempted in the state court actions. If the State's motions are not granted, they will be able to pursue the same relief in the district court. In neither event will they be bound by any decision this court renders, since they are not parties to this proceeding.

Finally, the court notes that if the Intervening Plaintiffs had commenced this action on their own, the court would have abstained from deciding the case pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), in light of the pending state court actions against them. *Younger* affirmed a "longstanding public policy against federal court interference with state court proceedings." *Id.* at 43. The policy rests on "the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44. As the doctrine has developed, "*Younger* abstention is called for in exactly three classes of cases: where federal jurisdiction would intrude into ongoing state criminal proceedings, or into certain civil enforcement proceedings (judicial or administrative) akin to criminal prosecutions, or into civil proceedings 'that implicate a State's interest in enforcing the orders and judgments of its courts.'" *Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 815 (7th Cir. 2014) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013)). This case plainly falls within its scope. To grant the Intervening Plaintiffs' motions to intervene in this action would intrude into civil enforcement proceedings akin to criminal prosecutions.

This last consideration also warrants denial of the Intervening Plaintiffs' alternative argument that they should be granted permissive intervention. Rule 24(b), which governs permissive intervention, states in relevant part: "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." In exercising the discretion afforded under this Rule, however, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Because of the need for the court to avoid intruding on the action initiated by the State against the Intervening Plaintiffs, permitting them to intervene in this case will delay decision on the CFTC's motion for a preliminary injunction. For this reason, and because the CFTC's representation of their position on the legal issue before the court is adequate, the motion for permissive intervention is denied.

Finally, the American Gaming Association (AGA), whose members include commercial and tribal casino operators, suppliers, and sport betting operators across the country, has recently filed a motion to intervene as a defendant in opposition to the CFTC's Complaint for Declaratory and Injunctive Relief. Dkt. No. 46. The AGA contends that the sweeping ruling the federal government seeks "would permit prediction markets to offer sports wagers while avoiding the extensive state and tribal regulatory obligations that govern every other participant in the legal gaming industry." Dkt. No. 47 at 6. "If accepted," the AGA argues, "that theory would adversely affect AGA members, who have invested billions of dollars, entered into long-term commercial arrangements, and structured their businesses around the settled understanding that sport wagering is regulated by states and tribes, not the CFTC." *Id.* Given the interest of its members, the AGA contends, like the Intervening Plaintiffs, it is entitled to intervene as of right. Alternatively, also like the Intervening Plaintiffs, the AGA seeks permissive intervention.

The AGA's motion to intervene as of right is denied for the same reasons that the motions of the Intervening Plaintiffs are denied. Its members have no interest relating to the property or transaction that is the subject of the action that is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest. In fact, the interests of the AGA's members is even more remote than that of the Intervening Plaintiffs. Moreover, just as the CFTC is adequately representing the interest that the Intervening Plaintiffs have in the action, so also the State of Wisconsin is adequately representing the interests of the AGA members in opposing the CFTC's assertion of exclusive jurisdiction over the sports-related event contracts of the companies it regulates. The AGA's motion to intervene as of right is therefore denied.

The AGA's alternative request for permissive intervention is also denied. Having denied the Intervening Plaintiffs' motion for permissive intervention, it seems only fair that the motion of the AGA, whose members' interests are more remote, should also be denied. Like the Intervening Plaintiffs, the AGA contends that its members have large sums of money at stake. But the legal issue presented in this case is not dependent upon the amount of money either side stands to lose. The question presented is whether the federal CEA preempts Wisconsin's statutory prohibition of gambling as applied to CFTC-regulated markets and market participants. It is to that question that the court now turns.

**II. Motion for Preliminary Injunction**

The CFTC seeks a preliminary injunction to prevent the State from enforcing its gambling statutes against entities such as Kalshi and CDNA. Dkt. No. 6 at 15. The CFTC argues that Wisconsin gambling statutes do not cover the event contracts in question, and even assuming they do, federal commodities regulations preempt the Wisconsin statutes. *Id.* at 16. Of course, if Wisconsin's gambling statutes do not cover sports-related event contracts, then the CFTC's case

against the State makes no sense. There is no reason to enjoin the State from enforcing a statute that does not apply. The application of the State's gambling statutes is ultimately a state-law question. But for purposes of deciding whether there is even a justiciable controversy, the court notes that the plain language of Wisconsin's commercial gambling statute seems to cover sports-related event contracts registered with the CFTC. The statute provides that whoever intentionally and for gain "uses a wire communication facility for the transmission or receipt of information assisting in the placing of a bet or offer to bet on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of a bet or offer to bet" is guilty of a Class I felony. Wis. Stat. § 945.03(1m)(g). A Class I felony is punishable by "a fine not to exceed $10,000 or imprisonment not to exceed 3 years and 6 months, or both." Wis. Stat. § 939.50(3)(i). The sports-related event contracts offered on the prediction markets operated by the companies that Wisconsin has sued in state court would seem to fall well within the scope of the statute. The court therefore turns to the question whether the State's enforcement of its gambling statute should be enjoined.

A preliminary injunction is an exceptional remedy, "never to be indulged . . . except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (internal quotation marks and citations omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). A plaintiff seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The balance of equities "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice

versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). The court must analyze the CFTC's claims with regard to each of these factors.

In undertaking this task, the court finds especially helpful and persuasive the careful and thorough analysis of several courts that have recently addressed this same issue. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) (denying motion for preliminary injunction enjoining enforcement of state gambling law); *N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.*, 815 F. Supp. 3d 1169 (D. Nev. 2025) (same); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (same); *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026); *QCX LLC v. Nessel*, No. 1:26-cv-710, 2026 WL 1895958 (W.D. Mich. June 17, 2026) (same); *KalshiEX LLC v. Williams,* No. 25 Civ. 8846 (AT), 2026 WL 1961872 (S.D.N.Y. July 7, 2026) (same); *but see KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026) (affirming district court decision enjoining enforcement of state law prohibiting sports-related events contracts); *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting injunction enjoining enforcement of state gambling statute); *Johnson*, 2026 WL 1223373 (same); *United States v. Minnesota*, 26 WL 2150211, at *18 (same).

**A. Likelihood of Success on the Merits**

"The first step in the analysis requires a plaintiff to demonstrate that [his] claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (internal quotation marks and citation omitted) (alteration in original). The CFTC argues that it is likely to prevail on the merits of its argument that federal commodities regulations cover sports-related event contracts and that state gambling law as applied to such contracts is therefore preempted. Dkt. No. 6 at 10. In the view of the CFTC, Congress entrusted it with exclusive jurisdiction over such instruments by virtue of its enactment

of the Wall Street Reform and Consumer Protection Act of 2010 (the Dodd-Frank Act), which extended the CFTC's regulatory authority over "transactions involving swaps." Compl. ¶ 53 (citing Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A)).

In assessing the CFTC's argument, the court must be mindful of "the 'background principle' that when a federal statute touches on 'areas of traditional state responsibility,' courts must look for a clear statement from Congress that it intended to 'effect a significant change in the sensitive relation between' the federal and state governments." *Nessel*, 2026 WL 1895958, at *1 (quoting *Bond v. United States*, 572 U.S. 844, 858 (2014)). Gambling is an area of traditional state responsibility. For "it is well-established that the regulation of gambling, . . . is a legitimate state interest." *Northville Downs v. Granholm*, 622 F.3d 579, 587 (6th Cir. 2010). "A state's gambling laws reflect 'the state's paramount interest in the health, welfare, safety, and morals of its citizens' and thus 'lie[] at the heart of the state's police power.'" *Nessel*, 2026 WL 1895958, at *5 (quoting *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999)). In short, "[t]he power of the state to enact laws to suppress gambling cannot be doubted . . . ." *Marvin v. Trout*, 199 U.S. 212, 224 (1905). Thus, for the CFTC to prevail on its claim that Wisconsin cannot enforce its gambling statute to prohibit the sports-related event contracts, it must point to a clear congressional statement.

**1. The CEA's Definition of "Swaps"**

The CFTC argues that event contracts are "swaps" within the meaning of 7 U.S.C. § 1a(47)(A)(ii), which defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7

U.S.C. § 1a(47)(A)(ii); Dkt. No. 6 at 19–20. In the CFTC's view, this definition would encompass agreements, contracts, or transactions that pay based on the outcomes of elections and sporting events, given their impact on "tax and spending policy . . . ticket and merchandise sales, advertising, brand endorsements, vendors, lodging businesses, and food and beverage services." Dkt. No. 6 at 20. Indeed, it is difficult to imagine any agreement, contract, or transaction that this definition would not cover. As one court addressing the issue has observed, when removed from its context,

> the definition of the term "swap" becomes so broad that it sweeps in any agreement or transaction dependent on anything happening that could conceivably result in any degree of financial consequence for anyone. This would intrude not only on the province of state gambling law but also contract law (service contracts), property law (mortgages), and family law (prenuptial agreements), among others. It is difficult to imagine anything that would not have any potential financial consequence, especially if the downstream consequences could include others betting on the event. Plaintiff's reading would make many transactions across all spheres of life into "swaps," and thus unlawful unless they are "entered into on, or subject to the rules of, a board of trade designated as a contract market." 7 U.S.C. § 2(e).

*Nessel*, 2026 WL 1895958, at *6.

When faced with statutory language of such breadth and imprecision, the Court has noted the importance of context in discerning its meaning: "[A] statute's meaning does not always turn solely on the broadest imaginable definitions of its component words. . . . Linguistic and statutory context also matter." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (internal quotation marks and citation omitted). Faced with this same definition of the term "swap" in *KalshiEX v. Schuler*, the court explained:

> Where, as here, undefined terms lead to a dispute over a statute's meaning, courts walk the "well-trod path" of statutory interpretation. *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018). On the first pass, those terms are given their "ordinary and natural meaning." *Id.* (quoting *United States v. Miller*, 734 F.3d 530, 540 (6th Cir. 2013)). But if "a word in isolation is susceptible of multiple meanings," courts also consider the word's "placement and purpose in the statutory

> scheme." *Id.* (quoting *Miller* at 540). Finally, "working only within the range of 'textually permissible meanings,' [courts] consider which of those interpretations would serve, rather than frustrate, the statute's manifest purpose." *Id.* at 442–43 (quoting Antonin Scalia & Bryan A. Garner, Reading Law 57 (2012)). It follows that "courts should not construe a statute to produce an absurd result that [the court is] confident Congress did not intend." *Id.* at 447.

2026 WL 657004, at *4.

The purpose of the CEA as laid out by Congress was to "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).

As the court in *Schuler* recently explained, "[t]hese goals are better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly affect commodity prices. Currency exchange rates, the weather, and energy costs all do that; the number of points scored in the Huskies-Bobcats game does not." 2026 WL 657004, at *6. The court reached the same conclusion in *Nessel*:

> Plaintiff's sports-related products do not fall within the statutory definition of "swap." Congress included language in that definition, "associated with," which can only be defined by reference to context and purpose. Context and purpose make clear that Congress intended the definition of swap to capture a set of products in the financial industry which caused the 2008 financial crisis and threatened to create other crises in the future, and not to place broad swaths of everyday economic activity under the authority of the Commodity Futures Trading Commission. "Associated with" thus takes on the more limited sense it frequently does in ordinary use rather than extending to infinity as it hypothetically can, and the part of the swap definition on which Plaintiff relies requires an inherent connection with potential economic consequences that Plaintiff's sports products lack. Plaintiff's attempts to rehabilitate its understanding that the swap definition is effectively unbounded rely on faulty readings of other statutory provisions and regulations.

2026 WL 1895958, at *8. Other courts have reached the same conclusion. *See Crypto.com*, 815 F. Supp. 3d at 1183–84 ("Crypto's live presentation industry event contracts are not swaps because, as Crypto self-certified to the CFTC, these contracts turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event."); *Hendrick*, 817 F. Supp. 3d at 1026 (same); *see also* Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. CHI. BUS. L. REV. 128–40 (2025) ("The CFTC has ignored its decades-long jurisdictional drift. The agency can and should undertake a review of traded products to delist those that have only attenuated connection to the purposes of the CEA. Many products should not benefit from preemption, and instead, be subject to state law—including restrictions on gambling.").

At least at this stage of the proceedings, this court finds the analyses provided by these courts persuasive. Although a divided panel of the Third Circuit concluded that sports-related event contracts do fall within the CEA's definition of "swap" in *Flaherty*, 172 F.4th at 227–28, the majority offered no limiting principle to the definition that, according to the dissent, taken to its logical extreme could lead to "a rationality-defying outcome." *Id.* at 233 (Roth, J., dissenting). Notwithstanding the *Flaherty* majority's conclusion, this court finds that the CFTC has not shown that it is likely to prevail on its argument that the CEA's definition of "swaps" covers the event contracts offered by entities such as Kalshi. For this reason alone, the CFTC's motion for a preliminary injunction would be denied.

**2. Preemption**

Even if event contracts do fall under the CEA's definition of "swaps," the CFTC is unlikely to prevail on its argument that the CEA preempts state law. Preemption can take one of three forms: express, conflict, or field preemption. *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928

F.3d 639, 646 (7th Cir. 2019) (citation omitted). Express preemption involves a declaration by Congress of an intent to preempt state law. *Id.* Conflict preemption occurs either when a person cannot comply with both state and federal law at the same time or when state law impedes the implementation of congressional objectives. *Id.* at 646–47. Field preemption applies when Congress has legislated with regard to an area of law in so pervasive a manner as to lead to the conclusion that Congress did not intend for states to further regulate that area. *Id.* at 647. The CFTC argues that Wisconsin gambling statutes are preempted under all three forms. Dkt. No. 6 at 10–11.

**a. Express Preemption**

The CFTC argues that the CEA's grant of "exclusive jurisdiction" to the CFTC to regulate swaps, 7 U.S.C. § 2(a)(1)(A), is an express preemption provision that bars states from regulating event contracts such as those targeted by the State's enforcement action. Dkt. No. 6 at 25–26. But as the Sixth Circuit noted in its decision denying Kalshi's motion for a preliminary injunction pending its appeal from the court's decision denying its motion for an injunction in *Schuler,* the CEA's grant of "exclusive jurisdiction" applies to the CFTC in contrast to other agencies, not in contrast to other laws. *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026). The court explained that the "exclusive jurisdiction" language, read in its broader context of the statutory scheme as a whole, indicates that the CEA does not preempt all state laws. Some provisions of the CEA do expressly preempt state law in certain circumstances, using the language "shall supersede and preempt the application of any State or local law." *See, e.g.*, 7 U.S.C. § 16(e)(2). The invocation of this express preemption language suggested to the court that state law is not preempted in other circumstances. *Schuler*, 2026 WL 1295806, at *4. This court agrees.

### b. Field Preemption

The CFTC argues that the scope of the CEA indicates that Congress intended to occupy the field of commodities regulation, leaving no room for statutes such as Wisconsin's. Dkt. No. 6 at 28. As the Seventh Circuit has recognized, however, field preemption applies in very few circumstances. *Nelson*, 928 F.3d at 652 ("[T]he absence of language indicating an intent to occupy the field weighs heavily, of course, 'in favor of holding that it was the intent of Congress *not* to occupy the field.' . . . Field preemption is confined to only a few areas of the law, such as the National Labor Relations Act . . . and the Employee Retirement Income Security Act." (citations omitted)).

As noted above, the party challenging a statute as preempted carries a particularly heavy burden when the subject matter of the statute is an area traditionally regulated by the states. *See, e.g.*, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress."). Sports gambling is an area traditionally regulated by the states. *See, e.g.*, *Vill. of Rosemont v. Jaffe*, 482 F.3d 926, 937 (7th Cir. 2007). This presumption weighs more heavily in favor of Wisconsin's enforcement of its gambling laws than it did in favor of the state immigration laws at issue in *Arizona*, since immigration is an area regulated primarily by the federal government as provided for in the Constitution. U.S. Const. art. I, § 8; *Arizona*, 567 U.S. at 394.

The CFTC argues that the State's enforcement against companies like Kalshi and CDNA "increases the risk [to said companies] *in complying with federal law.*" Dkt. No. 6 at 31 (emphasis added). But this implies that the regulated companies must choose between complying with state or with federal law, which is not the case. Compliance with Wisconsin law only requires that the

companies abstain from certain activities that the CFTC claims are *permitted*, not *required*, under the CEA. As the State points out, "[b]y complying with stricter state law, prediction markets necessarily comply with more forgiving federal law." Dkt. No. 31 at 21.

The CFTC argues that the State's enforcement of its statutes intrudes upon federal sovereignty because if the State can prohibit sports-related event contracts, the CFTC is powerless to permit those same contracts. Dkt. No. 34 at 18. But this argument fails to demonstrate an understanding of the distinction between permitting an activity and guaranteeing a right to that activity. The federal commodities regulations cited by the CFTC may permit DCMs to offer event contracts, but they do not guarantee a right to offer such contracts or require DCMs to offer them, nor do they prohibit states from banning them altogether. Given the above-discussed provisions in the CEA which indicate that states retain the ability to regulate commodities outside those specific circumstances in which federal law explicitly preempts them from doing so, the CFTC has failed to carry its burden to show that Wisconsin's gambling statutes are field-preempted.

**c. Conflict Preemption**

The CFTC also contends that the State's laws are conflict preempted by the CFTC's regulations. Dkt. No. 6 at 28. "[C]onflict preemption exists when either (1) 'compliance with both federal and state regulations is a physical impossibility' or (2) state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wisconsinites for Alts. to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976, 986 (7th Cir. 2026) (citations omitted).

The CFTC argues that the State's enforcement of its statutes against entities such as Kalshi and CDNA forces such entities to violate 17 C.F.R. § 38.151(b), which requires them to provide "impartial access to [their] markets and services." Dkt. No. 9 at 22; 17 C.F.R. § 38.151(b). The

CFTC interprets § 38.151(b) to prohibit DCMs from offering products in some states but not in others. Dkt. No. 9 at 22. The DCMs would thus be confronted with the dilemma of either offering their products in every state in compliance with federal law or refusing to offer them in Wisconsin in compliance with Wisconsin law. *Id.* But the CFTC has not cited any authority supporting its contention that "impartial access" means that DCMs have to offer all the same products to every customer in every location. As the Sixth Circuit ruled in *Schuler*, § 38.151(b) may be read convincingly as a non-discrimination provision. 2026 WL 1295806, at *6; *see also Flaherty*, 172 F.4th at 239 (Roth, J., dissenting).

Furthermore, another CFTC regulation forbids registered entities from listing contracts that involve activities which are unlawful under state law. 17 C.F.R. § 40.11(a)(1). This regulation could bar an entity from offering certain contracts in one state that it may offer in another, which directly contradicts the CFTC's interpretation of the "impartial access" requirement. *See Schuler*, 2026 WL 1295806, at *6. Section 38.151(b) is therefore most convincingly read as not requiring regulated entities to offer the same products in every state. Wisconsin's gambling statutes do not conflict with federal commodities regulations and are not preempted by them. "There is no implied conflict preemption if there is no conflict." *Casey*, 172 F.4th at 988.

To be sure, the Third Circuit came to the opposite conclusion. *Flaherty*, 172 F.4th at 229. That court's analysis, however, states only that the enforcement of state gambling statutes stands as an obstacle to federal objectives by creating a patchwork of state regulation. *Id.* at 230. The court did not identify any way in which compliance with state law would require a regulated party to violate federal law.

## B. Irreparable Harm and Inadequate Remedies at Law

The CFTC argues that it will suffer irreparable harm if the court does not enjoin the State's enforcement of its gambling statutes. Dkt. No. 6 at 30. A litigant may be granted a preliminary injunction only if he can demonstrate that he will suffer harm "that cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). The CFTC argues that its "ability to enforce its policies and achieve its objectives will be undermined by the state's enforcement of statutes that interfere with federal law." Dkt. No. 6 at 30. It also argues that the federal government's regulation of the commodities market will be disrupted by the enforcement of the Wisconsin statutes, which will "increase[] the risk to companies [such as those affected] *in complying with federal law*." *Id.* at 31 (emphasis added). But this argument suggests that the regulated entities' attempt to comply with Wisconsin law would put them at risk of violating federal law, which, as previously discussed, is not the case. Furthermore, the regulated entities, rather than the CFTC, would be the proper plaintiffs to challenge the State's enforcement of its statutes and to allege irreparable harm from the risk of enforcement. The CFTC has not demonstrated that it will suffer irreparable harm if the State is not preliminarily enjoined from enforcing its gambling statutes.

Consideration of harm to CDNA and Kalshi would not change the result. In *Kalshi v. Williams*, for example, Kalshi argued that without an injunction, it would face "the threat of civil and criminal enforcement by the Gaming Commission, disruption to its business in New York and nationwide, including the cost of 'comprehensively geolocat[ing] its users on a state-by-state basis,' and harm to its reputation, including the possibility that the CFTC could revoke Kalshi's designation as a DCM." 2026 WL 1961872, at *10. The court rejected Kalshi's argument, noting that while the prospect of being subject to criminal prosecution could demonstrate a showing of

irreparable injury, Kalshi's harms were largely monetary. Any civil fines that could be levied would be vacated if Kalshi ultimately prevailed on the merits, which the court had concluded in considering the merits was unlikely. And Kalshi's argument that geolocating its users on a state-by-state basis would constitute irreparable injury was found "unpersuasive because the ordinary burdens and costs of complying with government regulation are typically insufficient to constitute irreparable harm." Finally, Kalshi had presented no evidence that the CFTC would revoke its designation as a DCM. *Id.* Other courts have rejected similar arguments. *See, e.g.*, *Nessel*, 2026 WL 1895958, at *13; *Schuler*, 2026 WL 657004, at *10; *Hendricks*, 817 F. Supp. 3d at 1034–37.

**C. Balance of Equities**

The CFTC argues that the balance of equities favors granting a preliminary injunction because enjoining the State's enforcement of its gambling statutes "would be less harmful than allowing state laws that are likely preempted by federal law to be enforced." Dkt. No. 6 at 32. As discussed above, the court does not accept the premise that federal law likely preempts Wisconsin gambling statutes. Furthermore, the parties most likely to suffer harm if an injunction is not granted are the regulated entities who would lose the opportunity to profit from the sale of event contracts. Again, this would make them, as opposed to the CFTC, the proper parties to challenge the State's enforcement of its statutes.

The State, on the other hand, has identified an interest in exercising its traditional police powers to prevent the risks associated with gambling addiction. Dkt. No. 31 at 30. The State notes that "[t]he American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders categorizes gambling disorder as an addictive disorder." *Id.* at 27 (citing Dkt. Nos. 32-4 & 22-5). The State also cites a review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling which shows that "[t]he rate of gambling

problems among sports bettors is at least twice as high as among gamblers in general," and "the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems." *Id.* at 27–28 (citing Dkt. No. 32-6 at 1). Since the CFTC has failed to show any significant harm, let alone harm that would outweigh that suffered by the State, the court finds that the balance of equities does not favor granting a preliminary injunction.

**CONCLUSION**

For the reasons set forth above, the court concludes that venue is proper in this district and the CFTC has standing to bring this action. The State's motions to change venue (Dkt. No. 9) and dismiss (Dkt. No. 27) are therefore **DENIED**. The motions to intervene and joinder by CDNA (Dkt. Nos. 12, 14) and Kashi (Dkt. Nos. 23, 26) are **DENIED**, as is the motion to intervene by the AGA (Dkt. No. 46). Finally, because the CFTC has failed to show that it is likely to prevail on the merits of its argument, that it will suffer irreparable harm, or that the balance of equities favors it, its motion for a preliminary injunction enjoining the State from enforcing its gambling statute (Dkt. No. 6) is **DENIED**. The Clerk is directed to place this matter on the court's calendar for a telephone Rule 16 conference to address further scheduling. *See* Fed. R. Civ. P. 16(b).

**SO ORDERED** at Green Bay, Wisconsin this 28th day of July, 2026.

William C. Griesbach
United States District Judge