Nos. 26-2675, 26-2636, 26-2696

IN THE

# United States Court of Appeals for the Seventh Circuit

UNITED STATES OF AMERICA *and* COMMODITY FUTURES TRADING COMMISSION,

*Plaintiffs-Appellants / Cross-Appellees*,

KALSHIEX LLC *and* AMERICAN GAMING ASSOCIATION,

*Appellants*,

v.

STATE OF WISCONSIN *and* JOSHUA L. KAUL,

*Defendants-Appellees / Cross-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Wisconsin, No. 2:26-cv-749
(Hon. William C. Griesbach)

**AMICUS BRIEF OF KALSHIEX LLC IN SUPPORT OF PLAINTIFFS-APPELLANTS IN NO. 26-2636**


DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

SARAH A. ZYLSTRA
BOARDMAN & CLARK LLP
1 S. Pinckney St., Ste. 410
P.O. Box 927
Madison, WI 53701

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

*Counsel for Amicus Curiae KalshiEX LLC*


September 28, 2026

Save As | Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2636

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
KalshiEX LLC (amicus curiae)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Milbank LLP; Boardman & Clark LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: s/ Neal Kumar Katyal    Date: 09/28/2026

Attorney's Printed Name: Neal Kumar Katyal

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: Milbank LLP, 1101 New York Ave. NW
Washington, DC 20005

Phone Number: (202) 835-7505    Fax Number: (202) 263-7586

E-Mail Address: nkatyal@milbank.com

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2636

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

KalshiEX LLC (amicus curiae)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Milbank LLP; Boardman & Clark LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: s/ Joshua B. Sterling Date: 09/28/2026

Attorney's Printed Name: Joshua B. Sterling

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Milbank LLP, 1101 New York Ave. NW

Washington, DC 20005

Phone Number: (202) 835-7535 Fax Number: (202) 263-7586

E-Mail Address: jsterling@milbank.com

Save As | Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2636

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
KalshiEX LLC (amicus curiae)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Milbank LLP; Boardman & Clark LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: s/ Colleen E. Roh Sinzdak Date: 09/28/2026

Attorney's Printed Name: Colleen E. Roh Sinzdak

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Milbank LLP, 1101 New York Ave. NW

Washington, DC 20005

Phone Number: (202) 835-7570 Fax Number: (202) 263-7586

E-Mail Address: crohsinzdak@milbank.com

Save As Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2636

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
KalshiEX LLC (amicus curiae)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Milbank LLP; Boardman & Clark LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: s/ William E. Havemann Date: 09/28/2026

Attorney's Printed Name: William E. Havemann

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Milbank LLP, 1101 New York Ave. NW
Washington, DC 20005

Phone Number: (202) 835-7518 Fax Number: (202) 263-7586

E-Mail Address: whavemann@milbank.com

rev. 12/19 AK

Save As Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2636

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
KalshiEX LLC (amicus curiae)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Milbank LLP; Boardman & Clark LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: s/ Samantha K. Ilagan Date: 09/28/2026

Attorney's Printed Name: Samantha K. Ilagan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Milbank LLP, 1101 New York Ave. NW
Washington, DC 20005

Phone Number: (202) 835-7594 Fax Number: (202) 263-7586

E-Mail Address: silagan@milbank.com

rev. 12/19 AK

Save As | Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2636

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

KalshiEX LLC (amicus curiae)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Milbank LLP; Boardman & Clark LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: s/ Natasha R. Khan Date: 09/28/2026

Attorney's Printed Name: Natasha R. Khan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Milbank LLP, 1101 New York Ave. NW

Washington, DC 20005

Phone Number: (202) 835-7573 Fax Number: (202) 263-7586

E-Mail Address: nkhan@milbank.com

rev. 12/19 AK

Save As Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2636

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
KalshiEX LLC (amicus curiae)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Milbank LLP; Boardman & Clark LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: s/ Davis B. Campbell Date: 09/28/2026

Attorney's Printed Name: Davis B. Campbell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Milbank LLP, 55 Hudson Yards

New York, NY 10001

Phone Number: (212) 530-5222 Fax Number: (212) 822-5222

E-Mail Address: dcampbell@milbank.com

Save As Clear Form

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2636

Short Caption: United States v. Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
KalshiEX LLC (amicus curiae)

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Milbank LLP; Boardman & Clark LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Kalshi, Inc.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

---

Attorney's Signature: s/ Sarah A. Zylstra Date: 09/28/2026

Attorney's Printed Name: Sarah A. Zylstra

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: Boardman & Clark LLP, P.O. Box 927, 1 South Pinckney St. Ste 410

Madison, WI 53701

Phone Number: (608) 283-1741 Fax Number: (608) 283-1709

E-Mail Address: szylstra@boardmanclark.com

**TABLE OF CONTENTS**

Page

IDENTITY AND INTEREST OF AMICUS CURIAE .................... 1

INTRODUCTION .................... 2

BACKGROUND .................... 6

I. STATUTORY SCHEME .................... 6

II. STATUTORY HISTORY .................... 8

III. REGULATORY FRAMEWORK .................... 14

ARGUMENT .................... 15

I. THE CEA PREEMPTS STATE GAMBLING LAWS AS APPLIED TO DCM-TRADED SPORTS-EVENT CONTRACTS .................... 15

A. The CEA's Exclusive-Jurisdiction Provision Expressly Preempts State Regulation .................... 15

B. Kalshi's Sports-Event Contracts Fall Within The CEA's Express-Preemption Provision .................... 19

C. The CEA Impliedly Preempts State Gambling Laws .................... 23

D. Arguments Against Preemption Contravene The CEA's Text .................... 25

II. KALSHI'S HARMS STRONGLY SUPPORT AN INJUNCTION .................... 34

CONCLUSION .................... 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992)....................................... 3, 16, 24, 25, 26, 27

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) .................................................................. 19

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .................................................................8, 32, 33

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) ..........................................................................5, 32

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019) ...................................................... 24, 25, 27

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ............................................................................. 16

*Inv. Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) .........................................................29, 30

*KalshiEX LLC v. Assad,*
--- F.4th ----, No. 25-7516, 2026 WL 2543846
(9th Cir. Aug. 28, 2026) ........................................... 3, 4, 16, 17, 26, 31, 32

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ................................................3, 4, 16, 24, 30

*KalshiEX LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026)...................................................... 34

*KalshiEX LLC v. Schuler,*
--- F.4th ----, No. 26-3196, 2026 WL 2884087
(6th Cir. Sep. 25, 2026) ............................................................ 26, 28, 32

Page(s)

*Lockhart v. United States*,
577 U.S. 347 (2016) .......... 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 6, 14, 24

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) .......... 15, 16

*N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*,
635 F.3d 66 (2d Cir. 2011) .......... 16, 17

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
928 F.3d 639 (7th Cir. 2019) .......... 19

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) .......... 6, 28

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .......... 25, 26

*Rice v. Bd. of Trade of Chi.*,
331 U.S. 247 (1947) .......... 9, 17

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 16, 17, 24

*Slaney v. Int'l Amateur Athletic Fed'n*,
244 F.3d 580 (7th Cir. 2001) .......... 16

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......... 12, 29, 30

*Wisconsinites for Alts. to Smoking & Tobacco, Inc. v. Casey*,
172 F.4th 976 (7th Cir. 2026) .......... 25

Page(s)

**STATUTES:**

5 U.S.C. § 551(13) ........ 20

7 U.S.C. §§

1a(6) ........ 7

1a(9) ........ 6, 7

1a(19) ........ 11

1a(19)(iv) ........ 28

1a(37) ........ 7

1a(47)(A) ........ 7

1a(47)(A)(ii) ........ 3, 4, 13, 21, 28, 29

1a(47)(A)(iv) ........ 13, 21, 23

1a(47)(B) ........ 13

1a(51) ........ 33

1a(51)(A)(ii) ........ 7

2(a)(1)(A) ........ 1, 2, 6, 8, 9, 10, 12, 15, 16, 17, 19, 20, 26, 30

2(e) ........ 12

5(a) ........ 5, 6, 29, 34

6a ........ 7

6b ........ 7

6c ........ 7

Page(s)


7(d) ........................................................................................ 7

7(d)(1)(A) ........................................................................................ 14

7(d)(1)(B)........................................................................................ 14

7(d)(2) ........................................................................................ 14

7(d)(3) ........................................................................................ 31

7a-2(c) ........................................................................................ 14

7a-2(c)(1) ........................................................................................ 14

7a-2(c)(5)(B) ........................................................................................ 14

7a-2(c)(5)(C)(i).................................................................. 5, 13, 19, 27

7a-2(c)(5)(C)(ii)........................................................................................ 14

8(b) ........................................................................................ 7, 8

9 ........................................................................................ 7

9(10)(C)........................................................................................ 7, 8

13 ........................................................................................ 7, 8

13-1 ........................................................................................ 13

13a-2(1) ........................................................................................8, 18

13a-2(7) ........................................................................................ 18

16(e)(1)(B)(i)........................................................................................ 18

16(e)(2)........................................................................................8, 11

15 U.S.C. § 8302(d)(1) ..............................................................13, 30

Page(s)

15 U.S.C. § 8321(b) .......... 13

31 U.S.C. § 5362(1)(E)(ii) .......... 12, 18

31 U.S.C. § 5362(10)(A) .......... 12, 18

Commodity Exchange Act of 1936,
Pub. L. No. 74-675, 49 Stat. 1491 .......... 9

Commodity Futures Modernization Act of 2000,
Pub. L. No. 106-554, 114 Stat. 2763A–365 .......... 10, 11, 12

**REGULATIONS:**

17 C.F.R. §§

38.4(b) .......... 14

38.151(b) .......... 14, 25

38.251(a) .......... 31

pt. 38 .......... 14

40.2(a) .......... 14

40.3(b) .......... 14

40.11(a)(1) .......... 27

Concept Release,
73 Fed. Reg. 25,669 (May 7, 2008) .......... 10

Further Definition of "Swap,"
77 Fed. Reg. 48,208 (Aug. 13, 2012) .......... 30

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026) .......... 15, 19, 23, 31, 32

Page(s)

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30464 (1974) .......... 17

156 Cong. Rec. S5923 (daily ed. July 15, 2010) .......... 12, 13

*Hearings Before the H. Comm. on Agric.*, 93d Cong. (1974) .......... 9

*Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. (1974) .......... 9, 10

H.R. Rep. No. 93-975 (1974) .......... 9

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) .......... 10, 24

H.R. Rep. No. 106-711, pt. 2 (2000) .......... 11

S. Rep. No. 93-1131 (1974) .......... 10

**OTHER AUTHORITIES:**

Al Tylis et al., *The Financing Gap in Sports*, Apollo (Dec. 2025), https://perma.cc/PF34-XZZP .......... 22

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5 .......... 22

Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679 .......... 22

*Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .......... 21

Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM .......... 22

Page(s)

Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents*, CFTC (July 14, 2026), https://perma.cc/82PB-J6QM ........ 34

*CME Group partners with FutureSports to introduce world's first futures on sports indexes*, CME Grp. (July 29, 2026), https://perma.cc/XJ7L-HKKA ........ 23

CME Submission No. 26-316 (July 14, 2026), https://perma.cc/HW9L-XB9C ........ 23

CME Submission No. 26-387 (Sep. 25, 2026), https://perma.cc/5LWB-TJHC ........ 23

*Event*, Oxford American Dictionary and Thesaurus (2d ed. 2009) ........ 28

*Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) ........ 28

*Exclusive*, American Heritage Dictionary (5th ed. 2022) ........ 15, 16

John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825 (1982) ........ 8

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) ........ 17, 18

Krystal Hur, *Cantor Lets Hedge Funds Place Big Bets on Kalshi's Prediction Markets*, Wall St. J. (Aug. 19, 2026), https://perma.cc/CY69-CYTZ ........ 23

## IDENTITY AND INTEREST OF AMICUS CURIAE

KalshiEX LLC ("Kalshi") is a CFTC-registered exchange that offers event contracts related to climate, technology, economics, politics, sports, and more. The issue presented is whether the Commodity Exchange Act ("CEA"), which grants the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" to regulate trading on federally registered derivatives exchanges, 7 U.S.C. § 2(a)(1)(A), preempts Wisconsin from regulating event contracts involving sports.

Kalshi has a direct stake in the outcome of this appeal. In April, the Wisconsin Attorney General filed an enforcement proceeding to prohibit Kalshi from offering sports-event contracts in Wisconsin. The federal government initiated this case to stop that proceeding, which intrudes on the CFTC's exclusive regulatory jurisdiction. The district court denied a preliminary injunction, and the CFTC appealed. This appeal will determine whether states in this Circuit can proceed with civil—or even criminal—enforcement against Kalshi for offering event contracts that its exclusive federal regulator permits.

The district court erroneously denied Kalshi's motion to intervene as a plaintiff below. Kalshi separately appealed that denial and filed its opening brief in that appeal on September 21, 2026. Because that brief was directed to the intervention question rather than the merits, Kalshi now files this amicus brief

to explain why the district court profoundly erred in denying preliminary relief.[1] Kalshi readily satisfies the standard for filing an amicus brief. Fed. R. App. P. 29(a)(3). As explained, it has a direct and substantial interest in this appeal which the CFTC, as Kalshi's regulator, cannot adequately represent. And Kalshi is well-positioned to speak on these issues as a party litigating them nationwide.

## INTRODUCTION

For over half a century, it has been clear that the federal government—rather than the states—has exclusive regulatory authority over trading on derivatives exchanges. The CEA's plain text says as much. It grants a federal agency, the CFTC, "exclusive jurisdiction" over all "agreements …, and transactions involving swaps or … future[s] … traded or executed" on federally designated contract markets ("DCMs"). 7 U.S.C. § 2(a)(1)(A). That means that, no matter how much Wisconsin or any other state may believe derivatives trading resembles gambling, the state cannot regulate it without contravening Section 2(a)(1)(A).

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amicus curiae and its counsel, made any monetary contribution toward the preparation or submission of this brief.

That principle decides this case. Below, the CFTC sued to stop Wisconsin from punishing Kalshi and other DCMs for offering certain event contracts subject to the CFTC's exclusive jurisdiction. These DCM-traded event contracts are "agreements," and they are also "swaps," which the CEA defines as "contract[s]" where payment depends on the "occurrence" of an "event … associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). They therefore fall within the CFTC's exclusive remit. Wisconsin can no more enforce its state laws against these event contracts than it can prosecute the Chicago Mercantile Exchange for offering weather swaps or grain futures.

The district court held otherwise, concluding the CEA does not preempt state regulation of derivatives trading. RSA21. That holding is obviously incorrect. A state's exercise of *concurrent* jurisdiction over derivatives is self-evidently incompatible with *exclusive* CFTC jurisdiction. The court's holding is also radical—it would let states regulate derivatives under state law, subjecting nationwide exchanges to the patchwork of regulation Congress sought to eliminate when it created the CFTC and gave it exclusive jurisdiction. This Court has concluded that far less extreme incursions into the CFTC's jurisdiction are preempted, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992), and other courts of appeals have likewise

recognized the CEA's preemptive effect, *see KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026); *KalshiEX LLC v. Assad*, --- F.4th ----, No. 25-7516, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026).

The district court alternatively held that Kalshi's event contracts fall outside the CFTC's jurisdiction because they are not "swaps." The court singled out sports events and categorically excluded them from the CEA's broad "swap" definition. That holding cannot be reconciled with the CEA's text, which grants the CFTC jurisdiction over "*any* agreement" providing for payment based on the "occurrence" of an "event or contingency" associated with "potential financial, economic, or commercial consequence[s]." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). As the Third Circuit held, sports events "fit comfortably" within this definition, *Flaherty*, 172 F.4th at 227 (quoting *id.* at 233 (Roth, J., dissenting)). Kalshi's sports-event contracts provide for payment based on the occurrence of certain sports events—such as a Spain World Cup win or a Chicago Bears loss—that have potential financial consequences for advertisers, sponsors, manufacturers, and merchandise retailers, among others. In fact, entities often hedge sports-related financial risks on Kalshi. The CEA does not permit courts to carve out exclusions from the CFTC's jurisdiction based on policy-driven assumptions about congressional intent. A swap is a swap, whether it involves weather, interest rates, sports, or anything else.

If there were any doubt, the CEA's "Special [R]ule"—a provision the district court effectively ignored—would resolve it. 7 U.S.C. § 7a-2(c)(5)(C)(i). That provision specifically governs "[e]vent contracts," including "swaps," that "involve … gaming." *Id.* Far from categorically barring these contracts from DCMs or permitting concurrent state regulation, the Special Rule provides that "the Commission" "may" determine such contracts are "contrary to the public interest." *Id.* Absent such a determination, they are like all other instruments under exclusive CFTC jurisdiction.

The district court's decision rested on the view that sports-event contracts resemble gambling and Congress did not intend to entrust such instruments to CFTC regulation. To the contrary, *all* derivatives trading involves speculation, and states historically viewed *all* derivatives trading as "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). One of Congress's principal goals in granting the CFTC exclusive jurisdiction was to end those efforts. The reason is straightforward: Nationwide derivatives exchanges that connect buyers and sellers at prices set by market forces maximize hedging utility and provide the public with valuable information crowdsourced by traders with financial incentives to predict accurately. Congress determined that instruments traded in this manner are affected with a "national public interest"

and require oversight by one federal regulator rather than a patchwork of states. 7 U.S.C. § 5(a).

The district court disregarded that congressional decision in favor of its own erroneous intuitions about what Congress might have wanted. Its decision erroneously "replace[s] the actual text with speculation as to Congress' intent." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (citation omitted). This Court should reverse.

## BACKGROUND

### I. STATUTORY SCHEME

1. The CEA establishes a "comprehensive regulatory structure to oversee" on-DCM derivatives trading. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). The statute explains that derivatives trading—that is, exchanging financial instruments whose prices depend on underlying commodities—serves the "national public interest" by establishing "a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). To vindicate that national interest, the CEA grants a federal agency—the CFTC—"exclusive jurisdiction" to regulate DCM-traded derivatives. *Id.* § 2(a)(1)(A).

The CFTC's statutory jurisdiction is broad. The CEA defines "commodit[ies]" to include almost "all … goods and articles … and all services,

rights, and interests … in which contracts for future delivery are presently or in the future dealt in." *Id.* § 1a(9). The range of covered derivatives is defined with equal breadth. For example, the six-part definition of "swap" includes not just interest-rate and weather swaps but also any contract providing for payment "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence," and any "transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A).

2. The CEA also includes numerous provisions regarding DCMs—federally designated exchanges on which derivatives trade. DCMs are defined as "trading facilit[ies]," *id.* §§ 1a(6), (37), which operate through a "pre-determined non-discretionary" algorithm to automatically match bids and offers, *id.* § 1a(51)(A)(ii). The CEA's detailed instructions mandate how exchanges become DCMs, how they should operate upon designation, and what instruments can be traded on them. *See id.* § 7(d) (enumerating 23 "[c]ore principles for contract markets"). The CEA contains numerous provisions designed to protect the integrity of on-DCM trading, including prohibitions on fraud, manipulation, and disruptive trading. *Id.* §§ 6a, 6b, 6c, 9. And the CEA gives the CFTC enforcement tools to ensure compliance with the statutory

scheme, including civil penalties, revocation of licensing, and referral for criminal enforcement. *Id.* §§ 8(b), 9(10)(C), 13.

3. Federal preemption is the cornerstone of the CEA. Section 2(a)(1)(A) grants the CFTC "exclusive jurisdiction" over "accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery …, traded or executed on a [designated] contract market" or other federally regulated "board of trade." Section 16(e)(2) extends preemption of state "gaming" or "bucket shop[ ]" laws to a narrow class of instruments traded *off*-DCM. And Section 13a-2(1), entitled "Jurisdiction of States," lets states enforce the CEA—but only against entities "other than a [designated] contract market."

## II. STATUTORY HISTORY

1. Derivatives trading has not always been federally regulated. Historically, because futures traders often exchanged contracts to speculate on the future price of goods without delivery, states decried futures trading as "gambling in grain." *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888). States enacted "anti-gaming" and "anti-bucket shop" laws to make it "as difficult as humanly possible to trade futures." John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982) (quotation marks omitted).

2. Congress first recognized the national interest in derivatives trading with the Grain Futures Act of 1922. In 1936, Congress enacted the original CEA, which expanded the Grain Futures Act framework to cover more commodities and adopted anti-fraud measures. Pub. L. No. 74-675, 49 Stat. 1491, 1491-99. But Congress stopped short of preemption. The original CEA did *not* provide that the federal system for regulating "trading on contract markets is exclusive of state regulation," and it preserved "'any State law applicable'" to certain "'transaction[s]'" regulated by the Act. *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 253-255 (1947) (citation omitted).

Over the following decades, a patchwork of regulations emerged, leading exchanges to recommend that "federal policy … be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1974) ("House Hearings").

3. Congress responded with the Commodity Futures Trading Commission Act of 1974, which aimed to "[b]ring[ ] all futures trading under federal regulation." H.R. Rep. No. 93-975, at 54 (1974). This statute created the CFTC and made federal authority supreme through Section 2(a)(1)(A)'s exclusive-jurisdiction provision, which Congress enacted to avoid "any possible conflicts over jurisdiction." *House Hearings* at 128. After all, "different State

laws would just lead to total chaos" absent "preemption." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) (statement of Sen. Clark).

When the House added a state-law savings clause to Section 2(a)(1)(A), the Senate promptly revised it to ensure it applied " 'except as hereinabove provided' " in the exclusive-jurisdiction provision. S. Rep. No. 93-1131, at 31 (1974). That proviso ensured "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." *Id*. at 6. The Senate also "struck" the provision in the 1936 Act that had preserved " 'any State law applicable' " to derivatives transactions. H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). As the Conference Report explained, these amendments sought to "preempt the field insofar as futures regulation is concerned." *Id.*

4. Throughout the 1990s, derivative instruments known as event contracts gained popularity. *See* Concept Release, 73 Fed. Reg. 25,669, 25,671 (May 7, 2008). In 2000, Congress amended the CEA in the Commodity Futures Modernization Act ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763A–365, which approved of event contracts by expressly recognizing that an "occurrence" or "contingency" could be a commodity. The CFMA created a new category of commodity labeled "excluded commodit[ies]"—so named not because they were barred, but because they were excluded from the CEA's requirement that derivatives must be traded on-DCM. *Id.* at 2763A–377.

Sophisticated market participants known as "eligible contract participants" could enter transactions in excluded commodities "over-the-counter"—*i.e.*, off-exchange. *Id.* at 2763A–366, 2763A–379. Congress defined excluded commodities to include certain intangibles such as "interest rate[s]," "commercial ind[ices]," and—as most relevant here—financially consequential "occurrence[s]." 7 U.S.C. § 1a(19).

Because "occurrence[s]" were excluded commodities, the CFMA allowed event contracts to be traded off-DCM. To prevent state gambling laws from interfering with these transactions, Congress enacted a new preemption provision now codified at Section 16(e)(2), which mandates that the CEA "shall supersede and preempt" any state law "that prohibits or regulates gaming or the operation of bucket shops" as to transactions "excluded" or "exempted" from the on-DCM trading requirement. The Committee Report explained that the then-"current" CEA already "supersede[d] and preempt[ed]" state regulation of "transactions conducted" on registered entities like DCMs. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). The new provision clarified that the CEA likewise "supersedes and preempts State gaming and bucket shop laws" as to excluded off-DCM transactions. *Id.*

The CFMA also addressed derivatives known as "swaps." As with excluded commodities, Congress in 2000 exempted most swaps from the CEA's

on-DCM trading requirement. 114 Stat. at 2763A–379. Congress also barred the CFTC and SEC from regulating most swaps, including over-the-counter swaps markets. *See id.* at 2763A–452-453.

5. In 2006, Congress addressed the application of gambling laws to interstate internet transactions in the Unlawful Internet Gambling Enforcement Act ("UIGEA"). That statute generally prohibits internet "bet[s] or wager[s]" if they are illegal in the state where they are initiated or received. 31 U.S.C. § 5362(10)(A). But UIGEA's prohibitions do not apply to transactions conducted on DCMs under the CEA, in keeping with the CFTC's exclusive jurisdiction over on-DCM trading. *Id.* § 5362(1)(E)(ii).

6. Congress returned to the CEA in the Dodd-Frank Act of 2010. Following the financial crisis, Congress sought to bring unregulated swaps trading under federal control. *See United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). Thus, reversing its decision in the CFMA to deregulate swaps, Congress placed swaps within the CFTC's "exclusive jurisdiction" and required most swaps to be traded on-DCM. 7 U.S.C. §§ 2(a)(1)(A), 2(e). Congress also adopted "a broad and expansive" six-part "definition of the term 'swap'" to capture not just the credit default swaps that fueled the financial crisis, but other products that market participants might adopt to "evade these important new

legal requirements." 156 Cong. Rec. S5923 (daily ed. July 15, 2010) (statement of Sen. Lincoln).

As relevant here, Congress defined swaps to include event contracts—contracts providing for payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Congress also defined "swap" to include any contract "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). And it authorized the CFTC to "further define" "swap" by regulation, 15 U.S.C. § 8302(d)(1), including to cover instruments "structured to evade" Dodd-Frank's new protections, *id.* § 8321(b).

Dodd-Frank directly addressed sports-event contracts in the Special Rule, which describes "[e]vent contracts" as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon [an] occurrence, extent of an occurrence, or contingency." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule provides that the CFTC "may"—but need not—"determine" that event contracts are contrary to the public interest if they "involve" six categories, including "gaming." *Id.* § 7a-2(c)(5)(C)(i). Thus, while the CEA bans certain contracts outright, *see id.* § 13-1, and says others are not "swap[s]," *id.* § 1a(47)(B), Congress did not ban event contracts involving sports or other forms

of "gaming." Instead, Congress gave the CFTC discretion to prohibit these contracts if—but only if—the CFTC decides they are contrary to the public interest. *Id.* § 7a-2(c)(5)(C)(ii).

## III. REGULATORY FRAMEWORK

1. The CEA sets forth a "comprehensive" scheme to oversee derivatives trading. *Curran*, 456 U.S. at 356 (citation omitted). It identifies 23 "core principles" exchanges must satisfy to obtain and keep their federal designation as DCMs, 7 U.S.C. § 7(d)(1)(B), and further instructs the CFTC to promulgate "regulations … reasonably necessary to effectuate" these core principles, *id.* § 12a(5). The CFTC has accordingly adopted detailed regulations for DCMs. *See* 17 C.F.R. pt. 38. One requires DCMs to guarantee "impartial access" to their exchanges to vindicate Congress's interest in efficient and accurate pricing. *Id.* § 38.151(b); *see* 7 U.S.C. § 7(d)(2). DCMs "shall comply with" this and all other CFTC requirements. 7 U.S.C. § 7(d)(1)(A).

The CFTC also oversees listing of contracts on DCMs. *See id.* § 7a-2(c). DCMs may list contracts by submitting detailed self-certifications to the CFTC to demonstrate their compliance with the CEA. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 38.4(b), 40.2(a). The CFTC may review these certifications and determine whether contracts violate applicable law. 7 U.S.C. § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(b).

2. In June 2026, the CFTC promulgated a Notice of Proposed Rulemaking announcing a comprehensive framework for regulating event contracts—including sports-event contracts—under the Special Rule. *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The CFTC explained these instruments serve "information aggregation, price discovery, and price dissemination functions," and they also "allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists, ranging from events concerning macroeconomics, politics, weather, and climate conditions, to cultural trends and sporting events that generate billions of dollars in economic activity." *Id.* at 35,807-08 (citation modified).

## ARGUMENT

## I. THE CEA PREEMPTS STATE GAMBLING LAWS AS APPLIED TO DCM-TRADED SPORTS-EVENT CONTRACTS.

### A. The CEA's Exclusive-Jurisdiction Provision Expressly Preempts State Regulation.

1. Section 2(a)(1)(A) of the CEA expressly preempts state regulation of on-DCM trading. It grants the CFTC "exclusive jurisdiction … with respect to accounts, agreements …, and transactions involving swaps …, traded or executed on a contract market designated" by the CFTC. The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to others. *Mississippi v.*

*Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (5th ed. 2022) ("[n]ot divided or shared with others"). This Court has accordingly held that the CEA preempts "state law [that] would directly affect trading on or the operation of a futures market." *Am. Agric.*, 977 F.2d at 1156-57. The Ninth and Third Circuits have similarly recognized that Section 2(a)(1)(A) "expressly preempts state law regulating swaps 'traded or executed on' a DCM." *Assad*, 2026 WL 2543846, at *7 (citation omitted); *accord Flaherty*, 172 F.4th at 231.

A mountain of precedent interpreting analogous grants of exclusive jurisdiction confirms the point. For example, in *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), the Supreme Court held that a grant of "exclusive" "jurisdiction" to the Secretary of Agriculture means that "the matters regulated by the Federal Act cannot be regulated by the States." *Id.* at 233-234 (citation modified). More recently, the Supreme Court held a grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). In other contexts, too, this Court and others have held that a grant of "exclusive jurisdiction" preempts state law. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001); *see N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d

66, 72 (2d Cir. 2011) ("when … jurisdiction is exclusive," it "preempts other law").

2. Other features of Section 2(a)(1)(A)'s text reinforce express preemption. Its savings clause provides that Section 2 does not "supersede" the "jurisdiction" of "other regulatory authorities" under state laws "*[e]xcept as hereinabove provided*" (emphasis added). As the Ninth Circuit put it, if Section 2(a)'s exclusive-jurisdiction provision "was not intended to have preemptive effect, the '[e]xcept as hereinabove provided' clause would be superfluous." *Assad*, 2026 WL 2543846, at *7.

3. Statutory history further confirms express preemption. In 1947, the Supreme Court concluded that the CEA did not preempt state law because it lacked a "declaration" that its "system" was "exclusive of state regulation." *Bd. of Trade of Chi.*, 331 U.S. at 253. That distinguished the CEA from the statute at issue in *Santa Fe*, which preempted state law because it granted "exclusive" jurisdiction to a federal agency. *Id.* at 250, 253; *see Santa Fe*, 331 U.S. at 233. Congress in 1974 therefore made the CFTC's "jurisdiction" over on-DCM trading "exclusive." 7 U.S.C. § 2(a)(1)(A). Moreover, Senate drafters deleted the CEA provision preserving state law "to assure that Federal preemption is complete," 120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis), and added the "except as hereinabove provided" proviso. These changes "wholly and

unequivocally eliminated" the bases the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-693 (1982).

4. Following the 1974 amendments, Congress enacted other provisions underscoring that the CFTC's exclusive jurisdiction prohibits state regulation of on-DCM trading. The 1978 amendments, for example, authorize state officials to enforce the CEA and CFTC regulations—but *not against DCMs*—and general state "antifraud statute[s]"—but not state gambling laws. 7 U.S.C. §§13a-2(1), 13a-2(7).

Congress's 1982 amendments similarly instruct that the CEA does *not* "supersede or preempt" state law as to transactions "*not* conducted on" a DCM. *Id.* §16(e)(1)(B)(i) (emphasis added). The only plausible inference of specifying no preemption as to off-DCM transactions is that Congress intended preemption as to on-DCM transactions.

Finally, UIGEA makes interstate wagering unlawful federally if it is unlawful in the state where any wager is placed or received. 31 U.S.C. §5362(10)(A). But its prohibitions do not apply to transactions conducted on DCMs, *id.* §5362(1)(E)(ii), confirming Congress's understanding that state gambling laws do not apply there.

### B. Kalshi's Sports-Event Contracts Fall Within The CEA's Express-Preemption Provision.

After concluding a statute contains an express-preemption clause, this Court "identif[ies] the domain expressly pre-empted." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 647 (7th Cir. 2019) (citation omitted). The CFTC's "exclusive jurisdiction" extends to "accounts, agreements …, and transactions involving swaps …, traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Kalshi's sports-event contracts easily qualify.

1. The Special Rule confirms the CFTC has jurisdiction over sports-event contracts. It describes "[e]vent contracts" as, among other things, "agreements" and "swaps" that may be "list[ed] … by a designated contract market." *Id.* § 7a-2(c)(5)(C)(i). The CFTC may prevent DCMs from listing event contracts involving "*gaming*" or other enumerated categories if the CFTC finds them "contrary to the public interest." *Id.* (emphasis added). The CFTC recently explained that "gaming" readily encompasses sports events. 91 Fed. Reg. at 35,825. Thus, the Special Rule disposes of any argument that sports-event contracts are outside CFTC jurisdiction. Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989).

2. The CFTC's exclusive jurisdiction extends to DCM-traded "agreements." Kalshi's event contracts plainly qualify. The ordinary meaning

of "agreement" includes contracts. While the final term in Section 2(a)(1)(A)—"transactions"—is modified by the limiting clause "involving swaps," the rule of the last antecedent dictates that this limiting clause does not modify "agreements" or other terms separated by a comma. *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("a limiting clause … should ordinarily be read as modifying only the noun or phrase that it immediately follows" (citation omitted)).

In granting the CFTC exclusive jurisdiction over all DCM-traded instruments, Congress sought to avoid the situation Kalshi now faces—where different states each claim a roving license to police every DCM-traded contract to decide whether it qualifies as a "swap" or "future," with the threat of prosecution if any regulator ultimately concludes any such contract is not a swap or future after all. But states are not powerless if they believe the CFTC has permitted a DCM to offer an improper contract. Instead, states may bring suit against the CFTC under the Administrative Procedure Act for improperly enforcing the CEA. *See* 5 U.S.C. § 551(13). States may also challenge the CFTC's forthcoming rule regulating event contracts. But states cannot short-circuit these procedures by applying state laws directly against DCMs for offering contracts their exclusive federal regulator has permitted.

3. The CFTC's exclusive jurisdiction likewise extends to DCM-traded "swaps." The CEA's six-part "swap" definition includes contracts "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). It also includes any contract "that is, or *in the future* becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv) (emphasis added). Kalshi's event contracts readily qualify.

Event contracts—including sports-event contracts—provide for a payment "dependent" on the "occurrence" of an "event" that is "associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Kalshi's contracts pay out if a specified event (like the Federal Reserve increasing interest rates or Spain winning the World Cup) occurs. To "associate" means "to join or connect together," or "to bring together or into relationship in any of various intangible ways." *Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). The events underlying Kalshi's contracts have "connect[ions]" or "relationship[s]" to potential financial consequences and therefore have the requisite "associat[ion]."

That is no less true for Kalshi's sports-event contracts than for Kalshi's other contracts. Sports is a $2.5 *trillion* industry.[2] Sports events have financial consequences for sponsors that pay performance bonuses, advertisers with financial stakes in who excels, television networks that benefit from high viewership, local businesses that profit from team wins—the list goes on. *See* CFTC Br. 39-42, Dkt. No. 19 (providing examples). These *actual* and *substantial* economic consequences easily qualify as "potential" economic consequences.

Because sports events have substantial financial consequences, the record of hedging on Kalshi grows all the time. An insurance company "expects to hedge about $30 million annually" to mitigate the "financial risks of performance incentives in athletes' and coaches' contracts."[3] Businesses use Kalshi "to hedge" costly promotions tied to team victories.[4] And hedge funds

---

[2] Al Tylis et al., *The Financing Gap in Sports* 3, Apollo (Dec. 2025), https://perma.cc/PF34-XZZP.

[3] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

[4] Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM; Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.

find that "prediction markets allow us to be much more creative with the types of hedging."[5]

4. Additionally, the widespread adoption of sports-event contracts means they are "swaps" because they are "commonly known to the trade as a swap," a definition Congress included to capture market innovation. 7 U.S.C. § 1a(47)(A)(iv). Sports-event contracts are now commonplace—offered not just by young companies like Kalshi but also by incumbents like the Chicago Mercantile Exchange.[6] The CFTC's forthcoming regulation governing sports-event contracts, which repeatedly recognizes sports-event contracts as swaps under the CEA's "plain language," further confirms they fit easily within the statute. 91 Fed. Reg. at 35,808.

**C. The CEA Impliedly Preempts State Gambling Laws.**

Even setting aside express preemption, Wisconsin's gambling laws are also field-preempted and conflict-preempted as applied to DCM-traded event contracts.

---

[5] Krystal Hur, *Cantor Lets Hedge Funds Place Big Bets on Kalshi's Prediction Markets*, Wall St. J. (Aug. 19, 2026), https://perma.cc/CY69-CYTZ.

[6] *CME Group partners with FutureSports to introduce world's first futures on sports indexes*, CME Grp. (July 29, 2026), https://perma.cc/XJ7L-HKKA; *see* CME Submission No. 26-387, CFTC (Sep. 25, 2026), https://perma.cc/5LWB-TJHC (NHL team index future); CME Submission No. 26-316, CFTC (July 14, 2026), https://perma.cc/HW9L-XB9C (event contract swap on club soccer).

1. The CEA's express text and "comprehensive regulatory structure" for DCMs, *Curran*, 456 U.S. at 356 (citation omitted), demonstrate that it occupies the field of regulating on-DCM trading. *See* CFTC Br. 28-30. Congress made the CFTC's "jurisdiction" "exclusive"—the same words the Supreme Court recognized as field-preemptive in *Santa Fe*, a seminal field-preemption case. 331 U.S. at 233-234. The Conference Report to the 1974 amendments left no doubt that "the exclusive grant of jurisdiction … would preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35. Critically, Congress did not preempt the field of gambling laws generally, but only the field of "regulating trading on federally designated contract markets." *Flaherty*, 172 F.4th at 225-226.

2. Application of state gambling laws to on-DCM trading also conflicts with federal law. This Court has recognized that subjecting DCMs to state-by-state regulation would subvert Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. The Court accordingly held that "[w]hen application of state law would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to' " Congress's objectives "and hence is preempted." *Id.* at 1156-57 (citation omitted); *see also Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 893 (7th Cir. 2019) (holding "state-tort claims" preempted). The state laws there were far less

disruptive to DCMs than Wisconsin's efforts to use its gambling laws to dictate what contracts DCMs may offer.

Conflict preemption also applies because compliance with Wisconsin law is impossible. *See Wisconsinites for Alts. to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976, 986 (7th Cir. 2026). Wisconsin wants Kalshi to stop offering its contracts to Wisconsin residents, but CFTC regulations mandate DCMs to offer "impartial access" to their products nationwide. 17 C.F.R. § 38.151(b). As the CFTC has confirmed, Kalshi cannot do both, because "discriminat[ing] by residency" as Wisconsin demands is not "impartial." CFTC Br. 32-33 (citation modified).

### D. Arguments Against Preemption Contravene The CEA's Text.

In denying a preliminary injunction, the district court contributed to a division among federal courts over whether the CEA preempts state regulation of DCM-traded event contracts. While decisions rejecting preemption vary in particulars, they share one overriding problem—they depart from the CEA's plain text in favor of judicial intuitions about congressional intent.

**1. Express preemption**. The district court barely grappled with the meaning of "exclusive jurisdiction." It principally relied on a presumption against preemption. But courts should not "invoke any presumption against pre-emption" where, as here, a statute "contains an express pre-emption clause."

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified).

The court also noted that other CEA provisions use "express preemption language," which it understood to mean that state law is not otherwise preempted. RSA22. But "there are no magic words that a statute must employ to preempt state law," and Congress *did* use express-preemption language in Section 2(a)(1)(A) by granting the CFTC "exclusive jurisdiction." *Assad*, 2026 WL 2543846, at *7. The court's interpretation squarely conflicts with *American Agriculture*—a decision the court ignored—which held that "state law" "is preempted" when it would "directly affect trading on or the operation of a futures market." 977 F.2d at 1156-57.

The Sixth Circuit recently held that the CEA "displaces direct enforcement and regulatory authority" over DCMs, but that "ancillary regulations that only incidentally burden DCMs do not come within the provision's substantive scope." *KalshiEX LLC v. Schuler*, --- F.4th ----, No. 26-3196, 2026 WL 2884087, at *21 (6th Cir. Sep. 25, 2026). That distinction would replace the CFTC's *exclusive* jurisdiction with *concurrent* jurisdiction. Nor did the panel explain how a state's assertion of authority to outright ban contracts on DCMs is "ancillary." The panel's interpretation would radically upend the law

by letting states regulate on-DCM trading for the first time since the CFTC's creation 50 years ago.

**2. Implied preemption**. The district court failed to acknowledge this Court's binding decisions in *American Agriculture*, which held that permitting states to regulate DCMs would frustrate Congress's objectives, 977 F.2d at 1156-57, and *Effex Capital*, which held that the CEA preempts state-tort claims challenging a futures association's disciplinary actions, 933 F.3d at 893. The court recognized the CFTC's impartial-access requirement as a "non-discrimination provision," but misread it to permit DCMs to geographically discriminate against users. RSA25. In doing so, the court relied on Rule 40.11, which it interpreted to "bar an entity from offering certain contracts in one state that it may offer in another." RSA25. But the rule does not apply state-by-state. Instead, it applies across-the-board to contracts that "involve[], relate[] to, or reference[] … an activity that is unlawful under *any* State or Federal law." 17 C.F.R. §40.11(a)(1) (emphasis added); *see* 7 U.S.C. §7a-2(c)(5)(C)(i). That reflects the CFTC's authority to bar contracts nationwide if they involve activity that violates *any* state law; it does not mean certain contracts will be legal in some states and not others.

**3. Swaps**. The district court interpreted the "swap" definition to categorically exclude sporting events. The court suggested a sports "outcome"

differs from an "event" and therefore cannot underlie a swap. RSA21 (citation omitted). But an outcome *is* an event. Dictionaries define "event" to include "the *outcome*, issue, or result of anything," *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) (emphasis added), or—more generally—as any "thing that happens or takes place," *Event*, Oxford American Dictionary and Thesaurus (2d ed. 2009). Common usage is in accord. One would naturally refer to a Super Bowl win or election result as an "event." The Sixth Circuit recently agreed. *Schuler*, 2026 WL 2884087, at *9.

The district court also maintained that the CEA's "goals" are "better achieved when a 'swap' is understood as involving financial instruments and measures that traditionally and directly affect commodity prices." RSA20 (citation omitted). But the "text of a law controls over purported legislative intentions unmoored from any statutory text." *Castro-Huerta*, 597 U.S. at 642. The "swap" definition requires no connection to commodity prices, instead referring to "the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Regardless, "occurrence[s]" like those underlying Kalshi's sports-event contracts *are* commodities. *Id.* §1a(19)(iv). The text likewise refutes the court's conclusion that swaps can include only events with an "inherent connection" to economic consequences. *Contra* RSA20 (citation omitted). The

text instead requires events associated with a *potential* economic consequence—effectively the opposite of *inherent*.

**4. Limiting principles**. The district court tacked on extratextual limits because it believed Congress's definition would otherwise have "no limiting principle." RSA21. But courts have no license to rewrite statutes they believe are too broad. And the court's concern was misplaced, because the CEA itself imposes three distinct limitations.

*First*, because swap events must be "associated with" potential financial consequences, DCMs cannot list contracts involving events whose financial consequences are too attenuated or speculative to establish the requisite association. 7 U.S.C. § 1a(47)(A)(ii). Not every event—and not every sports event—will qualify. For example, Kalshi does not offer trades on the winner of a coin flip or the color of the President's tie when he throws the opening pitch. This limitation, however, cannot possibly support the contention that sports events categorically lack potential economic consequences. Given sports events' substantial economic consequences, it would be bizarre to single them out as the *only* events that cannot underlie DCM-traded swaps.

*Second*, swaps must be tradeable. That much is clear from their inclusion in the Commodity *Exchange* Act, a statute dedicated to regulating markets for *exchanging* derivatives. *See* 7 U.S.C. § 5(a). When instruments *trade* without

federal oversight, their financial risks can migrate to other markets and "permit[ ] enormous exposure" to grow unmonitored. *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 173-174 (D.D.C. 2012) (citation omitted); *see Phillips*, 155 F.4th at 113. For that reason, various CEA provisions presuppose that retail swaps are tradeable. *See, e.g.*, 7 U.S.C. § 2(a)(1)(A) (referring to instruments "*traded* or executed" on-DCM (emphasis added)).

The CFTC and SEC expressly articulated this tradability requirement in a 2012 regulation promulgated under their authority to "further define" the term swap. 15 U.S.C. § 8302(d)(1); *see Flaherty*, 172 F.4th at 228. That regulation distinguishes swaps from other "consumer or commercial arrangements" principally by asking whether an instrument's "payment provisions" are "severable" and whether the instrument is "*traded on an organized market or over-the-counter*." Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,247-48 (Aug. 13, 2012) (emphasis added). Event contracts satisfy this requirement because, like other derivatives, they can be traded. But other contracts that pay out depending on the occurrence of an event flunk this requirement. A flood insurance contract, for example, pays out upon the occurrence of a weather event (a flood), but it is not a swap because it is structured as a promise to pay a specific entity for a loss. So too with sports bets, which are non-fungible

contracts between an individual and a bookmaker that cannot be traded on an exchange.

*Third*, the CEA and its implementing regulations provide further limits on what contracts DCMs may offer. For example, contracts readily susceptible to "manipulation" are prohibited, so contracts based on manipulable occurrences may not be listed. *See* 7 U.S.C. § 7(d)(3); 17 C.F.R. § 38.251(a); *cf.* 91 Fed. Reg. at 35,866-67. The remainder of the CEA's 23 core principles supply further limitations, and the CFTC may impose yet more limits under the Special Rule, its express authorization to further define "swap," and its authority to implement the core principles.

**5. Rule 40.11**. The Ninth Circuit recently held that while the CEA preempts state regulation of DCM-traded swaps, Kalshi's sports-event contracts are not swaps. The Ninth Circuit relied heavily on Rule 40.11, which it interpreted as a categorical prohibition on sports-event contracts. *See Assad*, 2026 WL 2543846, at *12; *see also id.* at *19 (Lee, J., concurring) (acknowledging the Special Rule authorizes contracts involving gaming but that Rule 40.11 "controls the outcome of this appeal"). But Rule 40.11 is not a categorical ban. As the CFTC recently confirmed, it "has consistently applied § 40.11 to operate a discretionary review framework rather than a self-executing per se prohibition,

because the opposite interpretation would violate the statute." 91 Fed. Reg. at 35,815.

Regardless, even if Rule 40.11 categorically prohibits contracts involving gaming, that does not call into question the CEA's preemptive effect. If a CFTC regulation prohibits contracts involving gaming, that *underscores* the CFTC's jurisdiction to regulate these contracts in the first place. And the CFTC is in the process of revising Rule 40.11 to confirm that contracts involving gaming are not categorically prohibited.

**6. The CEA preempts regulation of instruments states view as "gambling."** The Ninth Circuit concluded Kalshi's contracts are not swaps because the panel did not believe Congress wanted the CFTC to regulate instruments with "the hallmarks of sports betting." *Assad*, 2026 WL 2543846, at *9. The Sixth Circuit adopted similar reasoning. *Schuler*, 2026 WL 2884087, at *22. Those rationales fundamentally misunderstand the nature and purposes of derivatives markets.

Whether an instrument resembles gambling does not—and cannot—resolve the preemption question. States have *always* sought to regulate derivatives as gambling. *See* CFTC Br. 6. Before the CEA, states banned futures trading as "gambling in grain," *Dickson*, 288 U.S. at 198, because it involved speculation on future prices where parties settled contracts for cash in the hope

of making a profit, *see, e.g.*, *Cothran*, 16 N.E. at 647. Allowing states to regulate derivatives that they view as gambling would allow states to ban *all* futures trading, as they did a century ago.

While the Ninth Circuit believed that sports-event contracts are no different than state-regulated sports betting, Congress reached a different conclusion. Congress concluded the structure of derivatives differs from the structure of state-regulated wagers, warranting different regulation. State-regulated sports betting does not involve a nationwide market, because it involves no exchange. Instead, bettors contract with bookmakers who set the odds and win when their customers lose, giving them incentives to structure wagers to advantage themselves over their customers. State law therefore focuses on preventing bookmakers from engaging in abusive practices.

By contrast, event contracts—including event contracts involving sports—are structured like every other derivative. They are traded between counterparties on a nationwide exchange that affords access to all. Prices are set not by exchanges, but by a neutral algorithm based on supply and demand. 7 U.S.C. § 1a(51). Congress in the CEA commanded that instruments structured this way must be regulated uniformly by one federal regulator rather than a patchwork of states. Such uniform nationwide regulation protects against the risks posed by exchange trading—most notably, risks of market manipulation,

distortions, and insufficient liquidity. It also maximizes the "public interest" that Congress recognized derivatives exchanges advance: the hedging utility and extraordinary predictive power of market forces brought to bear on questions of economic significance. *Id.* § 5(a).

## II. Kalshi's Harms Strongly Support An Injunction.

Because Kalshi should have been permitted to intervene below, its harms must be considered in balancing the equities. These harms are extreme. Wisconsin is one of dozens of states that have sought to enforce their gambling laws against Kalshi, seeking remedies as extreme as shutting down Kalshi altogether and recovering $36 *billion* in damages. Ex. A to Letter at 2-3, *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir. Aug. 12, 2026), Dkt. No. 39.1. Arizona has brought a criminal prosecution. *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 967 (D. Ariz. 2026) (enjoining Arizona's prosecution). In Michigan, a state court ordered Kalshi to unwind trades while the CFTC ordered the opposite, making dual compliance impossible.[7] Kalshi has been subjected to directly conflicting state and federal regulation for offering event

[7] Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents*, CFTC (July 14, 2026), https://perma.cc/82PB-J6QM.

contracts its exclusive federal regulator has determined are permissible. These extensive harms warrant injunctive relief.

## CONCLUSION

This Court should reverse the district court's denial of a preliminary injunction.

September 28, 2026

Respectfully submitted,

*<u>/s/ Neal Kumar Katyal</u>*

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

SARAH A. ZYLSTRA
BOARDMAN & CLARK LLP
1 S. Pinckney St., Ste. 410
P.O. Box 927
Madison, WI 53701

*Counsel for Amicus Curiae*
*KalshiEX LLC*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Circuit Rule 29 because it contains 6,986 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and Circuit Rule 32(a) because this brief has been prepared in 14-point Calisto MT font using Microsoft Office Word for Office 365.

September 28, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Amicus Curiae*
*KalshiEX LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system on September 28, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by CM/ECF.

September 28, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Amicus Curiae*
*KalshiEX LLC*