No. 26-2636, 26-2675, 26-2696

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA, COMMODITY FUTURES TRADING COMMISSION,

Plaintiffs-Appellants,

v.

STATE OF WISCONSIN and JOSHUA L. KAUL,

Defendants-Appellees.

---

APPEAL FROM AN INTERLOCUTORY ORDER ENTERED BY THE EASTERN DISTRICT OF WISCONSIN,
HONORABLE WILLIAM GRIESBACH, PRESIDING

---

**RESPONSE BRIEF OF THE STATE DEFENDANTS**

---

JOSHUA L. KAUL
Attorney General of Wisconsin

COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

Attorneys for the State Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
(608) 294-2907 (Fax)
colin.roth@wisdoj.gov

## TABLE OF CONTENTS


JURISDICTIONAL STATEMENT .......... 1

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 4

I. Wisconsin's sports betting regulations have long coexisted with federal commodities law. .......... 4

A. Wisconsin has banned sports betting since the late 1800s. .......... 4

B. Federal commodities law has never addressed sports betting. .......... 5

II. Prediction markets facilitate sports betting in Wisconsin through their event contract trading platforms. .......... 7

III. The CFTC sued to stop Wisconsin's enforcement efforts against illegal sports betting on prediction markets. .......... 12

SUMMARY OF THE ARGUMENT .......... 14

STANDARDS OF REVIEW .......... 16

ARGUMENT .......... 17

I. The district court correctly allowed Wisconsin to continue using state law to combat illegal sports betting. .......... 17

A. The CFTC's merits showing isn't strong. .......... 17

1. The CFTC lacks Article III standing. .......... 17

a. There's no harm to CFTC operations that might support standing. .......... 18

b. The CFTC's purported sovereign injury doesn't support standing either. .......... 19

2. The CEA doesn't preempt Wisconsin's effort to combat illegal sports betting on prediction markets....22

a. Sports-related event contracts aren't "swaps." ....22

(1) Who can regulate sports betting presents a major question. ....22

(2) Sports outcomes aren't "associated with a potential … commercial consequence." ....25

(3) Sports-related event contracts don't involve the "occurrence ... of an event." ....32

(4) The CFTC offers no principled way to limit its "swap" reading, nor does the Special Rule help it. ....33

(5) Kalshi's alternative arguments shouldn't be considered and fail anyway. ....37

b. The CEA doesn't preempt Wisconsin from regulating sports bets anyway, even if they are "swaps." ....39

(1) The presumption against preemption applies here. ....39

(2) The CEA's reference to "exclusive jurisdiction" doesn't expressly preempt Wisconsin's sports betting laws. ....42

(3) The CEA doesn't preempt any relevant field either. ....50

(4) Wisconsin's sports betting laws aren't conflict preempted by the CEA. ....53

(i) Impossibility preemption. ............ 54

(ii) Obstacle preemption. .................... 56

3. Exhaustion is irrelevant to the CFTC's preemption claim. ...................................................... 62

B. The balance of equities further justifies denying a preliminary injunction. ........................................................ 64

1. Sports betting on prediction markets harms Wisconsin. ................................................................ 64

2. The CFTC identifies no counterbalancing irreparable harm. ........................................................ 65

II. The district court rightly denied Kalshi's request to intervene. ........................................................................... 66

A. Kalshi doesn't have a right to intervene. ............................ 66

1. Kalshi seeks to split its preemption claim. ................ 67

2. This litigation won't impair Kalshi's asserted interests. ...................................................................... 69

3. The CFTC adequately represents Kalshi's interests. ...................................................................... 70

B. Permissive intervention was also properly denied. ............ 72

CONCLUSION ............................................................................................ 73

## TABLE OF AUTHORITIES

### Cases

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) ........................................ 40

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ........................................ 45, 48, 52, 60, 61

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................ 21

*Artichoke Joe's Cal. Grand Casino v. Norton*,
353 F.3d 712 (9th Cir. 2003) ........................................ 40

*Bloomberg L.P. v. Commodity Futures Trading Comm'n*,
949 F. Supp. 2d 91 (D.D.C. 2013) ........................................ 7

*Bond v. United States*,
572 U.S. 844 (2014) ........................................ 30, 31, 32, 60

*Bost v. Ill. State Bd. of Elections*,
75 F.4th 682 (7th Cir. 2023) ........................................ 16, 66, 70, 71, 72

*Brandenburg Tel. Co. v. Sprint Commc'ns Co., L.P.*,
658 F. Supp. 3d 427 (W.D. Ky. 2023) ........................................ 68

*C.Y. Wholesale, Inc. v. Holcomb*,
965 F.3d 541 (7th Cir. 2020) ........................................ 40, 50

*Carson v. Milwaukee Produce Co.*,
133 Wis. 85, 113 N.W. 393 (1907) ........................................ 5

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) ........................................ 54, 56, 61

*Chevron USA Inc. v. Plaquemines Parish*,
608 U.S. 1 (2026) ........................................ 26, 27

*Council for Responsible Nutrition v. James*,
159 F.4th 155 (2d Cir. 2025) ........................................ 40

*Crothersville Lighthouse Tabernacle Church, Inc. v. Church Mut. Ins. Co., S.I.*,
168 F.4th 483 (7th Cir. 2026) ........................................ 37, 62

*Driftless Area Land Conservancy v. Huebsch*,
969 F.3d 742 (7th Cir. 2020) .......... 71

*Dunn v. Commodity Futures Trading Comm'n*,
519 U.S. 465 (1997) .......... 6

*Ecolab Inc. v. IBA, Inc.*,
810 F. Supp. 3d 183 (D. Mass. 2025) .......... 68

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019) .......... 15, *passim*

*Elections Bd. of State of Wis. v. Wis. Mfrs. & Com.*,
227 Wis. 2d 650, 597 N.W.2d 721 (1999) .......... 69

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .......... 32

*Ex parte Young*,
209 U.S. 123 (1908) .......... 69

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 28

*Geo Group, Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .......... 18

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) .......... 40

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 39

*Heller Fin., Inc. v. Midwhey Powder Co., Inc.*,
883 F.2d 1286 (7th Cir. 1989) .......... 68

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) .......... 45

*Illinois v. City of Chicago*,
137 F.3d 474 (7th Cir. 1998) .......... 19, 21

*In re Debs*,
158 U.S. 564 (1895) .......... 20

*In re Nat'l Sec. Agency Telecomm. Recs. Litig.*,
633 F. Supp. 2d 892 (N.D. Cal. 2007) .......... 20

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
121 F.4th 604 (7th Cir. 2024) .......... 16

*KalshiEX, LLC v. Assad*,
No. 25-7516, __ F.4th __, 2026 WL 2543846 (9th Cir. Aug. 28, 2026) .......2, *passim*

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 2, *passim*

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) .......... 33

*KalshiEX LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) .......... 21

*KalshiEX LLC v. Schuler*,
No. 26-3196, __ F.4th __, 2026 WL 2884087 (6th Cir. Sept. 25, 2026).......2, *passim*

*KalshiEX LLC v. Schuler*,
No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) .......... 64, 66

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991) .......... 37

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......... 50

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) .......... 24

*Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*,
924 F.3d 375 (7th Cir. 2019) .......... 69, 70

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 17, 19

*Maryland v. King,*
567 U.S. 1301 (2012) .......... 64

*McHenry County v. Kwame Raoul*,
44 F.4th 581 (7th Cir. 2022) .......... 57, 62

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) .......... 42, 43, 50

*Menominee Indian Tribe of Wisconsin v. Env't Prot. Agency*,
947 F.3d 1065 (7th Cir. 2020) .......... 63

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 5, 44

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) .......... 44

*Munaf v. Geren*,
553 U.S. 674 (2008) .......... 16

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 1, *passim*

*N.L.R.B. v. SW Gen., Inc.*,
580 U.S. 288 (2017) .......... 49

*Nalco Co. v. Chen*,
843 F.3d 670 (7th Cir. 2016) .......... 68

*Nationwide Freight Sys., Inc. v. Ill. Com. Comm'n*,
784 F.3d 367 (7th Cir. 2015) .......... 42

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
928 F.3d 639 (7th Cir. 2019) .......... 57

*New York & Atlantic Railway Co. v. Surface Transp. Bd.*,
635 F.3d 66 (2d Cir. 2011) .......... 46

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) .......... 52

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) .......... 41, 50, 51, 53

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) .......... 45

*Planned Parenthood of Wis., Inc. v. Kaul*,
942 F.3d 793 (7th Cir. 2019) .......... 72

*Puerto Rico v. Franklin California Tax-free Trust*,
579 U.S. 115 (2016) .......... 41

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 46

*Scholz v. United States*,
18 F.4th 941 (7th Cir. 2021) .......... 67, 68

*Slaney v. Int'l Amateur Athletic Fed'n*,
244 F.3d 580 (7th Cir. 2001) .......... 46

*Smith v. Pangilinan*,
651 F.2d 1320 (9th Cir. 1981) .......... 70

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 17

*State v. Vlahos*,
50 Wis. 2d 609, 184 N.W.2d 817 (1971) .......... 5

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 21

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 20

*U.S. Equal Emp. Opportunity Comm'n v. Fresh Venture Foods, LLC*,
No. 21-CV-07679, 2022 WL 3137722 (C.D. Cal. May 24, 2022) .......... 67

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) .......... 21

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .......... 18

*United States v. California*,
No. 2:25-CV-6230, 2026 WL 784514 (C.D. Cal. Mar. 18, 2026) .......... 21

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) .......... 18

*United States v. City of Boston*,
833 F. Supp. 3d 30 (D. Mass. 2026) .......... 21

*United States v. Hawaii*,
No. 25-CV-179, 2026 WL 1021227 (D. Haw. Apr. 15, 2026) .......... 21

*United States v. King County,*
122 F.4th 740 (9th Cir. 2024) .......... 18

*United States v. Michigan*,
No. 1:26-CV-246, 2026 WL 3088394 (W.D. Mich. Oct. 7, 2026) .......... 21

*United States v. Minnesota*,
No. 26-CV-2661, 2026 WL 2150211 (D. Minn. July 27, 2026) .......... 19, 45

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......... 37

*United States v. Supreme Ct. of New Mexico*,
839 F.3d 888 (10th Cir. 2016) .......... 18, 21

*United States v. Texas*,
181 F.4th 548 (5th Cir. 2026) .......... 67

*Vill. of DePue v. Exxon Mobil Corp.*,
537 F.3d 775 (7th Cir. 2008) .......... 68

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) .......... 56, 61

*W. Virginia v. Env't Prot. Agency*,
597 U.S. 697 (2022) .......... 2, 23, 39

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 23

*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018) .......... 43

*Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*,
172 F.4th 976 (7th Cir. 2026) .......... 53, 54, 57

*Wyandotte Transp. Co. v. United States*,
389 U.S. 191 (1967) .......... 20

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 39, 48, 54, 60

**Statutes**

7 U.S.C. § 1a(18) .......... 35

7 U.S.C. § 1a(47) .......... 7

7 U.S.C. § 1a(47)(A)(i) .......... 28

7 U.S.C. § 1a(47)(A)(ii) .......... 14, *passim*

7 U.S.C. § 1a(47)(A)(iii) .......... 28

7 U.S.C. § 1a(47)(A)(iii)(I), (VII), (XV) .......... 25

7 U.S.C. § 1a(47)(A)(iv) ........................................ 37, 38

7 U.S.C. § 2(a)(1)(A) ........................................ 7, *passim*

7 U.S.C. § 2(a)(1)(D) ........................................ 38

7 U.S.C. § 2(d) ........................................ 49

7 U.S.C. § 2(e) ........................................ 7, 34–35

7 U.S.C. § 2(h) ........................................ 7, 34–35

7 U.S.C. § 6(a) ........................................ 49

7 U.S.C. § 6(c) ........................................ 48

7 U.S.C. § 6(c)(1), (2)(B)(i) ........................................ 49

7 U.S.C. § 6(c)(3) ........................................ 49

7 U.S.C. § 7a-2(c)(1) ........................................ 7

7 U.S.C. § 7a-2(c)(5)(C) ........................................ 58

7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii) ........................................ 36

7 U.S.C. § 7a-2(c)(5)(C)(i)(I) ........................................ 53, 55

7 U.S.C. § 13(a)(5) ........................................ 30

7 U.S.C. § 13a-2(7) ........................................ 46, 52

7 U.S.C. § 16(e)(1) ........................................ 46

7 U.S.C. § 16(e)(2) ........................................ 43, 46

7 U.S.C. § 16(h) ........................................ 46

7 U.S.C. § 18(a) ........................................ 63

7 U.S.C. § 27f(b) ........................................ 44

8 U.S.C. § 1324a(h)(2) ........................................ 43

12 U.S.C. § 25b(b) ........................................ 43

12 U.S.C. § 1831d ........................................ 43

15 U.S.C. § 3001(a)(1) .......... 51

18 U.S.C. § 1081 .......... 29

18 U.S.C. § 1084(a)–(b) .......... 29

18 U.S.C. § 1952–53 .......... 29

18 U.S.C. § 1955 .......... 29

25 U.S.C. § 2701 .......... 29

25 U.S.C. § 2710(b)(1)(A) .......... 29

25 U.S.C. § 2710(d)(1)(B) .......... 29

28 U.S.C. § 3702 .......... 29

29 U.S.C. § 1144(a) .......... 43

31 U.S.C. § 5361(b) .......... 47

46 U.S.C. § 31307 .......... 43

49 U.S.C. § 5125(a) .......... 43

49 U.S.C. § 10501(b) .......... 46

Pub. L. No. 67–331, §§ 4–6, 42 Stat. 998 (1922) .......... 5

Pub. L. No. 93–463, § 101(a), 88 Stat. 1389 (1974) .......... 6

Pub. L. No. 97–444, § 204, 96 Stat. 2294 (1982) .......... 6

Pub. L. No. 106–554, §§ 302–03, 114 Stat. 2763 (2000) .......... 6

Pub. L. No. 111–203, 124 Stat. 1376 (2010) .......... 7, 44

Wis. Stat. ch. 185 .......... 4

Wis. Stat. § 348.085(1)–(2) .......... 4

Wis. Stat. § 562.01(9) .......... 34

Wis. Stat. § 895.055 .......... 4

Wis. Stat. § 945.01(1) .......... 5

Wis. Stat. § 945.01(1)(a) ........ 5

Wis. Stat. § 945.03(1m) ........ 4, 70

**Regulations**

17 C.F.R. § 40.2 ........ 63

17 C.F.R. § 38.151(b) ........ 54

17 C.F.R. § 38.151(b)(2) ........ 55

17 C.F.R. § 38.151(b)(1) ........ 54

**Other Authorities**

75 Fed. Reg. 80,572 (Dec. 22, 2010) ........ 55

89 Fed. Reg. 48968 (June 10, 2024) ........ 23, 24

120 Cong. Rec. S30458, 30464 (Sept. 9, 1974) ........ 49

156 Cong. Rec. S5906–07 (July 15, 2010) ........ 59

*Derivative*, Black's Law Dictionary (12th ed. 2024) ........ 6

Norman Menachem Feder,
*Deconstructing over-the-Counter Derivatives*,
2002 Colum. Bus. L. Rev. 677 (2002) ........ 6

H.R. Rep. No. 93-1383 (1974) ........ 52

Lynn A. Stout,
*Derivatives and the Legal Origin of the 2008 Credit Crisis*,
1 Harv. Bus. L. Rev. 1 (2011) ........ 44

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is complete and correct.

## INTRODUCTION

Just eight years ago, the Supreme Court observed that "[t]he legalization of sports gambling requires an important policy choice" that "each State is free to [make] on its own." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 484, 486 (2018). A State might "legaliz[e]" sports betting, "outlaw[]" it altogether, or anything in between. *Id.* Wisconsin made its choice back in 1898: sports betting is illegal, with exceptions only for the State's sovereign Tribal Nations. So, after prediction markets like Kalshi began allowing Wisconsinites to wager money on things like the Packers' margin of victory over the Bears, the State sued to halt this illegal sports betting.

But the Supreme Court was wrong, according to the Commodity Futures Trading Commission (CFTC). The States supposedly have no choice in the matter because they (and the Supreme Court) have all missed an elephant in the room: Sixteen years ago, Congress quietly preempted every State's sports betting laws through the Dodd-Frank Wall Street Reform and Consumer Protection Act, a bill aimed at preventing another 2008-style financial crisis. Although the CFTC now arbitrarily says only *certain* sports bets are off-limits to the States—those repackaged as "event contracts" by prediction markets—its limitless reading of Dodd-Frank necessarily puts *all* sports betting at stake.

How, then, did a financial reform bill purportedly reverse the "coherent federal policy" of "respect[ing] the policy choices of the people of each State" on sports betting? *Murphy*, 584 U.S. at 484. Certainly not by expressly saying so. Dodd-Frank never mentioned sports betting or anything close. Instead, the bill addressed "swaps," esoteric financial instruments that in 2008 had nearly collapsed global financial markets. And that's where the CFTC locates a revolution in national gambling policy—Dodd-Frank's adding "swaps" to the Commodity Exchange Act (CEA).

Federal preemption doesn't occur through such "subtle device[s]." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (alteration in original) (citation omitted). Congress instead uses "clear" language, *id.*, when it means to yank a historic police power from the States, especially one involving a multibillion-dollar industry like sports betting. No such clarity exists here. Sports bets aren't plainly "swaps," and the CEA is loaded with signs that the States could still regulate sports bets dressed up as "swaps" anyway. Two Circuits have thus declined to contort the CEA to reach sports betting, and this Court should join them. *See KalshiEX LLC v. Schuler*, No. 26-3196, __ F.4th __, 2026 WL 2884087 (6th Cir. Sept. 25, 2026); *KalshiEX, LLC v. Assad*, No. 25-7516, __ F.4th __, 2026 WL 2543846 (9th Cir. Aug. 28, 2026); *but see KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026).

The CFTC has injury problems too. It lacks Article III standing because Wisconsin is regulating private prediction markets, not the federal government or any private companies on which federal operations rely. If the CFTC's novel "sovereign injury" theory sufficed, Article III standing would have no teeth when the federal government sues the States on preemption grounds. Moreover, whatever harms the CFTC faces don't outweigh (for preliminary injunction purposes) Wisconsin's interest in minimizing the concrete harms associated with sports betting.

Kalshi's effort to intervene also rightly failed. Claim-splitting principles prevent Kalshi from asserting the same preemption defense against Wisconsin in two cases, as it's trying to do. And the CFTC adequately represents Kalshi's interest in avoiding state regulation, an interest Kalshi can protect through its other litigation against Wisconsin anyway.

## STATEMENT OF THE ISSUES

1. Does the CFTC lack a strong chance of success on the merits, whether because it lacks Article III standing, sports bets aren't "swaps" under the CEA, or the CEA doesn't preempt Wisconsin's sports betting laws applied to such "swaps" anyway? The district court answered yes, and this Court should affirm.

2. Would enjoining Wisconsin's efforts to halt illegal sports betting on prediction markets harm the State more than allowing those efforts would harm the CFTC? The district court answered yes, and this Court should affirm.

3. Should Kalshi's request to intervene be denied, whether because Kalshi is splitting its preemption defense into two cases, Kalshi can defend its interests through separate pending litigation against the State, or the CFTC is adequately representing Kalshi's interests here anyway? The district court answered yes, and this Court should affirm.

## STATEMENT OF THE CASE

### I. Wisconsin's sports betting regulations have long coexisted with federal commodities law.

#### A. Wisconsin has banned sports betting since the late 1800s.

Wisconsin has banned both placing sports bets and operating as a sports bookmaker since at least 1898. *See* Wis. Stat. ch. 185, §§ 4535, 4539b (1898). In parallel, Wisconsin has long provided that all agreements wagering money on "any race, fight, sport or pastime" are "void." *See* Wis. Stat. ch. 185, § 4538 (1898). And in 1921 the State declared sports betting an unlawful public nuisance. *See* Wis. Stat. § 348.085(1)–(2) (1929). That ban continues today in Wis. Stat. § 945.03(1m), which generally bars "commercial gambling," and Wis. Stat. § 895.055, which still "void[s]" sports betting contracts.

Specifically, Wisconsin law prohibits facilitating "bets," which are "bargain[s] in which the parties agree that, dependent upon chance even

though accompanied by some skill, one stands to win or lose something of value specified in the agreement." Wis. Stat. § 945.01(1). Sports wagers count as illegal "bets." *See, e.g.*, *State v. Vlahos*, 50 Wis. 2d 609, 612, 184 N.W.2d 817 (1971). Although Wisconsin once classified certain futures agreements as bets, *see Carson v. Milwaukee Produce Co.*, 133 Wis. 85, 113 N.W. 393, 395 (1907), it abandoned that approach long ago. In 1955, Wisconsin expressly excluded from the definition of an unlawful bet "[b]ona fide business transactions which are valid under the law of contracts including ... [c]ontracts for the purchase or sale at a future date of securities or other commodities." *See* 1955 Wis. Act 696, § 1 (creating Wis. Stat. § 945.01(1)(a)).

### B. Federal commodities law has never addressed sports betting.

Futures contracts—agreements to buy or sell something at a future date at an agreed-upon price—were historically used to hedge against price fluctuations in agricultural markets. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357 (1982). Congress began regulating trading markets for grain futures in 1922, partly by requiring exchanges (like the Chicago Board of Trade) to register as "contract markets." *See* Pub. L. No. 67–331, §§ 4–6, 42 Stat. 998 (1922). Federal regulation expanded to other agricultural products, and in 1974 Congress amended what had since become

the CEA to cover nonagricultural commodities. *See Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 475 n.11 (1997).

Congress introduced three major innovations in the 1970s and 1980s. First, it created the CFTC, a federal agency tasked with regulating futures agreements and markets. *See* Pub. L. No. 93–463, § 101(a), 88 Stat. 1389 (1974). Second, it gave the new agency "exclusive jurisdiction" over specified derivatives.[1] *Id.* § 201(b). And third, it required most derivatives to be traded on "designated contract markets" (DCMs) regulated by the CFTC. *See* Pub. L. No. 97–444, § 204, 96 Stat. 2294 (1982).

But the derivatives known as "swaps" initially escaped the CEA's reach. Generally, "[a] swap is an exchange of cash flows." Norman Menachem Feder, *Deconstructing over-the-Counter Derivatives*, 2002 Colum. Bus. L. Rev. 677, 701 (2002). A classic example is the interest-rate swap, in which a borrower transfers a variable interest rate obligation to another party in exchange for fixed-rate payments, thereby hedging against the risk of rate increases. *Id.* at 702. In 2000, Congress barred the Securities Exchange Commission from regulating "swaps," *see* Pub. L. No. 106–554, §§ 302–03, 114 Stat. 2763 (2000), and the CEA didn't cover them either. Swaps could therefore be traded outside

[1] Derivatives are "financial instrument[s] whose value depends on or is derived from the performance of a secondary source such as an underlying bond, currency, or commodity." *Derivative*, Black's Law Dictionary (12th ed. 2024).

DCMs (i.e. "over-the-counter"), a deregulatory environment that "contributed significantly" to the 2008 financial crisis. *See* Financial Crisis Inquiry Comm'n Report ("FCIC Rep."), xxiv–xxv, 48–50, https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

To reduce the risk of another crisis, Congress brought swaps out of the shadows through Dodd-Frank. *See* Pub. L. No. 111–203, 124 Stat. 1376 (2010). The bill added "swaps" to the list of instruments subject to the CFTC's "exclusive jurisdiction," required that many swaps be traded on DCMs, and subjected many swaps to "clearing" requirements.[2] *See id.* §§ 721(a)(21) (creating 7 U.S.C. § 1a(47)), 722(a) (amending 7 U.S.C. § 2(a)(1)(A)), 723(a)(2)–(3) (creating 7 U.S.C. § 2(e), (h)). To ease this new regulatory burden, Dodd-Frank also allowed DCMs to self-certify that agreements they list for trading comply with the CEA. *Id.* § 745(b) (creating 7 U.S.C. § 7a-2(c)(1)).

## II. Prediction markets facilitate sports betting in Wisconsin through their event contract trading platforms.

Ten years after Dodd-Frank, Kalshi in 2020 became the first major prediction market to register with the CFTC as a DCM.[3] In short, prediction

---

[2] "Clearing" involves a third-party "assuming the credit risk of both counterparties" to the swap. *Bloomberg L.P. v. Commodity Futures Trading Comm'n*, 949 F. Supp. 2d 91, 99 (D.D.C. 2013).

[3] *Designated Contract Markets*, Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?col=Date&dir=ASC&page=1.

markets are online trading platforms that allow customers to transact event contracts, which are "derivative contract[s] whose payoff is based on a specified event, occurrence, or value such as the value of a macroeconomic indicator, corporate earnings, level of snowfall, or dollar value of damages caused by a hurricane." *Contracts & Products*, Commodity Futures Trading Comm'n, https://perma.cc/VQV4-5Y3M.

As Kalshi has put it, such contracts let customers "wager on diverse topics" by letting them "place bets using simple 'yes' or 'no' contracts." (Doc. 32-1:2.) A customer buys an event contract at a price "between one cent and 99 cents" that reflects the "probability that an event will occur"; if the customer takes the correct position, they'll receive $1 per contract and nothing otherwise. (Doc. 32-2:2–3.) When event contracts are traded on prediction markets like Kalshi's, their prices "fluctuate in real time" because "[e]ach trader's bet helps shape the market consensus." (*Id.*) Kalshi's first self-certified event contracts were tied to traditional economic indicators: the U.S. GDP, the U.S.-China trade deficit, the U.S. Consumer Price Index, and U.S. home sales.[4]

[4] *Designated Contract Markets,* Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?Organization=KEX&Status=Certified&dir=ASC&col=Date.

Kalshi began dipping its toes into sports in 2024, self-certifying event contracts tied to Bill Belicheck's coaching career and Lebron James' choice of teams.[5] And starting in 2025, it self-certified contracts that mimic ordinary sports bets, like whether a team will win its league's championship,[6] a team's margin of victory,[7] whether a certain number of points will be scored,[8] and a player's individual points scored.[9] Kalshi's customers can now even link multiple sports-related outcomes in a single contract akin to multi-leg parlay bets.[10]

To illustrate, Kalshi once offered event contracts tied to the 2026 NCAA college basketball championship. (Doc. 32:1–4.) Customers in Wisconsin could use Kalshi to wager money on all sorts of outcomes in that game.

---

[5] *Designated Contract Markets,* Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?Organization=KEX&Status=Certified&col=Date&dir=ASC&page=9.

[6] *Designated Contract Market Products: 54955,* Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/54955.

[7] *Designated Contract Market Products: 57879,* Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/57879

[8] *Designated Contract Market Products: 57878,* Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/57878

[9] *Designated Contract Market Products: 58662,* Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/58662

[10] *Designated Contract Market Products: 58033,* Commodity Futures Trading Comm'n, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/58033; *Parlay Betting Guide: How Parlays Work*, Caesars Sportsbook, https://www.caesars.com/sportsbook-and-casino/betting-guide/parlay.

- They could bet on which team would win:




- They could bet on the point spread and the total points scored:



- And they could even bet on which team would score ten points first:




Kalshi once described sports-related event contracts like these as "nationwide legal sports betting":






*See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2024), perma.cc/DT9Y-6C7B.

Every day, major prediction markets operating through DCMs offer thousands of different sports bets.[11] This is now a multi-billion-dollar business, bigger even than sports betting at traditional sportsbooks.[12]

## III. The CFTC sued to stop Wisconsin's enforcement efforts against illegal sports betting on prediction markets.

To prevent Kalshi and several other major prediction markets from facilitating illegal sports betting in Wisconsin, the State filed three civil enforcement actions alleging that their repeated, open, ongoing violations of state gambling law are causing a public nuisance. (Doc. 1:20–21.)

The CFTC sued Wisconsin days later, arguing that the CEA preempts the State's enforcement efforts. (Doc. 1.) The CFTC requested a preliminary injunction (Doc. 6), the State moved to dismiss for lack of standing (Doc. 27), and several third parties (including two prediction markets) sought to intervene (Doc. 12; 23; 46).

---

[11] *See* Kalshi, https://kalshi.com/category/sports/all-sports; Polymarket, https://polymarket.us/sports; Crypto, https://web.crypto.com/explore/predict/sports; Robinhood, https://robinhood.com/us/en/prediction-markets/ (select "Sports"); Coinbase, https://www.coinbase.com/predictions/sports.

[12] *Prediction Markets' Trading Volume Doubled Between May and July, Largely Driven by Sports*, Pew Research Center, Sept. 23, 2026, https://www.pewresearch.org/short-reads/2026/09/23/prediction-markets-trading-volume-doubled-between-may-and-july-largely-driven-by-sports/.

The district court denied all these motions. (Doc. 54.) It found Article III standing through the CFTC's allegation that Wisconsin's enforcement efforts "interfere[] with and undermine[] the national public interest in authorizing and regulating derivatives." (Doc. 54:11.) The court also declined to let the prediction markets intervene, reasoning that (1) the CFTC, through this preemption case and others, is "vigorously representing" interests that are "aligned with" prediction markets' (Doc. 54:12), and (2) the prediction markets are "already protecting their interests" through preemption defenses in Wisconsin's pending enforcement actions (Doc. 54:12–13).

And the court denied a preliminary injunction, holding that the CFTC lacks a strong chance of success for two reasons. One, sports-related event contracts likely aren't CEA-regulated "swaps." (Doc. 54:18–21.) And two, even if they were, the CEA likely doesn't preempt Wisconsin from using state law to regulate them. (Doc. 54:21–25.) The court also held that the CFTC isn't suffering irreparable harm or, at the very least, any "significant harm" that outweighs Wisconsin's interest in "exercising its traditional police powers to prevent the risks associated with gambling addiction." (Doc. 54:25–28.)

## SUMMARY OF THE ARGUMENT

**I.** Wisconsin's effort to halt illegal sports betting on prediction markets can continue because the CFTC doesn't show either strong chances on the merits or irreparable harm that outweighs the State's.

**A.** The CFTC's preemption claim likely won't succeed.

**1.** The CFTC lacks a concrete and particularized injury-in-fact that supports Article III standing. Wisconsin's sports betting laws don't regulate federal government operations or private activity on which those operations rely, which are the typical routes for federal government standing in a preemption case. The CFTC mostly relies on the supposed sovereign harm the United States always suffers from an allegedly preempted state law, but no binding cases have recognized such a broad standing theory.

**2.** The CFTC also doesn't make a strong showing that the CEA preempts Wisconsin's efforts to regulate sports bets placed on prediction markets.

**a.** Sports bets aren't "swaps" under the CEA, whether they're placed at ordinary sportsbooks or on prediction markets. Because the sports betting industry is a big and important one, Congress must have used especially clear language to extend the CEA to cover sports bets. Dodd-Frank didn't do so by defining "swaps" as agreements involving an "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C.

§ 1a(47)(A)(ii). That language doesn't unambiguously cover bets on sports outcomes like whether a Packers wide receiver will catch 75 passes this season. (CFTC Br. 41.)

**b.** Even if sports bets are "swaps," the CEA doesn't preempt Wisconsin's efforts to regulate them. This Court has already held that the CEA neither expressly preempts state law nor implicitly does so through field preemption. *See Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019). Nor does conflict preemption apply. The CFTC's "impossibility" theory misreads the impartial access rule in 17 C.F.R. § 38.151(b), which addresses forms of economic discrimination, not geographic regulatory differences. As for obstacle preemption, allowing States to continue their long history of regulating sports betting wouldn't interfere with Congress's effort to avoid another financial crisis by adding "swaps" to the CEA.

**B.** The CFTC doesn't face irreparable injury, just as it lacks an Article III injury-in-fact. And in balancing the equities, the concrete harm Wisconsin faces from illegal sports betting outweighs whatever abstract interest the CFTC might have in establishing federal preemption.

**II.** Kalshi's intervention effort fails too. Kalshi's narrowest theory would guarantee intervention to everyone regulated by an allegedly preempted state law, and its broadest one would guarantee intervention to everyone potentially affected by a precedential appellate decision. Neither is correct.

## STANDARDS OF REVIEW

On appeals of preliminary injunction decisions, this Court "review[s] the district court's findings of fact for clear error, its legal conclusions de novo, and its balancing of the factors for a preliminary injunction for abuse of discretion." *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 614 (7th Cir. 2024).

The "extraordinary and drastic remedy" of a preliminary injunction "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). The CFTC bears the "significant burden" of showing a "strong" chance of success on the merits. *K.C.*, 121 F.4th at 614 (citation omitted). And the CFTC also "must" show that it faces irreparable harm absent an injunction. *Id.* at 632. If it does, courts weigh the injuries each side will suffer if an injunction is wrongly granted or denied. *Id.* at 632. That balancing gives significant weight to a State's "substantial interest" in the "effectiveness" of its "duly enacted law[s]." *Id.* at 633.

Intervention-as-of-right decisions receive de novo review, and permissive intervention decisions are reviewed for abuse of discretion. *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 686, 690–91 (7th Cir. 2023).

## ARGUMENT

### I. The district court correctly allowed Wisconsin to continue using state law to combat illegal sports betting.

The CFTC hasn't made a strong showing that Wisconsin can't use state law to combat illegal sports betting on prediction markets. Moreover, the district court reasonably exercised its discretion in finding that the equities favor the State: enjoining the State would inflict greater gambling-related harms than the CFTC's abstract interests would suffer without a preliminary injunction.

#### A. The CFTC's merits showing isn't strong.

The CFTC's merits case has three independently fatal flaws: (1) the CFTC lacks Article III standing; (2) sports bets aren't "swaps" under the CEA; and (3) the CEA doesn't preempt the States' sports betting laws anyway.

##### 1. The CFTC lacks Article III standing.

The CFTC lacks Article III standing because it hasn't suffered an injury-in-fact—"an invasion of a legally protected interest" that is both "concrete and particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). A "concrete" injury is "'real,' and not 'abstract.'" *Id.* at 340 (citation omitted). And a "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Id.* at 339 (citation omitted). So, standing is "'substantially more difficult' to establish" where—as here—the plaintiff isn't "the object of the government action or inaction [it] challenges." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (citation omitted).

### a. There's no harm to CFTC operations that might support standing.

The federal government can establish standing by showing that an allegedly preempted state provision regulates federal government operations. *Cf. United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026) (challenged law "directly regulate[d] the federal government in its performance of law enforcement operations"); *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 893 (10th Cir. 2016) (challenged provision restricted federal prosecutors' subpoena powers); *United States v. City of Arcata*, 629 F.3d 986, 988 (9th Cir. 2010) (challenged provisions banned federal military recruiters from targeting minors).

Or the federal government can show that the challenged state provision regulates private activity on which its operations rely. *See, e.g.*, *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (state law barring private detention facilities threatened "profound disruptions" to ICE operations); *United States v. King County,* 122 F.4th 740, 750 (9th Cir. 2024) (state law barring airfields from servicing ICE flights threatened "essential" services for ICE operations).

The CFTC identifies neither type of injury here. Wisconsin's gambling laws regulate private prediction markets like Kalshi, not the federal government, which makes the CFTC's standing "'substantially more difficult' to establish."

*Lujan*, 504 U.S. at 562 (citation omitted). Nor has the CFTC identified any regulated private activity on which its operations rely—the CFTC doesn't *use* prediction markets to do its job, it *regulates* them.

Below, the CFTC essentially argued that this preemption controversy itself generates standing. (Doc. 34:19.) Specifically, the CFTC said it has "received requests for guidance" from prediction markets after "recent court decisions" regarding "appropriate steps to comply" with both federal and state law. (Doc. 6-1:4.) These questions have supposedly "diverted" some resources "from core functions" of the agency. (Doc. 6-1:4.) Although one district court found this sufficed, *see United States v. Minnesota*, No. 26-CV-2661, 2026 WL 2150211, at *9 (D. Minn. July 27, 2026), it's hard to imagine any preemption dispute that wouldn't generate some queries from regulated parties. Standing requires far more concrete impacts caused by the challenged provision itself, not mere legal inquiries from regulated parties.

**b. The CFTC's purported sovereign injury doesn't support standing either.**

The CFTC also argued below that its supposed "sovereign injuries" support standing. (Doc. 34:8.) But this Court has observed that "injury to a sovereign" usually isn't enough to assert preemption claims; the "right plaintiff" is instead usually a regulated private party. *Illinois v. City of Chicago*, 137 F.3d 474, 477 (7th Cir. 1998). None of the CFTC's responses below show otherwise.

First, the CFTC analogized to the injury the federal government suffers when people break federal civil and criminal laws. (Doc. 34:11–12 (citing, *inter alia*, *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 193 (1967) (suit to enforce Rivers and Harbors Act of 1899)).) Wisconsin, however, hasn't allegedly violated any federal laws. This is a preemption case, and federal preemption provisions don't "operate directly on the States" or "involve congressional commands to the States." *Murphy*, 584 U.S. at 478–79. The Supremacy Clause is only an "indirect[] restrict[ion]" on state action that "provides 'a rule of decision'" between federal and state law. *Id.* at 471, 477 (citation omitted). Traditional "lawbreaker standing" thus doesn't exist here.

Second, the CFTC cited *In re Debs*, 158 U.S. 564 (1895), one in an "obscure line of cases" that has "seldom been invoked" involving whether the federal government has a "cause of action" to "vindicate its sovereign interests even when not authorized by statute." *In re Nat'l Sec. Agency Telecomm. Recs. Litig.*, 633 F. Supp. 2d 892, 899, 900 (N.D. Cal. 2007); (Doc. 34:13). But a cause of action isn't the same thing as Article III standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–27 (2021). And *In re Debs* shouldn't be read more broadly to create standing whenever the federal government identifies an "injury to the general welfare." *In re Debs*, 158 U.S. at 584. That would render standing toothless here, since in a preemption case the federal government

could always allege some such impact. Recent cases like *City of Arcata* and *Geo Group* implicitly recognize that such abstract injuries don't suffice.

The district court erred on this point. In its view, the CFTC generated standing with its allegation that Wisconsin is "interfer[ing] with and undermin[ing] the national public interest in authorizing and regulating derivatives." (Doc. 54:11); *cf. United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) (similar); *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 967 (D. Ariz. 2026) (similar). If that sufficed for Article III purposes, then the federal government would have standing in every preemption case.

No binding cases have gone that far. The main one on which the district court relied—*Arizona v. United States*, 567 U.S. 387 (2012)—never mentioned standing and therefore has "no precedential effect" on that jurisdictional issue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998). This Court's refusal to always credit "injury to a sovereign" is the better approach, *Illinois*, 137 F.3d at 477, and multiple district courts have recently drawn similar conclusions. *See United States v. Hawaii*, No. 25-CV-179, 2026 WL 1021227 (D. Haw. Apr. 15, 2026); *United States v. California*, No. 2:25-CV-6230, 2026 WL 784514, at *4 (C.D. Cal. Mar. 18, 2026); *United States v. City of Boston*, 833 F. Supp. 3d 30, 45 (D. Mass. 2026); *United States v. Michigan*, No. 1:26-CV-246, 2026 WL 3088394, at *4 (W.D. Mich. Oct. 7, 2026); *United States v. City of New York*, No. 25-CV-4084 (E.D.N.Y. Oct. 15, 2026), ECF No. 79.

#### 2. The CEA doesn't preempt Wisconsin's effort to combat illegal sports betting on prediction markets.

The CFTC's attempt to seize regulatory control over sports betting fails on the preemption merits too. Repackaging ordinary sports bets as event contracts doesn't turn them into "swaps" subject to the CFTC's "exclusive jurisdiction" under 7 U.S.C. § 2(a)(1)(A). Regardless, the CEA doesn't preempt Wisconsin from regulating a two-year-old innovation that mimics ordinary sports betting, activity the State has banned for over a century.

##### a. Sports-related event contracts aren't "swaps."

Sports bets—whether placed at Caesars' sportsbook or on Kalshi's prediction markets—aren't "swaps" for two reasons. First, the underlying sports outcomes aren't "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Second, the contracts themselves aren't "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." *Id.* The major questions doctrine resolves any ambiguity for Wisconsin because the CFTC seeks to seize the States' historic police power authority over the multi-billion-dollar sports betting industry.

###### (1) Who can regulate sports betting presents a major question.

The major questions doctrine rests on the common-sense observation that Congress doesn't "alter the fundamental details of a regulatory scheme in

vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). That is, "[e]xtraordinary grants of regulatory authority" in areas of great "economic and political significance" are "rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *W. Virginia*, 597 U.S. at 721, 722–23 (alteration in original) (citation omitted). Sweeping regulatory authority requires equally "clear congressional authorization," not merely a "colorable textual basis." *Id.* at 722, 724. Courts are therefore "reluctant to read into ambiguous statutory text" a "radical or fundamental change" to major regulatory schemes. *Id.* at 723. And even more so when the federal agency at issue has "no comparative expertise" in the area. *Id.* at 729 (citation omitted). Such inexperience further suggests "'Congress ... would not' [have] task[ed] [the agency] with" regulating the issue at hand. *Id.*

This case checks all the major question boxes. Sports betting presents an issue of great economic significance: it "involves 'billions of dollars' and affects 'millions of people.'" *Assad*, 2026 WL 2543846, at *15 (citation omitted). And it is of great political significance: "Americans have never been of one mind about gambling," and the back-and-forth history of state regulation illustrates the salience of this "important policy choice." *Murphy*, 584 U.S. at 458, 486. And the CFTC just two years ago recognized that it lacks the "statutory mandate" or "specialized experience" to regulate the "rapidly evolving field" of gambling. 89 Fed. Reg. 48968, 48982–83 (June 10, 2024). Instead, the CFTC explained

how "gambling is overseen by state regulators with particular expertise" and that federal derivatives law is not "aimed at protecting against gambling-specific risks and concerns," including those associated with sports wagering. *Id.* Transferring authority over sports betting from the States to the CFTC thus implicates a quintessential major question. *See Assad*, 2026 WL 2543846, at *15 (agreeing); *Schuler*, 2026 WL 2884087, at *16 n.9 (noting "appeal" of applying major questions doctrine here).

The CFTC offers two unpersuasive responses.

First, the CFTC says it has "regulated event contracts for decades," which supposedly means it's not exercising an "unheralded [regulatory] power" "discover[ed] in a long-extant statute." (CFTC Br. 48 (citation omitted).) But that frames the issue too generally. The question here isn't whether the CFTC can regulate event contracts writ large; it's whether Dodd-Frank's adding "swaps" to the CEA transferred all authority over sports betting from the States to the CFTC. The CFTC's new position on that specific issue was plainly "unheralded."

Second, the CFTC says that "swaps" were "no mousehole" in Dodd-Frank but rather one of the bills "most significant changes." (CFTC Br. 49.) Perhaps, but the major questions doctrine "also caution[s] against reading extraordinary powers into 'broad or general' statutory language." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 283 (2026) (Gorsuch, J., concurring) (citation omitted).

The CFTC's core problem thus remains: Dodd-Frank had to be exceptionally clear that it meant for reforms aimed largely at "the role of unregulated credit-default swaps in the 2008 financial crisis" (CFTC Br. 49) to also cover sports betting nationwide.

**(2) Sports outcomes aren't "associated with a potential … commercial consequence."**

The CFTC is wrong that the sports outcomes underlying event contracts are "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). A true "swap" under the CEA involves things that are intrinsically connected with economic risk, like debt defaults or changes in interest rates and currency values. *See, e.g.*, 7 U.S.C. § 1a(47)(A)(iii)(I), (VII), (XV); (FCIC Rep. 46). While sports outcomes may lead to "downstream economic consequences," *Schuler*, 2026 WL 2884087, *8, they lack that intrinsic connection. They therefore don't satisfy this prong of the "swap" definition, at least not clearly enough to answer the major question presented here.

The CFTC's error lies in inflating the statutory phrase "associated with" to reach anything with a "potential for commercial ramifications" through indirect downstream effects. (CFTC Br. 40–42; *see also* Kalshi Am. Br. 22–23.) Just two of the CFTC's own examples illustrate the problem: a Packers wide receiver's catching 75 passes this season qualifies because of his contract

bonus, and the Knicks' winning an NBA Finals game counts because of a bar's promotional drink specials. (CFTC Br. 40–41.) The Third Circuit took a similarly limitless view by considering loosely "affected stakeholders" like "sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 228. Kalshi concedes that some sports-related downstream consequences are too "attenuated or speculative" to count, but it offers no principled way to draw the line. (Kalshi Am. Br. 29.)[13]

That "sweeping" reading of "associated with" (CFTC Br. 44) would render the phrase "so broad as to be meaningless" and give it "no force." *Assad*, 2026 WL 2543846, *12 (first quote); *Schuler*, 2026 WL 2884087, *11 (second quote). That's why the Supreme Court rejected a similar reading of the parallel phrase "relating to" in *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 11 (2026). Much like the phrase "associated with," "in a literalist sense, 'everything is related to everything else.'" *Id.* (citation omitted). But the CFTC's literalist reading here isn't any better here than the one in *Plaquemines*. Just as "the fluttering of a butterfly's wings" doesn't "'relate to' the next week's weather," *id.* at 12, so too a wide receiver's catching 75 passes isn't "ordinar[ily]

[13] Kalshi once agreed that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Brief of Appellee at 45, *KalshiEX LLC v. CFTC,* No. 24-5205 (D.C. Cir. Nov. 15, 2024).

underst[ood],” *id.*, to be “associated with” economic consequences just because he might receive a corresponding bonus. (CFTC Br. 41.)

Because “tenuous, remote, or peripheral” connections aren’t enough, *Plaquemines*, 608 U.S. at 12, phrases like “relating to” or “associated with” instead require some kind of “close relationship between” whatever’s at issue. *Id.* So, in *Plaquemines*, the federal-officer removal statute required a “close relationship between [the remover’s] challenged conduct and the performance of its federal duties.” *Id.* Here, that “close relationship” requires the event underlying a swap to be “inherently associated with a ‘financial, economic, or commercial consequence’” in a way that sports outcomes aren’t. *Schuler*, 2026 WL 2884087, *11 (citation omitted); *see also Assad*, 2026 WL 2543846, *12 (agreeing).[14]

Four pieces of contextual evidence support that bounded approach.

First, requiring an inherent connection to financial consequences flows directly from “the surrounding statutory language.” *Assad*, 2026 WL 2543846, *12. The CEA’s many other “swap” definitions “refer ‘almost exclusively to financial measures, indices, or instruments’,” which indicates that the one in subpart (ii) also hinges on inherent financial consequences. *Id.* (citation

[14] The CFTC seizes on how the district court mentioned effects on “commodity prices” (CFTC Br. 45; *see also* Kalshi Am. Br. 28), but that’s not a necessary component of the Sixth and Ninth Circuit’s approach.

omitted); *see also Schuler*, 2026 WL 2884087, *12 (reasoning similarly). For instance, subpart (i) requires an agreement "for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind," and subpart (iii) similarly describes an agreement that "transfer[s] ... financial risk associated with a future change" in things like "interest or other rates" or "currencies." 7 U.S.C. § 1a(47)(A)(i), (iii).[15] Congress didn't clearly exchange this carefully targeted approach for butterfly-effect causation in subpart (ii).

Second, the CFTC's limitless reading would swallow the CEA's many other "swap" definitions. Because they all also "involve[] events that may have some downstream financial consequence," they would serve no independent purpose if subpart (ii) already covered such results. *Schuler*, 2026 WL 2884087, *13. An "unbounded reading" that effectively eliminates multiple entries in a "reticulated list" like this one is strongly disfavored. *See Fischer v. United States*, 603 U.S. 480, 493 (2024). Perhaps the State's narrower reading causes

---

[15] A couple swaps listed in subpart (iii), arguably aren't "intrinsically associated with financial consequences." *Schuler*, 2026 WL 2884087, *12 n.7. But that just shows how Congress used much more specific language when it wanted "swaps" to include things with indirect financial consequences. *See also KalshiEX, LLC v. Assad*, No. 25-7516, __ F.4th __, 2026 WL 2543846, *12 (9th Cir. Aug. 28, 2026) (reasoning similarly).

"some surplusage" too, *Schuler*, 2026 WL 2884087, *13, (CFTC Br. 45–46), but that's better than the total surplusage the CFTC's approach yields.

Third, because "Congress has spoken on gambling repeatedly, deliberately, and specifically" through several other federal statutes, the CEA shouldn't be read to wipe out those other choices. *Assad*, 2026 WL 2543846, *9. For one, the Wire Act, 18 U.S.C. § 1081, *et seq.*, criminally prohibits the interstate transmission of "bets or wagers on any sporting event or contest," unless the bets are "legal" in both States. 18 U.S.C. § 1084(a)–(b). Likewise, the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701, *et seq.*, allows tribes to conduct certain gaming operations on their reservations, but only if the State "permits such gaming." 25 U.S.C. § 2710(b)(1)(A), (d)(1)(B). And the Professional and Amateur Sports Protection Act (PAPSA) once prohibited States from "authoriz[ing] ... wagering scheme[s] based … on competitive games in which amateur or professional athletes participate." 28 U.S.C. § 3702. Several other general gambling statutes turn on state law too. *See* 18 U.S.C. §§ 1952–53, 1955. Considering all these statutes, Congress likely didn't "intend[] to upend its decades of careful regulation of gambling based on broad definitions of the words used in a Wall Street Reform Bill." *Assad*, 2026 WL 2543846, *10.

Fourth, the CFTC's approach would subject every sports bet nationwide to the CEA, and it could even reach most ordinary casino games. Consider the

CFTC's logic: an event contract on whether the Knicks will win the NBA Finals is a swap because it's an "agreement" based on an "event" that's "associated with ... economic consequences." (CFTC Br. 40.) If that's a swap, then so too is an ordinary bet placed at Caesars' sportsbook on that same outcome. Similarly, if an event contract on a wide receiver's catching 75 passes is a "swap" because of his bonus incentives (CFTC Br. 41), why not also a contract on someone's wager that the next spin of the roulette wheel will land on black? They're both "associated with" economic consequences in the same basic way: a payout based on an outcome that has indirect financial consequences.

This isn't just an academic similarity. If all sports wagers qualify as "swaps" (and they would, under the CFTC's reading), that would "expose countless Americans to potential criminal liability." *Schuler*, 2026 WL 2884087, *14. After all, it's a federal crime to transact in most swaps outside DCMs (for example, at Caesars). *See* 7 U.S.C. §§ 2(e), 13(a)(5); *see also Assad*, 2026 WL 2543846, *11 (reasoning similarly); *Flaherty*, 172 F.4th at 233 (Roth, J., dissenting) (same). That cannot be what Congress intended when responding to a financial crisis unconnected to sports betting.

Avoiding this huge expansion of federal criminal liability further counsels against the CFTC's interpretation, much like it did in *Bond v. United States*, 572 U.S. 844 (2014). There, the federal government's similarly "sweeping" view of the term at issue—"[c]hemical weapon"—would have covered "spreading

irritating chemicals on [the victim's] door knob." *Id.* at 860–61, 866. The Supreme Court rejected that "boundless reading" for two pertinent reasons. *Id.* at 860. One, it would have "intrude[d] on the police power of the States" by "convert[ing] an astonishing amount of 'traditionally local criminal conduct' into 'a matter for federal enforcement.'" *Id.* at 863 (citation omitted). Two, it would have "transform[ed]" a statute meant to cover serious "acts of war, assassination, and terrorism" into one that reached "poison[ing] goldfish." *Id.* at 862–63. There was "no reason to suppose that Congress" intended to "upset the Constitution's balance between national and local power" in that way. *Id.* at 866.

Here, the CFTC's "swap" theory wouldn't just expand federal criminal liability like in *Bond*; it'd also strip the States of authority to enforce their own criminal laws. That's a far greater "intrusion into traditional state authority" than the one *Bond* rejected, since the States in *Bond* still could have enforced their parallel criminal laws. *Id.* at 864–66. And the CFTC's theory would similarly "transform[]" the CEA from a statute meant to address the "2008 financial crisis" (CFTC Br. 44, 49) into one that permits sports betting (and perhaps virtually all gambling) nationwide. *Bond*, *Plaquemines*, and the major questions doctrine all require rejecting that "dramatic" theory. *Bond*, 572 U.S. at 866.

**(3) Sports-related event contracts don't involve the "occurrence ... of an event."**

Sports-related event contracts also don't "depend[] on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency," the other component of a "swap." 7 U.S.C. § 1a(47)(A)(ii); (CFTC Br. 37–39).

The CFTC seems to view this phrase as covering "something that happens," *Assad*, 2026 WL 2543846, *8—indeed, *anything* that happens—in relation to a sporting event, like the Bears beating the Lions by more than 3.5 points. (CFTC Br. 37.) Although the CFTC's cited dictionary definitions could conceivably support that view (CFTC Br. 38–39; *see also* Kalshi Am. Br. 28), statutory meaning "does not always 'turn solely' on the broadest imaginable 'definitions of its component words.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (citation omitted). The critical context here is again that transforming all sports betting nationwide into a matter of federal criminal concern raises the *Bond* problem, obviates other federal statutes on the subject, and creates surplusage with other "swap" definitions.

The better approach construes the terms "event or contingency" not to cover sports outcomes, in the same way *Bond* declined to consider "a local assault with a chemical irritant as the deployment of a chemical weapon." *Bond*, 572 U.S. at 866. In the sporting context, ordinary English speakers would understand the terms "event" or "contingency" to reference whether the

sporting contest will occur, not the winner of that contest, the performance of players therein, and the like. *See Assad*, 2026 WL 2543846, *18 (Lee, J., concurring). But sports-related event contracts don't pay out based on whether the sporting event occurs at all; they pay out based instead on the "outcomes of sporting events or on things that happen during a sporting event"—who wins, how many points are scored, and the like. *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1026 (D. Nev. 2025), *aff'd in part Assad*, 2026 WL 2543846.

**(4) The CFTC offers no principled way to limit its "swap" reading, nor does the Special Rule help it.**

The CFTC responds by accusing Wisconsin (and the Sixth and Ninth Circuits) of using mere "purposivism" that "shunt[s] the plain text to the side." (CFTC Br. 42; *cf.* Kalshi Am. Br. 25.) But Wisconsin's analysis uses statutory context plus *Plaquemines*, *Bond*, and *West Virginia* to give "swap" some concrete meaning beyond "an agreement regarding any conceivable future happening"—the CFTC's basic view.

Indeed, even the CFTC recognizes that its "potential for commercial ramifications" approach (CFTC Br. 42) needs some limiting principle, lest the term cover ordinary "casino-gambling wagers." (CFTC Br. 46–47; *cf.* Kalshi Am. Br. 29–31.) But the CFTC's proposals have zero connection to the CEA's text, and they don't do the work the CFTC needs anyway.

The CFTC first notes how the counterparty for many casino wagers is the "house," which sets prices. (CFTC Br. 46.) If the CFTC means that "swaps" can't include agreements with such counterparties, it never explains why. *See Assad*, 2026 WL 2543846, *11 (rejecting these "distinctions without differences"). Again, a "swap" has only three elements: (1) an "agreement"; (2) involving an "event or occurrence"; that is (3) "associated with" "economic consequences." 7 U.S.C. § 1a(47)(A)(ii). The counterparty is irrelevant to all three. And betting against the "house" isn't even a shared feature of all casino-style betting anyway: pari-mutuel wagering is widely used for betting on horse races (*see, e.g.*, Wis. Stat. § 562.01(9)), and casinos traditionally take a cut of the action between poker players.

The CFTC's next suggestion—that a "swap" must be "inherently tradeable"—has similar problems. (CFTC Br. 46–47; *see also* Kalshi Am. Br. 29–30.) For one, whether an instrument is "tradeable" also has nothing to do with the "swap" definition's three elements. *See* 7 U.S.C. § 1a(47)(A)(ii).

And it's unclear why the CFTC thinks swaps are "inherently tradeable" in a way that ordinary sports bets aren't. The CFTC seems to suggest that swaps are necessarily "trad[ed] on neutral, CFTC-registered exchanges" and "centrally cleared by neutral, CFTC-registered clearinghouses." (CFTC Br. 47; *see also* Kalshi Am. Br. 29–30.) But that's wrong; some swaps aren't subject to the CEA's exchange-trading and clearing requirements. *See generally* 7 U.S.C.

§ 2(e), (h). For instance, institutional traders like big banks (so-called "eligible contract participant[s]," *see* 7 U.S.C. § 1a(18)), may transact in swaps *outside* a trading exchange. *See* 7 U.S.C. § 2(e). Over-the-counter transactions like these can involve "swaps" just like on-DCM transactions can. (CFTC Br. 27 (citing 77 Fed. Reg. 48,208, 48,247 (Aug. 13, 2012).) And the CFTC never explains why over-the-counter swaps might be any more (or less) "inherently tradeable" than a gambler's wager with a casino sportsbook.[16] (*Cf*. Kalshi Am. Br. 30–31 (calling sports bets "non-fungible contracts," without explanation).)

And the CFTC inverts Dodd-Frank's history by suggesting that the CEA doesn't reach non-exchange-traded, non-cleared financial instruments. The 2008 financial crisis can be traced partly to deregulatory efforts that generally allowed swaps to be transacted outside regulated exchanges and central clearinghouses. (FCIC Rep., 45–51.) That hands-off approach encouraged financial institutions to inconspicuously accumulate huge portfolios of over-the-counter derivatives without possessing adequate collateral, like AIG did with privately negotiated credit default swaps. (FCIC Rep. xxiv, 50, 140–142, 200–02, 243–44.) The rest is history—AIG's positions exploded and nearly

---

[16] Many sportsbooks apparently let customers close out their bets early, much like prediction markets do. *See, e.g.*, *House Rules,* Caesars Sportsbook, https://www.caesars.com/sportsbook-and-casino/support/house-rules (noting that "[c]ashout gives the opportunity to settle a wager at the value displayed before the market is resulted"); *What is the Cash Out Feature?,* FanDuel Inc., https://support.fanduel.com/s/article/What-is-the-Cash-Out-Feature (similar).

brought down the global financial system (*id.*, at 279, 345–52, 376–79), leading Congress to enact Dodd-Frank.

This history disproves any theory that the CEA can't reach *non*-exchange-traded and *non*-cleared financial instruments. Quite the opposite. Swaps are now (often) traded on DCMs and centrally cleared because Dodd-Frank required as much, not because of their inherent nature. The CFTC can't arbitrarily exclude ordinary sports bets from its "swap" theory on this basis, either.

That leaves the CEA's "Special Rule," which neither solves the CFTC's line-drawing problem nor proves that sports-related event contracts are "swaps." (CFTC Br. 43–44, 46, 49; *see also* Kalshi Am. Br. 19.) The Special Rule allows the CFTC to find that "agreements, contracts, transactions, or swaps" involving "gaming" (or "terrorism" or "assassination," among other things) are "contrary to the public interest" and may *not* be traded on DCMs. 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). But because the Special Rule covers more than just "swaps," sports-related event contracts aren't necessarily "swaps," even if they're subject to the Special Rule—they could instead be "agreements, contracts, [or] transactions." *Id.*; *see also Schuler*, 2026 WL 2884087, *15 (agreeing). It thus wouldn't be "nonsensical" if event contracts involving terrorism or assassinations weren't "swaps" either—they too could instead be the other instruments covered by the Special Rule. (CFTC Br. 46.) And because

the Special Rule sheds no light on whether sports-related event contracts are "swaps," it's irrelevant to the major questions analysis too. (CFTC Br. 49.)

**(5) Kalshi's alternative arguments shouldn't be considered and fail anyway.**

Kalshi—in its amicus role—raises two alternative arguments. First, it argues that its sports-related event contracts also qualify as "swaps" under a different definition that covers an agreement "that is, or in the future becomes, commonly known to the trade as a swap." (Kalshi Am. Br. 21, 23 (citing 7 U.S.C. § 1a(47)(A)(iv).) Second, Kalshi argues that even if these contracts aren't "swaps," they're still subject to the CEA's "exclusive jurisdiction" provision because they're "DCM-traded 'agreements.'" (Kalshi Am. Br. 19–20.)

Courts "do not ordinarily address issues raised only by amici." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97 n.4 (1991). Doing so can violate the party-presentation rule. *See United States v. Sineneng-Smith*, 590 U.S. 371, 378 (2020). Moreover, these arguments weren't raised below, and this Court "rarely review[s] unpreserved arguments ... in the civil context. *Crothersville Lighthouse Tabernacle Church, Inc. v. Church Mut. Ins. Co., S.I.*, 168 F.4th 483, 493 (7th Cir. 2026).

Kalshi's wrong anyway. Kalshi only started self-certifying sports bets as swaps less than two years ago, and many cases quickly challenged that novel proposition. (Doc. 54:17.) Whatever it means to "commonly [become] known to

the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), taking an aggressive, self-interested legal position that's promptly challenged in nationwide litigation isn't it.

And Kalshi's "agreements" argument misses the mark, too. The CEA's "exclusive jurisdiction" extends only to "accounts, agreements ... and transactions *involving swaps* ...." 7 U.S.C. § 2(a)(1)(A). So, Kalshi's contracts—whatever they are—must still "involv[e] swaps." Kalshi responds that "involv[es] swaps" only modifies the final term "transactions" (not also the earlier term "agreements"), invoking the "rule of the last antecedent." (Kalshi Am. Br. 20.) But it's better to apply "involv[es] swaps" to each of "accounts, agreements ... and transactions" because "[t]he modifier at issue immediately follows a concise, integrated clause" and isn't being applied to "qualify a remote or otherwise disconnected phrase." *Schuler*, 2026 WL 2884087, at *17 (citation omitted). Disconnecting that modifier from "agreements" would make little sense, as it would subject all "agreements" under the sun to the CFTC's exclusive jurisdiction (so long as someone chooses to trade them on a DCM) and create a "clash" with the SEC's similar jurisdiction over "agreements" elsewhere in the CEA. *Id.* (citing 7 U.S.C. § 2(a)(1)(D)).

* * *

Nothing in the CEA's text, context, or history indicates that sports bets, whether placed at casino sportsbooks or on prediction markets, qualify as

"swaps." At minimum, the CEA lacks the kind of "clear congressional authorization" needed to transfer the States' traditional police power over sports betting to the CFTC. *W. Virginia*, 597 U.S. at 723 (citation omitted).

**b. The CEA doesn't preempt Wisconsin from regulating sports bets anyway, even if they are "swaps."**

Even if sports bets made on prediction markets were "swaps," the CEA still allows the State to continue its century-plus tradition of regulating sports betting in any form. Any uncertainty again resolves in Wisconsin's favor, because another clear-statement rule—the presumption against preemption—favors leaving sports-betting authority with the States, where it's always been.

**(1) The presumption against preemption applies here.**

In every preemption case, courts "start with the assumption that the historic police powers of the States were not to be superseded" by federal law. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). That's especially true when federal law affects "a field which the States have traditionally occupied." *Id.* (citation omitted). The presumption is overcome only where "the clear and manifest purpose of Congress" is to supersede state law. *Id.* (citation omitted); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (defeating presumption requires "unmistakably clear" statutory language) (citation omitted).

This case involves sports betting regulations, and "[t]he suppression of gambling is … within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905); *see also Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (noting that "the regulation of gambling lies at the heart of the state's police power") (citation omitted). Federal law has therefore "defer[red] to, and even promote[d], differing gambling policies in different States." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999). And *Murphy* reaffirmed that sports betting in particular "requires an important policy choice" that "each State is free to [make] on its own." 584 U.S. at 486. The Sixth Circuit therefore rightly applied the presumption when analyzing the CEA's preemptive effect. *See Schuler*, 2026 WL 2884087, *18–19; *see also Flaherty*, 172 F.4th at 233–35 (Roth, J., dissenting) (same).

The CFTC tries to evade this presumption in two unconvincing ways.

First, the CFTC says the presumption doesn't apply when confronted with an express preemption provision. (CFTC Br. 30.) But that's arguably true only for unambiguous provisions; "[w]here the preemptive force of the text is ambiguous—as it is here—[courts] resolve that ambiguity against preemption." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025); *see also C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 546 (7th Cir. 2020) (considering express preemption provision and noting that

"[w]hen interpreting ambiguous statutes, courts favor the interpretation that does not preempt state law").[17] As shown below, the CEA has no such clear provision.

Next, the CFTC argues that the presumption shouldn't apply because "derivatives contracts are traditionally regulated by the CFTC, not the States." (CFTC Br. 30–31.) That again uses the wrong lens, since it's "importan[t] [to] consider[] the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). So, for instance, *Oneok* allowed state antitrust claims to proceed against natural-gas companies, even though the claims might have affected rates governed largely by federal law. *Id.* at 384–88. Because the state antitrust laws had "broad applicability"—they weren't "aimed at natural-gas companies in particular, but rather all businesses"—the proper frame was the States' "long history" of providing antitrust remedies. *Id.* at 387–88.

Here, Wisconsin is similarly using gambling laws of "broad applicability" that don't "aim[] at [prediction markets] in particular, but rather all businesses" that facilitate sports betting. *Id.* at 387. And Wisconsin has a

[17] Both decisions post-date *Puerto Rico v. Franklin California Tax-free Trust*, 579 U.S. 115 (2016), which the CFTC cites to justify not applying the presumption to express preemption provisions. (CFTC Br. 30; Kalshi Am. Br. 25–26); *see also Assad*, 2026 WL 2543846, *7.

comparably "long history" of remedying illegal sports betting.[18] *Id.* The presumption against preemption thus "applies with particular force" here. *Schuler*, 2026 WL 2884087, *19 (citation omitted); *see also Flaherty*, 172 F.4th at 236–37 (Roth, J., dissenting) (similar).

#### (2) The CEA's reference to "exclusive jurisdiction" doesn't expressly preempt Wisconsin's sports betting laws.

Express preemption occurs when a statute "explicitly [says] what states may and may not do." *Nationwide Freight Sys., Inc. v. Ill. Com. Comm'n*, 784 F.3d 367, 373 (7th Cir. 2015). And even when a provision expressly preempts "at least some state law," a court must still "identify the domain expressly pre-empted." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996).

Whether the CEA expressly preempts state law isn't an open question in this Circuit. In *Effex Capital, LLC v. National Futures Association*, 933 F.3d 882, 894 (7th Cir. 2019), this Court observed that "the Commodity Exchange Act does not expressly preempt state law."

There's no reason to deviate from that rule here. The CFTC's express preemption theory relies on the agency's "exclusive jurisdiction ... with respect to accounts, agreements ... and transactions involving swaps ... traded or

[18] The CFTC's interstate-versus-intrastate gambling distinction makes no difference, since federal law has long respected the States' decisions on betting activity that crosses state lines, *see Schuler*, 2026 WL 2884087, at *18, and Wisconsin seeks only to regulate gambling activity within its borders.

executed on” DCMs. 7 U.S.C. § 2(a)(1)(A); (CFTC Br. 20–28). That language doesn’t expressly preempt state law and, even if it did, it doesn’t clearly identify state sports betting laws as the “domain [that’s] expressly pre-empted.” *Medtronic*, 518 U.S. at 484 (citation omitted).

First, Section 2(a)(1)(A) doesn’t expressly preempt state law. Its “exclusive jurisdiction” phrasing would make for an “unusual express preemption provision.” *Schuler*, 2026 WL 2884087, *20. Such provisions “typical[ly] use[] words such as ‘preempt’ or ‘supersede’ when referring to state law.” *Id.* (citing 8 U.S.C. § 1324a(h)(2) (“preempt”); 12 U.S.C. §§ 25b(b) (“preempted”), 1831d (“preempted”); 29 U.S.C. § 1144(a) (“supersede”)); *see also* 46 U.S.C. § 31307 (“supersede[]”); 49 U.S.C. § 5125(a) (“preempt[]”). Granted, Congress need not use “magic words ... to preempt state law.” (CFTC Br. 26 (citing *Assad*, 2026 WL 2543846, *7)); Kalshi Am. Br. 26). But the CEA uses much more express language elsewhere to preempt state law, and such stark “differences” within a single statute likely “convey differences in meaning.” *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018) (citation omitted).

Three examples show how the CEA expressly preempts state laws relating to “gaming” and “swaps” only in specific, unrelated circumstances. Section 16(e)(2) provides that “[t]his chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming,” but only in unrelated off-DCM scenarios. 7 U.S.C. § 16(e)(2). Similarly,

Section 27f(b) "supersede[s] and preempt[s]" state laws that "prohibit[] or regulate[] gaming" as applied to a "hybrid instrument that is predominantly a banking product." 7 U.S.C. § 27f(b).[19] And under Section 16(h), swaps "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h). These provisions indicate that Congress "knew how to draft" a provision expressly preempting state gaming law as applied to swaps "but chose not to" do so. *Schuler*, 2026 WL 2884087, *20.

The term "exclusive jurisdiction" starkly contrasts with this kind of language. It's usually read to "limit courts' jurisdiction, rather than agencies' power to regulate or states' power to make law." *Schuler*, 2026 WL 2884087, at *20; (*cf.* Kalshi Am. Br. 16–17 (citing *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992))). Or sometimes, as in the CEA, it "separate[s] the functions" of federal agencies (like the CFTC's from the Securities and Exchange Commission's). *Merrill Lynch*, 456 U.S. at 386; *see also* Lynn A. Stout, *Derivatives and the Legal Origin of the 2008 Credit Crisis*, 1 Harv. Bus. L. Rev. 1, 17 (2011) (noting historical "political turf battles" among federal agencies over derivatives). That's bolstered here by how Section 2(a)(1)(A) "identifies the governing *agency*"—that is, the CFTC—rather than "the governing *law*." *Schuler*, 2026

---

[19] Dodd-Frank similarly amended the Securities Exchange Act to provide that "[n]o State law which prohibits … wagering or gaming contracts … shall invalidate" various securities, including "security-based swaps." Pub. L. No. 111-203, § 767, 124 Stat. 1376 (creating 15 U.S.C. § 78bb(a)(3)).

WL 2884087, *21 (citation omitted). Preemption would thus have to be inferred from this "exclusive jurisdiction" language, which is the opposite of what an express preemption provision does.

None of the CFTC's cases show that "exclusive jurisdiction" should be read as expressly preempting state law. (CFTC Br. 21–22.) In *American Agriculture Movement*, this Court primarily addressed "the second type of conflict preemption," a form of implied preemption that isn't relevant yet.[20] *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1154 (7th Cir. 1992). *Flaherty* didn't address express preemption, either. 172 F.4th at 228 (holding covers only "field and conflict preemption"). As for *Assad* and the District of Minnesota's contrary approach, it doesn't persuasively account for the different language Congress used elsewhere in the CEA to accomplish express preemption. *Cf. Assad*, 2026 WL 2543846, *7; *Minnesota*, 2026 WL 2150211, at *10. And the CFTC's other two cases involved implied preemption in other statutory schemes, where the Supreme Court used the phrase "exclusive jurisdiction" to describe the statutes' field-preemptive effect. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Pacific Gas &*

[20] The CFTC announces that *American Agriculture*'s conflict preemption analysis is "equally applicable to express preemption" (CFTC Br. 23 n.9), but it's unclear why considering the CEA's "goals and policies" for implied preemption purposes informs the text-focused express preemption analysis. *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1155 (7th Cir. 1992)

*Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 207 (1983). Neither case interpreted statutes using this language.

Kalshi's cited cases lie similarly afield. (Kalshi Am. Br. 16–17.) The federal statute in *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 222 (1947) used materially different language to accomplish field (not express) preemption: "power, jurisdiction, and authority." And three factors distinguish *Slaney v. International Amateur Athletic Federation*, 244 F.3d 580, 595 (7th Cir. 2001): (1) there's no indication the Court read "exclusive jurisdiction" as an express preemption provision; (2) the statute at issue didn't have contrasting express preemption language; and (3) the case involved Olympic eligibility, an area States have no similar tradition of regulating. As for *New York & Atlantic Railway Co. v. Surface Transportation Board*, 635 F.3d 66, 71 (2d Cir. 2011), it involved just what the CEA lacks: language that expressly connected the body's "exclusive" "jurisdiction" to "preempt[ing] the remedies provided under ... State law." *See* 49 U.S.C. § 10501(b).

The CFTC and Kalshi's other favored provisions don't shed more light. (CFTC Br. 23; Kalshi Am. Br. 18.) A couple describe what the CEA *doesn't* preempt. *See* 7 U.S.C. §§ 13a-2(7) (allowing enforcement of state antifraud laws); 16(e)(1) (allowing States to regulate most off-DCM transactions). But they don't expressly say what (if anything) the CEA *does* preempt, unlike the several CEA provisions discussed above that do. *Cf.* 7 U.S.C. §§ 16(e)(2), (h);

27f(b). Similarly, Section 13a-2(1) describes the States' authority to enforce CEA provisions—that is, *federal* law—which also doesn't illuminate whether (or when) *state* law is preempted. And the Unlawful Internet Gambling Enforcement Act is irrelevant; its "specific, limited" definitions of the bets it covers are "not meant to 'alter[] or limit[] other laws." *Assad*, 2026 WL 2543846, *9 n.4; *see* 31 U.S.C. § 5361(b).

But even if all that's wrong, and Section 2(a)(1)(A) does sometimes expressly preempt state law, it remains necessary to "define[] the scope of such a preemptive effect." *Effex*, 933 F.3d at 893. The provision's scope doesn't clearly extend to Wisconsin's sports betting laws.

At bottom, the CFTC offers no solution to the tension between the CEA's "exclusive jurisdiction" provision and its savings clause, which envisions some state law role in regulating on-DCM transactions:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities *under the laws* of the United States *or of any State*, or (II) restrict the Securities and Exchange Commission *and such other authorities* from carrying out their duties and responsibilities in accordance *with such laws*.

7 U.S.C. § 2(a)(1)(A) (emphasis added).

Even if this savings clause might suggest that Section 2(a)(1)(A) has *some* preemptive effect (CFTC Br. 21–22 (citing *Assad*, 2026 WL 2543846, at *7)); Kalshi Am. Br. 17), that would only answer half the question. The savings

clause must preserve "at least some state law causes of action," *Effex*, 933 F.3d at 894 (citation omitted), or else its reference to the "laws ... of any state" makes little sense. 7 U.S.C. § 2(a)(1)(A). A hard line-drawing problem thus arises: what's the "scope" of the provision's "preemptive effect"? *Effex*, 933 F.3d at 893. More to the point, do the States' sports-betting laws fall within that scope? The CFTC can't offer any good solution, because the CEA generally "provides no clue as to how this line should be drawn." *Am. Agric.*, 977 F.2d at 1155.

That unresolved tension means Section 2(a)(1)(A) doesn't display the "clear and manifest purpose" needed to eliminate the State's "historic police power" over sports betting. *Wyeth*, 555 U.S. at 565 (citation omitted). And all the more because the CEA's express "gaming" preemption provisions in Sections 16(e)(2) and 27f(b) don't apply here.

The CFTC responds that it's "incoherent" to treat Section 16(e)(2) as the CEA's sole gaming-related express preemption provision, which ignores Section 27f(b) and is otherwise irrelevant and wrong. (CFTC Br. 26–27.) It's irrelevant because the CFTC is just second-guessing the plain-text line Congress drew. And it's wrong because it rests on a flawed hypothetical: that the CFTC could trigger Section 16(e)(2)'s express preemption (which covers only some off-DCM conduct) by "'exempt[ing]' all sports event contracts from CEA requirements." (CFTC Br. 26–27.) The CFTC's supposed source of authority for such exemptions—7 U.S.C. § 6(c)—doesn't cover retail swaps like

these.[21] So, there's no "incoherent" scenario in which the CFTC can trigger preemption for sports-related event contracts by "decid[ing] to relax" the CEA as to them. (CFTC Br. 27.)

And the CFTC's survey of the agency's history doesn't solve its line-drawing problem either. (CFTC Br. 23–25; *see also* Kalshi Am. Br. 17–18.) The CFTC theorizes that Congress "designed" the exclusive-jurisdiction clause in 1974 to "preempt state law." (CFTC Br. 25.) That may or may not be true.[22] Either way, this history is silent on whether Congress in 1974 meant to allow nationwide sports betting through event contracts, an innovation that wouldn't arise for another half-century.

In sum, the CFTC has—at most—identified an ambiguous express preemption provision in Section 2(a)(1)(A). That's not enough to trump Wisconsin's sports betting laws, since "courts favor the interpretation that does

[21] That authority extends only to ordinary futures "subject to [7 U.S.C. § 6(a)]," *id.*, that are traded by "appropriate persons." 7 U.S.C. § 6(c)(1), (2)(B)(i). Swaps aren't "subject to" Section 6(a), *see* 7 U.S.C. § 2(d), and retail traders aren't "appropriate persons," *see* 7 U.S.C. § 6(c)(3).

[22] The CFTC's questionable history infers that Congress waited almost 30 years to reverse a Supreme Court decision from 1947 based largely on a single legislator's floor statement, which is among the "least illuminating forms of legislative history." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017); (CFTC Br. 25). And even that floor statement opines only that the 1974 amendment would have preempted "substantive state law" that was "contrary to or inconsistent with Federal law." 120 Cong. Rec. S30458, 30464 (Sept. 9, 1974). This would only justify conflict preemption, not express preemption.

not preempt state law," *C.Y. Wholesale, Inc.*, 965 F.3d at 546, especially when considering a historic state police power like this one.

#### (3) The CEA doesn't preempt any relevant field either.

Turning to field preemption, this version of implied preemption applies "rare[ly]," only where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (citation omitted).

The CEA doesn't "clear[ly] and manifest[ly]," *Medtronic*, 518 U.S. at 485, field preempt the States' sports betting laws. Here, the CFTC mostly rehashes its express preemption theory, citing again its "exclusive jurisdiction" and adding only scattered CEA regulations that govern aspects of on-DCM transactions. (CFTC Br. 28–30; *see also* Kalshi Am. Br. 24.)

The argument fares no better this time. The same tension in Section 2(a)(1)(A) between "exclusive jurisdiction" and the savings provisions means the CEA doesn't "manifest an intent to occupy completely the entire field of commodity futures regulation," let alone the field of sports betting. *Effex*, 933 F.3d at 894; *cf. Oneok*, 575 U.S. at 385 (field preemption analysis "proceed[s] cautiously" when federal statute preserves at least some state law). Although nailing down the correct field doesn't ultimately matter—Wisconsin wins either way—considering both options drives the point home.

Consider first the field of sports betting. That's "the *target* at which the state law *aims*" here, and so it's the correct field to "consider[] in determining whether that law is pre-empted." *Oneok*, 575 U.S. at 385. The CFTC doesn't even contend that the CEA preempts that field, and rightly so. Other federal statutes (like the Wire Act) show that "Congress has explicitly not occupied the field of gambling," *Assad*, 2026 WL 2543846, *17, and one even expressly declares that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders.'" 15 U.S.C. § 3001(a)(1); *see also Schuler*, 2026 WL 2884087, *24 n.14 (agreeing); *Flaherty*, 172 F.4th at 236–37 (Roth, J., dissenting) (same).

Nothing changes by shifting to the CFTC's preferred field: "trading on a DCM." (CFTC Br. 29.) Again, that's the wrong field, since Wisconsin's gambling laws of "broad applicability" don't "target" such markets, just like the permissible state antitrust claims in *Oneok* didn't target federally regulated natural gas markets. 575 U.S. at 385, 87. Although Wisconsin's laws may "incidentally burden" sports-betting contracts traded on DCMs, *Schuler*, 2026 WL 2884087, *27, that's different from laws that might "aim directly" at on-DCM trading, *Oneok*, 575 U.S. at 385 (citation omitted).

The CFTC's framing fails anyway. This Court's observation that the CEA doesn't preempt the whole field of "commodity futures regulation," *Effex*, 933 F.3d at 894, covers the CFTC's proffered field too. (CFTC Br. 31.) Although

on-DCM trading is a subset of all commodity futures trading, *see, e.g.*, 7 U.S.C. §§ 2(e), 6(c), *American Agriculture* involved on-DCM trading and still found no field preemption. *See Am. Agric.*, 977 F.2d at 1150–51 (state law claims targeted trades made on the Chicago Board of Trade, a "designated ... 'contract market'"). And *American Agriculture* rested its field preemption analysis on the limited reach of Section 2(a)(1)(A), which covers only on-DCM transactions (and contemplates some state involvement in them). *Id.* at 1155. So, *American Agriculture* necessarily means that the CEA doesn't field-preempt states from regulating on-DCM trading either. *See also Schuler*, 2026 WL 2884087, *23 (rejecting field preemption because Section 2(a)(1)(A)'s savings clause "reserves state power ... with respect to on-DCM transactions").[23]

If *Effex* and *American Agriculture* weren't enough, two other CEA provisions also envision state law involvement in on-DCM transactions. One of them, 7 U.S.C. § 13a-2(7) contemplates "State officials ... proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State," with no exclusion for on-DCM transactions.

[23] The 1974 House Report the CFTC cites isn't to the contrary and illustrates the risks of relying on legislative history. (CFTC Br. 29; Kalshi Am. Br. 24.) The Report misdescribes a supposed Congressional desire to preempt "contrary" or "inconsistent" state law as "preempt[ing] the field." H.R. Rep. No. 93-1383, at 35-36 (1974). Again, that describes only conflict preemption, not field preemption. In any event, courts "may not 'replace the actual text with speculation as to Congress' intent.'" *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (citation omitted).

Similarly, the Special Rule allows the CFTC to disallow event contracts that are "unlawful under ... State law," which would make little sense if the CEA field-preempted States from deeming those contracts "unlawful" in the first place. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)(I).

The presumption against preemption would resolve any remaining doubt against field-preempting Wisconsin's sports betting laws. Because only implied preemption is at issue here, the CFTC can't ward off this presumption by conflating its express and field preemption arguments. (CFTC Br. 30.) And the CFTC's "traditional[] regulat[ion]" of "derivatives contracts" (CFTC Br. 30) is again irrelevant, since Wisconsin isn't "target[ing]" that field. *Oneok*, 575 U.S. at 385.

**(4) Wisconsin's sports betting laws aren't conflict preempted by the CEA.**

Only conflict preemption remains, which "exists when either (1) 'compliance with both federal and state regulations is a physical impossibility' or (2) state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976, 986 (7th Cir. 2026) (citations omitted). The CFTC doesn't clear the "high threshold" needed to show that either form of conflict preemption—impossibility or obstacle—applies here.

*Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality op.) (citation omitted).

**(i) Impossibility preemption.**

Prediction markets face no "physical impossibility," *Wisconsinites*, 172 F.4th at 986, in complying with both state and federal law—halting their sport-related offerings in Wisconsin would satisfy both. Wisconsin law is obviously "more protective than federal law," but that "does not inherently create a conflict." *Assad*, 2026 WL 2543846, *16 (citing *Wyeth*, 555 U.S. at 573).

The CFTC's main impossibility argument misconstrues 17 C.F.R. § 38.151(b), the so-called "impartial access" rule. (CFTC Br. 32–33; *see also* Kalshi Am. Br. 25, 27.) This provision requires prediction markets to provide "impartial access to its markets and services," including "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b), (b)(1). The CFTC (at least today) reads this provision as barring "discriminat[ion] by residency," which shutting down sports-related event contracts in Wisconsin would supposedly cause. (CFTC Br. 32.)

This rule doesn't require prediction markets "to offer any 'particular market' for the event contracts it lists"; instead, the rule "mandate[s] 'impartial' 'access' to whatever 'market(s)' the entity offers." *Schuler*, 2026 WL 2884087, *26 (citing *Flaherty*, 172 F.4th at 239 (Roth, J., dissenting)); *see also* *Assad*, 2026 WL 2543846, *16 (finding no reason why "not offering sports

events contracts in [a state] would run afoul of § 38.151(b)"). Three pieces of context support this conclusion.

One, when the CFTC promulgated this rule in 2010, it described the rule's "purpose" as "prevent[ing] DCMs from using discriminatory access requirements as a competitive tool against certain participants." 75 Fed. Reg. 80,572, 80,579 (Dec. 10, 2010). The rule would bar, for instance, DCMs from "creati[ng] ... exclusive membership standards that focus on high net worth." *Id.* at 80,579 n.51. That's the kind of "discriminatory" or "improper" access standard the rule prohibits, since it's not based on the "financial and operational soundness of a participant." *Id.* at 80,579. This reveals a focus on *economic* discrimination, not *geographic* restrictions arising from neutral state laws.

Two, the rule's second prong confirms that the provision addresses "economic rather than geographical impartiality." *Schuler*, 2026 WL 2884087, *26. That subsection requires "[c]omparable fee structures for members ... receiving equal access to, or services from, the designated contract market." 17 C.F.R. § 38.151(b)(2). Again, no hint of a ban on geographic restrictions.

Three, the CEA's Special Rule also indicates that the impartial access rule can coexist with state-specific restrictions. It contemplates the CFTC banning event contracts that are "unlawful under any ... State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). That makes sense only if such contracts would be barred in the corresponding state but not all 49 others, notwithstanding the impartial

access rule. The CFTC announces (without explanation) that the Special Rule "does not allow" a state-by-state remedy (CFTC Br. 33; *see also* Kalshi Am. Br. 27), but its position would let a single state "'effectively ban' an event contract in the remaining states." *Schuler*, 2026 WL 2884087, *26 (citation omitted). It's unlikely that the Special Rule—created in a bill aiming at a "uniform national scheme" (CFTC Br. 17)—meant to let a single state dictate national policy like this. And, yes, the CFTC (not the States) "exercises authority" under the Special Rule (CFTC Br. 33), but that misses the point. The provision contemplates state-by-state restrictions, which indicates that the impartial access rule allows the same.

**(ii) Obstacle preemption.**

"Obstacle" preemption is the least favored version of implied preemption, given how "it is Congress rather than the courts that preempts state law." *Chamber of Com.*, 563 U.S. at 607 (citation omitted). Here, courts should avoid a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *id.* (citation omitted), that would "elevate abstract and unenacted legislative desires above state law." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (plurality op.). Doing otherwise risks "displacing perfectly legitimate state laws" based on "'purposes' … that may seem perfectly logical …. but that lack the democratic provenance the Constitution demands before a federal law may be declared supreme." *Id.* This

Court has rightly embraced *Virginia Uranium*'s careful approach in recent conflict preemption cases. *See McHenry County v. Kwame Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) ("[I]nvoking 'some brooding federal interest' is not enough to support a preemption claim."); *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 650 (7th Cir. 2019) ("[Courts] should not add to [express preemption provisions] on the theory that more sweeping preemption seems like a better policy.").

There's no clear indication here that Wisconsin's banning sports-related event contracts would pose an "obstacle" to Congress's aims when enacting the CEA and Dodd-Frank. *Wisconsinites*, 172 F.4th at 986. That could be true only if, by adding "swaps" to the CEA, Congress meant for Dodd-Frank to snatch the issue of sports betting from the States and hand it to the CFTC.

But state-by-state regulation of sports betting aligns with the "general federal approach to gambling" that the Supreme Court observed in 2018, eight years *after* Dodd-Frank. *Murphy*, 584 U.S. at 484. Without mentioning the CEA or Dodd-Frank, *Murphy* concluded that other statutes "implement a coherent federal policy" of "respect[ing] the policy choices of the people of each State on the controversial issue of gambling." *Id.* It cannot be that all nine Justices in *Murphy* simply missed how, eight years earlier, Dodd-Frank had already *required* legal sports betting nationwide (subject only to CFTC regulations). Indeed, if that's right, what was the point of *Murphy*? Why resolve

whether PAPSA could prohibit States from *legalizing* sports betting, if Dodd-Frank had already effectively repealed PAPSA by barring States from *prohibiting* sports betting? The obvious answer is that Dodd-Frank did no such thing because it aimed at a very different goal: regulating the financial instruments that had contributed to the 2008 financial crisis.

The CFTC again tries to dodge all this by reframing the issue. In its view, the States' sports betting laws undermine the CEA's goal of preventing "state-by-state" regulation of "futures trading." (CFTC Br. 33–34.) But the CEA doesn't aim at total "uniformity ... at all costs," given how it contemplates state regulation in the many ways discussed above (for instance, through its savings clause and narrow gaming-related express preemption provision). *Schuler*, 2026 WL 2884087, *27 (citation omitted). The CEA therefore leaves room for the States to regulate at least some event contracts that implicate historic state police powers, like those involving sports bets.

The Special Rule backs this up. It allows the CFTC to prohibit DCMs from trading not just event contracts involving "gaming," but also those involving "terrorism," "assassination," and "war." 7 U.S.C. § 7a-2(c)(5)(C). Why would Congress possibly have wanted to nationalize rules around betting on "terrorism," "assassination," and "war," just because they're packaged as event contracts? And not only that, could Congress really have intended to *legalize* such betting nationwide, so long as the CFTC declines to use its Special Rule

authority? Nothing in Dodd-Frank's context or history suggests as much. *Cf. Assad*, 2026 WL 2543846, *13 (noting that CEA doesn't give the CFTC "preemptive authority" over "terrorism or assassination" contracts). But that's the CFTC's theory—if the CFTC doesn't stop DCMs from listing event contracts on, say, assassinating prominent political figures, the States can't do so either.

The Special Rule is better understood as a "backstop" that ensures these kinds of problematic contracts don't end up on DCMs, regardless of what the States might or might not allow. *See Schuler*, 2026 WL 2884087, *27. The available legislative history indicates as much: the provision aims to "prevent gambling through futures markets" through event contracts involving wagers on "sporting events such as the Super Bowl, the Kentucky Derby, and [the] Masters Golf Tournament," since such contracts don't "serve any real commercial purpose" and instead "would be used solely for gambling." 156 Cong. Rec. S5906–07 (July 15, 2010) (statement of Senator Blanche Lincoln). That's the opposite of an indication that Congress aimed to clear the way for sports betting on DCMs by preempting all state laws on the subject.

Neither *American Agriculture* nor *Effex* demands a different result (CFTC Br. 34–35; Kashi Am. Br. 24–25, 27), since neither concerned the "important policy choice" of how to regulate sports betting. *Murphy*, 584 U.S. at 485. *American Agriculture* instead involved state tort claims aimed at the Chicago

Board of Trade's efforts to "prevent distortions in the soybean futures market." *Am. Agric.*, 977 F.2d at 1151. Taking "guidance from the goals and policies underlying" the CEA, the court found that allowing those tort claims would have "frustrate[d] Congress' intent to bring the markets under a uniform set of regulations." *Id.* at 1156. That analysis rested heavily on "circumstances surrounding passage of the 1974" CEA revisions, including concerns that States "might" try to regulate futures markets. *Id.* at 1155–56. As for *Effex*, it rejected another state tort claim aimed at a CFTC-regulated entity, this time one implicating federal disciplinary obligations. 933 F.3d at 886–89. These cases don't control here for three reasons.

First, the presumption against preemption appropriately played no role in either case. Displacing a "historic police power" triggers the presumption, *Wyeth*, 555 U.S. at 565, and Wisconsin has regulated sports betting by statute since 1898. By contrast, the common law breach of fiduciary duty and negligence torts in *American Agriculture* didn't rest on statutes enacted using a State's police power. *See Bond*, 572 U.S. at 854 (noting that the "police power" entails States "enact[ing] *legislation* for the public good") (emphasis added). And *American Agriculture* addressed ordinary futures contracts for agricultural commodities; by 1974, there's no sign that the States were still trying to regulate such futures as gambling. *Cf. Am. Agric.*, 977 F.2d at 1155–56 (noting concern that States "might" begin regulating futures); 1955 Wis. Act

696, § 1 (futures contracts involving "securities or other commodities" aren't "bets"). *Effex* involved common law claims too, this time "arising out of" the defendants' federal regulatory functions, another area states haven't traditionally occupied. 933 F.3d at 895–96.

Second, the "circumstances surrounding passage" of the 1974 CEA amendments and Dodd-Frank don't indicate any Congressional desire for "uniform legal rules" around sports betting. *Am. Agric.*, 977 F.2d at 1155–56. *American Agriculture* relied heavily on legislative history suggesting that Congress in 1974 generally aimed at uniformity in futures regulation, but there's no sign Congress had sports betting in mind then. Nor do any comparable "circumstances," *id.*, suggest that Congress sought to nationalize sports betting rules in 2010 through Dodd-Frank, a bill aimed at preventing another financial crisis. And there's no evidence that DCMs "could not operate efficiently, and perhaps not at all"—Congress's apparent concern in 1974, *id.* at 1156—if they had to stop offering sports-related event contracts in States like Wisconsin.

Third, extending *American Agriculture* and *Effex* to sports betting would exemplify the kind of "freewheeling judicial inquiry" that risks "displacing perfectly legitimate state laws" using "abstract and unenacted legislative desires." *Chamber of Com.*, 563 U.S. at 607 (first quote); *Virginia Uranium*, 587 U.S. at 778 (latter quotes). Given *Murphy*, Dodd-Frank's context, and the

presumption against preemption, a "brooding federal interest" in futures trading shouldn't be used to override the States' longstanding power over sports betting. *McHenry County*, 44 F.4th at 591.

* * *

Wisconsin isn't claiming authority to regulate ordinary "futures and options," every "type of swap," or even "*all* event contracts," as the CFTC fears. (CFTC Br. 36; *cf*. Kalshi Am. Br. 3.) It's only trying to enforce its century-old ban on sports betting, in whatever form. Nothing in the CEA clearly preempts Wisconsin's effort to exercise that historic state police power.

#### 3. Exhaustion is irrelevant to the CFTC's preemption claim.

The CFTC alternatively argues that Wisconsin must "proceed[] through proper administrative channels" to challenge the CFTC's "determination about whether a contract is a swap" rather than "collaterally attack[]" that decision "using state gambling law." (CFTC Br. 50.) But this argument wasn't raised below, and so it shouldn't be considered either. *See Crothersville*, 168 F.4th at 493.

In any event, this failure-to-exhaust argument is irrelevant to the CFTC's only claim: that Wisconsin's sports betting laws are preempted here. (Doc. 1:26–29.) Maybe Kalshi could raise exhaustion as a defense against Wisconsin's enforcement actions, but the CFTC's claim rises and falls on

preemption alone. And although that claim implicates the meaning of "swap," by "bringing this lawsuit" and using "the CEA as a sword, rather than a shield" against Wisconsin, the CFTC has "invite[d] this [C]ourt ... 'to say what the law is.'" *Assad*, 2026 WL 2543846, *6 (citation omitted).

The CFTC's suggested alternatives are also illusory. As for the Administrative Procedures Act, it "limits judicial review to 'final agency action[s].'" *Menominee Indian Tribe of Wisconsin v. Env't Prot. Agency*, 947 F.3d 1065, 1069 (7th Cir. 2020). The CFTC doesn't identify any formal agency decision that Wisconsin could have challenged; the "self-certification" process that DCMs have used to list their sports-related event contracts (CFTC Br. 52) doesn't require any affirmative CFTC action. *See generally* 17 C.F.R. § 40.2. And as for a petition under 7 U.S.C. § 18(a) (CFTC Br. 52), those are for "violation[s]" of the CEA itself, and Wisconsin's enforcement actions target state gambling law violations.

* * *

Because the CFTC hasn't made a strong merits showing, Wisconsin should be allowed to continue enforcing its laws against illegal sports betting on prediction markets.

### B. The balance of equities further justifies denying a preliminary injunction.

The district court also properly exercised its discretion in finding that Wisconsin's interest in "exercising its traditional police powers to prevent the risks associated with gambling addiction" outweighs any harm the CFTC might be facing. (Doc. 54:27.)

#### 1. Sports betting on prediction markets harms Wisconsin.

Enjoining Wisconsin's effort to halt sports betting on prediction markets would inflict two meaningful harms on the State and its people.

First, "a State 'suffers a form of irreparable injury' any time a court enjoins it 'from effectuating statutes enacted by representatives of its people.'" *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *7 (6th Cir. Apr. 24, 2026) (citing *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (citation omitted) (Roberts, C.J., in chambers)).

Second, an injunction would "impede the State from furthering its gaming laws' public-welfare considerations like protecting 'young people' from 'addictive' habits." *Id.* The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders categorizes gambling disorder as an addictive disorder. (Docs. 32-4, 32-5.) A review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling problems among sports bettors is

at least twice as high as among gamblers in general," and "the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems." (Doc. 32-6:1.) And sports betting has financial harms too: "not only does sports betting lead to increased betting activity, but it also leads to higher credit card balances, reduced available credit, decreased net investments in financial markets, and greater participation in lottery play." (Doc. 32-7:35.)

#### 2. The CFTC identifies no counterbalancing irreparable harm.

On the other side of the ledger, the CFTC faces no irreparable harm for the same reasons it faces no Article III injury-in-fact (*see supra* Argument I.A.1), or at least none that outweighs Wisconsin's.

There's no real dispute that prediction markets are facilitating huge amounts of sports betting in Wisconsin and causing all the attendant social ills.[24] These concrete harms outweigh whatever time the CFTC has spent addressing Wisconsin's enforcement efforts or the supposed abstract "threat[]" those efforts pose to the sports betting market (CFTC Br. 55), which didn't even

[24] The CFTC briefly references "legalized online sports gambling by tribes" in Wisconsin (CFTC Br. 56), but that recently enacted state law requires amendments to tribal gaming compacts that haven't occurred yet. *See generally* 2025 Wis. Act 247; Wis. Dept. of Admin., Tribal Compacts and Amendments, https://doa.wi.gov/Pages/AboutDOA/TribalCompactsAndAmendments.aspx.

exist on DCMs two years ago. As for Kalshi's supposed harms (Kalshi Am. Br. 34–35), they're irrelevant because Kalshi's not a party. And even if it was, "Kalshi's financial harms are 'dwarfed by [a State's] interest in exercising its police power, enforcing its duly-enacted laws, and regulating sports gambling to promote the public welfare.'" *Schuler*, 2026 WL 1295806, at *7 (citation omitted).

## II. The district court rightly denied Kalshi's request to intervene.

The district court also correctly denied Kalshi's intervention request. If Kalshi had a right to intervene despite the CFTC's vigorous assertion of federal preemption, so too would anyone regulated by a challenged governmental power, or perhaps even anyone that might be affected by a precedential appellate decision. Rule 24 doesn't require that sweeping result.

### A. Kalshi doesn't have a right to intervene.

Kalshi's effort to assert the same preemption defense in two cases—both here and in the separate civil enforcement action—amounts to claim splitting that alone merits denying intervention as-of-right under Rule 24(a)(2). And Kalshi also doesn't satisfy two traditional Rule 24(a)(2) factors: this case won't impair Kalshi's interests because Kalshi can defend them in the enforcement action, and the CFTC is adequately representing Kalshi's interest in establishing preemption. *See Bost*, 75 F.4th at 686.

### 1. Kalshi seeks to split its preemption claim.

The rule against claim splitting targets "duplicative" suits where "the 'claims, parties and available relief do not significantly differ between the two actions.'" *Scholz v. United States*, 18 F.4th 941, 951 (7th Cir. 2021) (citation omitted). In other words, a party "cannot use a second lawsuit against [a defendant] to take another bite at the apple." *Id.* at 951 (citation omitted). Claim-splitting justifies denying intervention, since it would be futile for a party to intervene only to have their claim dismissed on these grounds. *Cf. United States v. Texas*, 181 F.4th 548, 554 (5th Cir. 2026) ("[O]ur sister circuits have long held that futility rules apply to both plaintiff-and defense-side intervenors …."); *U.S. Equal Emp. Opportunity Comm'n v. Fresh Venture Foods, LLC*, No. 21-CV-07679, 2022 WL 3137722, at *4 (C.D. Cal. May 24, 2022) (denying intervention on claim-splitting grounds).

Kalshi wants to make identical preemption arguments in two cases. Here's how Kalshi described the affirmative preemption defense it will assert in the State's pending civil enforcement action:

> [W]hether states may use state law to stop the trading of federally regulated derivatives on federally regulated exchanges, despite Congress's grant of exclusive jurisdiction over those transactions to the Commodit[y] Futures Trading Commission.

*State of Wisconsin v. Kalshi Inc., et al.*, No. 26-cv-378 (W.D. Wis.) (Doc. 68:8). And Kalshi describes its claim here in the same terms:

> Defendants may not enforce Wisconsin's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA,

(Doc. 23-1:28.) Kalshi can't get "another bite at the apple" in that way. *Scholz*, 18 F.4th at 951.

This kind of claim-splitting isn't allowed just because Kalshi is asserting preemption as an affirmative defense there and as an offensive declaratory judgment claim here. Just like an offensive claim, "[a]ffirmative defenses are pleadings and, therefore, are subject to all pleading requirements of the Federal Rules of Civil Procedure." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). And, just like an offensive claim, Kalshi bears the burden of proof on its affirmative preemption defense. *See Vill. of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 786 (7th Cir. 2008). That makes Kalshi's affirmative defense much like a counterclaim, to which the claim-splitting rule applies. *Cf. Nalco Co. v. Chen*, 843 F.3d 670, 674 (7th Cir. 2016); *see also Brandenburg Tel. Co. v. Sprint Commc'ns Co., L.P.*, 658 F. Supp. 3d 427, 470 (W.D. Ky. 2023) (preemption pleaded as both affirmative defense and counterclaim).

Below, Kalshi responded that it can split its claims because the CFTC is a party here (unlike in the enforcement action) (Doc. 43:5), but that can't be right. *Cf., e.g.*, *Ecolab Inc. v. IBA, Inc.*, 810 F. Supp. 3d 183, 193 (D. Mass. 2025) (holding that "addition" of new party "[did] not defeat the claim splitting

analysis”). Imagine the CFTC had never filed this case and Kalshi filed the same offensive preemption claim against the State—claim-splitting would surely apply there, and there’s no good reason the result should differ just because Kalshi instead seeks to join the CFTC’s case.

#### 2. This litigation won’t impair Kalshi’s asserted interests.

Kalshi’s theory that this case will impair its “business, compliance, and reputational interests” gets it backwards. (Kalshi Br. 20, 28–33.) Precisely because Kalshi *isn’t* a party here, any judgment won’t prevent Kalshi from asserting its preemption defense in the separate enforcement action. Although that case should be remanded to state court, nothing in *Ex parte Young*, 209 U.S. 123 (1908), suggests that state courts won’t give full and fair consideration to federal preemption defenses. (Kalshi Br. 31.) And denying intervention won’t “require[e]” Kalshi to “start over” through another suit to defend its interests. *Lopez-Aguilar v. Marion Cnty. Sheriff’s Dep’t*, 924 F.3d 375, 392 (7th Cir. 2019); (Kalshi Br. 30). Kalshi is defending those interests right now in that other litigation.

What Kalshi really means is that it has a right to intervene because this appeal will be precedential and bind the district court in the separate enforcement action. (Kalshi Br. 28–29.) Leave aside how, if that case is remanded, any decision here won’t bind the state court. *See Elections Bd. of*

*State of Wis. v. Wis. Mfrs. & Com.*, 227 Wis. 2d 650, 671, 597 N.W.2d 721 (1999) ("On federal questions ... [t]he value of the opinions of federal courts of appeals and district courts is limited to their persuasiveness."). And leave aside how preemption alone won't resolve that case anyway. *See, e.g.*, Wis. Stat. § 945.03(1m) (requiring proof of an unlawful "bet").

Even if this case might doom Kalshi's chances elsewhere, that "potentially affected by an appeal" theory would blow the doors off Rule 24(a)(2). If correct, anyone that might someday be affected by a precedential appellate decision has a right to intervene in the underlying district court litigation. Kalshi cites no authority to support that absurd result. Kalshi instead misconstrues *Lopez-Aguilar*, which mentioned a "concern with the stare decisis effect of a decision," but only in the context of a State seeking to intervene to vindicate its "sovereign prerogative" to compel "subordinate entities of state government to comply" with the State's "legislative policy directives." 924 F.3d at 387; *see also Smith v. Pangilinan*, 651 F.2d 1320, 1325 (9th Cir. 1981) (allowing Attorney General to intervene to represent the "interest of the United States"). Kalshi has no such sovereign interests here.

### 3. The CFTC adequately represents Kalshi's interests.

Kalshi also can't show that the CFTC won't "adequate[ly]" represent its interests. *Bost*, 75 F.4th at 686. Both Kalshi and the CFTC share the same interest in establishing preemption, and the CFTC is adequately defending

that interest through this case. Trusting the federal regulator that's asserting a preemption claim to do its job makes good sense; otherwise, "any private person with a concrete interest at stake [could] intervene in every suit against a public official" in a case like this. *Bost*, 75 F.4th at 692 (Easterbrook, J., concurring).

That's true even if the lowest "tier" of adequacy applies here, such that Kalshi must show only that the CFTC's representation "may be" inadequate. *Bost*, 75 F.4th at 688. Kalshi's main evidence is that it has received two CFTC orders that purportedly compelled Kalshi to continue ordinary operations in defiance of state court decisions. (Kalshi Br. 24–25.) Those orders just show that Kalshi and the CFTC are perfectly aligned on the core question here: whether prediction markets can continue doing business as usual, without regard to the States' gambling laws.

Aside from those two CFTC orders, Kalshi makes no effort to identify any specific ways in which the CFTC's posture or preemption arguments diverge from its own. Nor could it; the CFTC's brief and Kalshi's amicus brief make virtually the same preemption arguments. (*See also* Kalshi Br. 39 ("Kalshi does not anticipate asserting claims or seeking relief different in kind from that which the CFTC already seeks.").) That distinguishes this case from *Driftless Area Land Conservancy v. Huebsch*, 969 F.3d 742, 749 (7th Cir. 2020), where the intervenor raised "[d]ifferent defenses" than its regulator and needed to

defend its "authority to use eminent domain," a power the regulator didn't have. Kalshi is thus left to rely on how its interests arguably "diverge" from the CFTC's (Kalshi Br. 24), but a "comparison" of interests "alone cannot also make the showing required under the default rule to prove inadequacy." *Bost*, 75 F.4th at 690. That's enough to deny intervention-as-of-right, regardless of whether the higher tiers of adequacy apply to a preemption case like this one.

### B. Permissive intervention was also properly denied.

Kalshi also identifies no abuse of discretion in the denial of permissive intervention under Rule 24(b)(1), which would be a "very rare bird indeed." *Bost*, 75 F.4th at 691 (citation omitted). The district court fairly reasoned that allowing intervention would "delay decision" of the CFTC's preliminary injunction motion (Doc. 54:14), which was a proper factor to consider under Rule 24(b)(3). So too was considering the CFTC's "adequate" "representation of [Kalshi's] position" on the main preemption issue. (Doc. 54:14.) *See Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 803 (7th Cir. 2019). Combined with the court's "thorough consideration of the interests of all the parties," this suffices to show an appropriate exercise of discretion. *Id.* at 804 (citation omitted).

Kalshi main response misconstrues the district court's brief discussion of *Younger* abstention. The court didn't say it "would be *required* to abstain" from deciding Kalshi's claim (Kalshi Br. 37); it just "note[d]" that Kalshi's effort to

intervene mirrored what *Younger* prevents: "intru[sions] into civil enforcement proceedings." (Doc. 54:13.) This bolstered the court's main rationale: promptly resolving the CFTC's preliminary injunction motion would serve similar interests as *Younger* by allowing the State's separate enforcement actions to continue apace. That leaves Kalshi's implicit request that this Court rebalance the permissive intervention factors (Kalshi Br. 37–39), which isn't an appropriate use of abuse-of-discretion review.

## CONCLUSION

The decisions below should be affirmed.

Dated this 28th day of October 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Colin T. Roth
COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

LEWIS W. BEILIN
Assistant Attorney General
State Bar #1038835

Attorneys for the State Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636 (Roth)
(608) 957-5218 (Gibson)
(608) 266-3076 (Beilin)
(608) 294-2907 (Fax)
colin.roth@wisdoj.gov
charlie.gibson@wisdoj.gov
lewis.beilin@wisdoj.gov

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

> This brief contains 15,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

Dated this 28th day of October 2026.

s/ Colin T. Roth
COLIN T. ROTH
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on October 28, 2026, I electronically filed the foregoing Response Brief of the State Defendants with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 28th day of October 2026.

s/ Colin T. Roth
COLIN T. ROTH
Assistant Attorney General